Sheri Sawyer MADISON, Plaintiff,

v.

IBP, INC., Defendant;

**United States of America, Intervenor.**

No. Civ. 4–96–CV–20712.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 28, 1999.

Roxanne Conlin, Conlin & Assoc., PC, Des Moines, IA, for Plaintiff.

Don C. Nickerson, U.S. Atty., Des Moines, IA, for Intervenor.

Patricia A. Schoff, Davis, Brown, Koehn, Shores & Roberts, PC, Des Moines, IA, Thomas D. Hanson, Lu Ann White, Hanson, Bjork & Russell, LLP, Des Moines, IA, for Defendant.

## ORDER AND JUDGMENT ON POST-TRIAL MOTIONS, EQUITABLE RELIEF, ATTORNEY FEES AND COSTS

BREMER, United States Magistrate Judge.

Plaintiff, Sheri Sawyer Madison, asserted employment discrimination and retaliation claims against Defendant, IBP, Inc., under 42 U.S.C. §§ 1981, 1981a; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17; and the Iowa Civil Rights Act (ICRA), Iowa Code ch. 216. Judgment was entered on March 19, 1999, following a verdict in Madison's favor on all counts. Presently before the Court are the following: Plaintiff's Motion to Amend Judgment under Fed.R.Civ.P. 50, 58 and 59(e) (Clerk's No. 209); Defendant's Motion for New Trial under Fed.R.Civ.P. 59 (Clerk's No. 212); Defendant's Renewed Rule 50 Motion for Judgment as a Matter of Law (Clerk's No 213); Defendant's Rule 59(e) Motion to Alter or Amend the Judgment (Clerk's No. 214); Plaintiff's claim for equitable relief, including front pay

damages (Proposed Findings of Fact on Equitable Relief) (Clerk's No. 174); and Plaintiff's Application for Attorney Fees and Costs (Clerk's No. 215).

Hearings were held March 10, 1999, on the claim for equitable relief; on May 27, 1999, on the Application for Attorney Fees; and on July 30, 1999, for the remaining post-trial motions. On September 27, 1999, the Court granted the United States' motion to intervene to defend against Plaintiff's challenge to the constitu-tionality of the damages cap provision under 42 U.S.C. § 1981a(b)(3) (Clerk's No. 346). On October 18, 1999, the United States consented to proceed before a Unit-ed States Magistrate Judge; the other parties had consented on April 1, 1998. *See* 28 U.S.C. § 636(c). The United States' brief was filed October 18, 1999, and Plaintiff filed a supplemental brief in resistance to the United States' position on November 12, 1999. This matter is fully submitted.

## TABLE OF CONTENTS

I. Background and Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745
 A. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745
 B. Discovery Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745
 C. Verdict and Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749
 D. Evidence Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 750
 1. Madison's Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 750
 2. IBP's Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 751
 3. Madison's Work History at IBP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 751
 4. Complaint Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 764
 a. Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 764
 b. Presenting A Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 765
 c. Identifying the Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 766
 d. Investigating the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767
 e. Remedies, Including Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . 770
 f. Follow-up Monitoring; Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . 771
 5. Promotion Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 772
 E. Events After Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 775

II. Post-trial Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777
 A. Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777
 1. Motion for Judgment as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . 777
 2. Motion to Alter or Amend Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . 777
 3. Motion for New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778
 B. Madison's Motion to Amend Judgment Under Fed.R.Civ.P. 50, 58 and
 59(e) (Clerk's No. 209) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778
 1. Reduction of Damages Under 42 U.S.C. § 1981a(b)(3) . . . . . . . . . . . . . 778
 a. Waiver of Affirmative Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 779
 b. Constitutionality of Section 1981a(b)(3) . . . . . . . . . . . . . . . . . . . . . . 780
 c. Application of Cap to Individual Claims . . . . . . . . . . . . . . . . . . . . . . 780
 2. Reallocation of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 781
 3. Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 782
 a. Prejudgment Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 782
 b. Post-judgment Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 783
 C. Madison's Claim for Equitable Relief, Including Front Pay (Clerk's No.
 174) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 783
 1. Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 784
 2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 785
 D. IBP's Post-trial Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 786
 1. Motion for New Trial (Clerk's No. 212) . . . . . . . . . . . . . . . . . . . . . . . . . 786
 a. Constructive Demotion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 786

1) Errors in Submission ........................................ 786
2) Sufficiency of Evidence; Treating as Section 1981 Claim ......... 788
b. Punitive Damages ................................................ 789
c. Other Claims of Insufficient Evidence .......................... 793
1) Failure to Promote ........................................... 793
2) Hostile Work Environment .................................... 794
3) Retaliation ................................................. 795
d. Other Errors in Jury Instructions and Verdict Forms .............. 796
1) Preliminary Instructions .................................... 796
2) Submission of Claims ........................................ 796
a) Insufficient Evidence Supported Claims ...................... 796
b) Duplicate Damages ........................................ 797
3) Instruction on Undisclosed Evidence ......................... 798
4) Other Instructions, Verdict Form ........................... 799
e. Mistrial Motions and Trial Conduct .............................. 800
f. Errors in Evidentiary Rulings .................................. 801
g. Statute of Limitations .......................................... 802
h. Discovery Rulings ............................................... 804
i. Rulings on Motions in Limine ................................... 805
j. Errors in Rulings on Closing Arguments ......................... 805
k. Verdict ......................................................... 805
l. Jury Selection Process .......................................... 806
2. Motion for Judgment as a Matter of Law (Clerk's No. 213) .............. 806
3. IBP's Motion to Alter or Amend Judgment (Clerk's No. 214) ........... 806

III. Attorney Fees Award ............................................... 806
A. Lodestar ........................................................ 807
1. Hourly Rate ................................................... 808
a. Conlin ...................................................... 808
b. Duff ........................................................ 809
c. Associates ................................................... 809
d. Law Clerks and Legal Assistants ............................. 809
2. Reasonable Hours Spent ........................................ 810
a. Conlin ...................................................... 810
b. Duff ........................................................ 810
c. Associates ................................................... 810
d. Law Clerks and Legal Assistants ............................. 811
B. Claim For Fee Enhancement ....................................... 811
C. Claim for Expenses and Costs .................................... 811
1. Legal Standard ................................................ 811
2. Costs Claimed ................................................. 812
a. Investigative Work .......................................... 812
b. Copying/Printing ............................................ 812
c. Filing and Service Fees ..................................... 813
d. Deposition .................................................. 813
e. Trial Transcript ............................................ 813
f. Expert Witness .............................................. 813
g. Fax and Telephone .......................................... 814
h. Meals and Travel ........................................... 814
i. Witness/Mileage ............................................ 814
j. Postage Delivery ........................................... 814
k. Online Research ............................................. 814
l. Supplies .................................................... 814
D. Summary of Fees and Expenses Award ............................. 814

IV. Conclusion and Order ............................................. 815

## I. Background and Facts

This case was tried to a jury from February 8 to 26, 1999. The jury found in favor of Madison on all counts, and awarded a total of $2,412,417 in damages. The parties have timely filed post-trial motions.

### A. Procedural History

Madison filed a complaint with the Iowa Civil Rights Commission (ICRC), and simultaneously with the Equal Employment Opportunity Commission (EEOC), on January 13, 1995. She amended this civil rights complaint on April 3, 1996. She exhausted her administrative remedies, including participation in an ICRC mediation on August 25, 1995. She received a right-to-sue notice, and timely filed this action on September 18, 1996.

The case was initially to be tried on July 6, 1998. The parties consented to proceed before a United States Magistrate Judge on April 1, 1998; by agreement of the parties, the trial was rescheduled to January 25, 1999.

### B. Discovery Disputes

The discovery process began October 18, 1996, with Madison's serving of Interrogatories and Requests for Production of Documents. After several extensions, the deadline for the close of discovery was finally set for December 15, 1998. Discovery disputes escalated as the final push of trial preparation began, and new lead counsel began representing both parties.

On November 25, 1998, Madison filed a Motion to Compel. On January 7, 1999, Judge Walters issued a ruling partially granting the motion. Reviewing the documents IBP produced, Madison found that certain items were missing or incomplete. IBP amended its responses to discovery requests with newly discovered documents in January 1999, shortly before trial was to start.

On January 22, 1999, Madison filed a Motion to Strike the Answer, as a sanction for discovery abuses. Madison produced evidence indicating that many of IBP's failures to adequately respond to discovery requests were due to the company's procedures for responding to such requests, inadequate staff training, or the execution of its document retention policy, even when it resulted in the destruction of documents required by federal regulations to be maintained.

IBP's procedure for answering discovery requests began when the company's outside counsel forwarded the requests to in-house counsel. IBP's in-house counsel, Rosanne Lienhard (who took over case management in July 1998) explained IBP's process. Alberto Olguin, personnel manager at IBP Perry, and Bernielle Ott, EEO Coordinator at IBP's Dakota City, Nebraska, corporate headquarters, were asked to supply information. "They are the experts," noted Lienhard, because in-house counsel does not know what documents each department maintains. (Tr., Att'y. Lienhard, 2/28/99 at 237–39).[1] Outside and in-house counsel dealt directly with Ott and Olguin to prepare answers to the discovery requests. Some material that was responsive to requests for production, such as Ott's notes of telephone conversations with Madison, were produced to in-house counsel, but were never produced to Madison in discovery. (Tr., Ott, 2/10/99 at 99).

---

1. For easier reference, the transcript citations refer to the date of testimony as the volume, because some of the testimony was transcribed and filed as daily copy, and other parts were transcribed and filed in the order requested by the parties while briefing the post-trial motions.

Ott testified that she followed her typical process for answering discovery requests. Before she prepared discovery answers, Ott did not see a copy of the requests for production or the interrogatories. (Tr., Ott, 2/11/99 at 32–34.) Rather, IBP's in-house counsel asked her for specific information, which she forwarded to them. Since Ott did not see the actual discovery requests, she had no idea whether the material she provided was complete, and was unaware of the scope of the requests. (Tr., Ott, 2/11/99 at 36.) Ott described IBP's discovery response process as reminiscent of "playing telephone," with information passing from one person to another without checks for accuracy, resulting in miscommunication. (Tr., Ott, 2/11/99 at 129.)

Ott never saw any of Madison's supplemental requests for documents. *Id.* at 32–36. No one has ever told her that she has a duty to seasonably update answers to discovery in pending litigation, even though she has worked in IBP's EEO department since 1989. (Tr., Ott, 2/10/99 at 25; 2/11/99 at 32.) Additionally, Ott inadvertently omitted production of some documents, which no one noticed until the final days before trial. (Tr., Ott, 2/11/99 at 36.)

Ott stores certain data on computer disk, including the workforce analysis, a detailed report providing information on how many women IBP promotes at its Perry plant. Consistent with Federal Rule of Civil Procedure 34, Madison had requested data compilations as part of her Request for Production of Documents. Ott and IBP, however, produced only summary reports, not the detailed workforce analysis. Ott explained she failed to produce the workforce analysis because no one asked her to print out electronic data. (Tr., Ott, 2/11/99 at 49–51.) IBP's in-house counsel said the EEO department did not produce the electronic data, "because it

was kept on the computer, and it was not something that was ever printed." (Tr., Att'y Lienhard, 1/28/99 at 240.) Ott did not print the detailed reports until January 21, 1999, four days before trial was set to start, because, she testified, that is the first time in-house counsel asked her to print them. (Tr., Ott, 2/11/99 at 37.) Ott did not print the applicant tracking reports (consisting of applicant flow logs and a summary of positions for which Madison applied, and for which IBP still had documents) until January 28, 1999, because no one asked her specifically for those documents until then. (Pl.'s Ex. 589, at 1–62; Tr., Ott, 2/11/99 at 115–17.)

Another problem with IBP's discovery response involved the company's failure to produce all requested applicant flow logs. These logs documented not only who applied for and received jobs, but the contemporaneously recorded reasons for the successful applicant's appointment. When Madison filed her EEOC complaint on January 13, 1995, all the applicant flow logs for 1994, and very likely some from the end of 1993 existed, because IBP's document-retention policy calls for maintaining such documents for at least one year before destroying them. (Tr., Ott, 2/11/99 at 109; Tr., Olguin, 2/19/99 at 359; Pl.'s Ex. 22.) No one at IBP, however, prevented the destruction of these, and later, applicant flow logs, even though Madison had filed an EEOC complaint. Thus, applicant flow logs for 1993, 1994, 1995, and part of 1996 were destroyed. (Tr., Olguin, 2/19/99 at 348.)

Labor Relations Manager Lonnie Jepsen testified he was never advised to maintain notes, promotion information, or documents relating to an EEOC or ICRC discrimination complaint. He was unaware of any EEOC rule or IBP policy stating that such information should be preserved while an EEOC complaint was

pending. Jepsen thought that the filing of a lawsuit, not an administrative complaint, triggered the duty to preserve such documents. (Tr., Jepsen, 2/2399 at 23.)

Similarly, Ott testified that no one ever told her to preserve documents relating to Madison's EEOC complaint, the lawsuit, or discovery requests. (Tr., Ott, 2/11/99 at 107–10, 122.) Ott did not see Madison's complaint when she filed her lawsuit, so Ott was unaware of the scope of Madison's claims. (Tr., Ott, 2/11/99 at 115). Ott said she did not produce any applicant flow logs in response to the Request for Production of Documents, "any and all writings relating to promotions," because she never saw that request (Pl.'s Ex. 600) until trial, even though Madison served the request on October 18, 1996.

Olguin has served as personnel manager of IBP's human resources department in Perry from 1994 to the present. He, too, has never been instructed to update discovery answers, nor was he shown the actual discovery requests, but only responded to counsel's requests. (Tr., Olguin, 2/19/99 at 356.) When Olguin responded to discovery requests, he limited his search to 1994 and later, because that is when he became personnel manager. It "never occurred" to him to check earlier records kept in his office, because he thought they were irrelevant; he "didn't think that they mattered." (Tr., Olguin, 2/19/99 at 282, 289–90.)

Olguin produced a small file, which contained his personal notes of sexual harassment investigations. *Id.* at 283–84. He told counsel no other such documents existed. Olguin explained his failure to produce the several hundred pages of prior sexual-harassment complaints by saying he forgot to look in his office credenza, where the former personnel manager's records were stored. *Id.* at 281–82. His office contains only a credenza, a desk and two

file cabinets. *Id* at 282. Olguin testified that one of the file cabinets blocks part of the credenza, and because he does not routinely open the credenza, he forgot it contained reports from a major sexual-harassment investigation IBP conducted in 1992. The former personnel manager, Rex Hofer, testified that when he left IBP in 1994, he showed Olguin where all such reports and notes were kept in the office. (Tr., Hofer, 2/17/99 at 166.)

Although Olguin discussed the topics of applicant flow logs, EEO reports, and personnel-file maintenance at his deposition in March 1998, he did not produce additional documents that he knew existed because no one asked him personally for the documents. (Tr., Olguin, 2/19/99 at 283–85.) Madison did not file a Motion to Compel these materials until November 1998; counsel for both parties conferred informally to obtain complete document production before the Motion to Compel was filed. Olguin testified he did not understand the scope of the Requests for Production until shortly before trial, when lead counsel made it clearer to him (although discovery counsel had asked Olguin repeatedly for additional documents, and had questioned the paucity of documents he produced). Olguin then found the files in the credenza and produced them. *Id.* at 289. He testified he did not intentionally withhold documents.

When IBP's trial counsel visited Olguin's office on January 30, 1999, he found additional documents that were responsive to Madison's 1996 requests, but which Olguin had not considered relevant. IBP then produced these documents. *Id.* at 359.

John McNamara, a Perry plant manager who was the decision-maker on several promotions Madison did not get, testified he never received any training on the requirements for record retention after an EEOC complaint was filed or training on

record production. (Tr., McNamara, 2/18/99 at 145.) Thus, McNamara did not keep notes from promotion interviews with Madison in May 1996, or in August 1997, when she purportedly did not do well on a math problem he gave her. No one told him to save any promotion or test material related to Madison's EEOC complaint, even though this material had been requested, and was required to be preserved by IBP's own policies. *Id.* at 138–45.

Michael Miller, director of the training department, who investigated Madison's 1994 complaints regarding Supervisor Eugene Jackson, did not produce his personal copies of investigation notes, because no one directly asked him to produce or retain them. At the time of trial, he believed his handwritten notes no longer existed. (Tr., Miller, 2/12/99 at 60.)

Of the documents IBP produced concerning Madison's promotion applications, several records were missing or incomplete. IBP contended that missing or incomplete records were due to typographical errors or misfiling. (Tr., Olguin, 2/19/99 at 360–65; 2/22/99 at 400, 405–06.) For example, the July 1996 applicant flow log was not produced; the September 14, 1996, applicant flow log for the B-shift trainer job did not list Madison, who was an applicant; all applications were missing from the file for the supervisor job Gary Hedlund got on December 1, 1996; all internal applications were gone from the file for the training-supervisor job Michael Miller got in 1993; and the file for the 1995 hides-division superintendent job contained no resumes and no applicant flow log.

The filing system used by the IBP Perry human resources department had no central registry or database compiling discrimination and harassment complaints. The system thus provided no way for Olguin or others to verify the completeness of what was produced in discovery. As a result:

■ Records of sexual-harassment complaints for 1997 were produced only through July 17, 1997; Olguin believed workers made no more complaints the rest of the year, because none were in his file. (Tr., Olguin, 2/22/99 at 433.)

■ None of the 1995 sexual harassment complaints were produced due to how the complaints were filed. *Id.* at 427.

■ Only part of the sexual-harassment complaints for 1996 were produced; the rest were misfiled. *Id.* at 428.

■ No sexual-harassment complaints were produced for 1993, and Olguin was unsure whether any existed. *Id.* at 438.

■ The applicant flow log, resumes and internal applications for the trainer position awarded to Jose Fuentes in 1995 were missing from IBP's files; Madison's grievance over not getting the job was also missing, although the union's files contained a copy. (Tr., Jepsen, 2/23/99 at 81.)

To ameliorate discovery difficulties, the Court granted several of Madison's motions for supplemental discovery made in January 1999. Instead of striking the Answer, which Madison requested as a sanction for incomplete production of documents, the Court ordered production of complete personnel files to augment the redacted versions produced. The number of complete personnel files to be produced was expanded beyond the number previously ordered by Judge Walters. Next, additional documents and data were ordered to be produced based on discussions with counsel, and on IBP's disclosure that it still had documents it previously identi-

fied as nonexistent. (Tr., 1/20/99, at 49) (Clerk's No. 144.)

IBP produced many documents, some voluntarily and some compelled, in the 10 days before trial, and the company continued to produce documents during trial. On January 22, 1999, Madison agreed to a one-week continuance of trial to complete the document review. IBP was ordered to pay the fees and costs associated with the motions to compel, but Madison's counsel declined a fee award at that time (reserving the claim for the general fee award) and requested that IBP pay Madison one week's salary ($500) for the work time she would miss due to the delay. This motion was granted. (Clerk's No. 127, 1/27/99; Clerk's No. 147, 1/29/99).

Trial proceeded from February 8 to 26, 1999. In the first Final Pretrial Confer-ence Order (Clerk's No. 102, 1/14/99) the parties stipulated to certain promotions or positions for which Madison had applied. However, IBP moved on February 2, 1999, and again during the trial, to withdraw several of its stipulations (Clerk's No. 143, 2/1/99). By agreement of the parties, some stipulations were withdrawn. As a sanction for discovery abuse, other stipulations were not allowed to be withdrawn. The final version of the stipulation is contained in Exhibit 653.

## C. Verdict and Judgment

On February 26, 1999, the jury returned a special verdict form (Clerk's No. 196) finding IBP liable for causing a total $2,412,417 in damages to Madison on all claims in her Complaint. The damage amounts were distributed as follows:

A. *Sex Discrimination*
1. Backpay and benefits — $ 50,688.00
2. Emotional distress past — $ 10,000.00
3. Emotional distress future — $ –0–
4. Punitive damages — $ 364,000.00

B. *Sexual Harassment*
1. Backpay and benefits — $ –0–
2. Emotional distress past — $ 100,000.00
3. Emotional distress future — $ –0–
4. Punitive damages — $ 600,000.00

C. *Race Discrimination*
1. Back pay and benefits — $ –0–
2. Emotional distress past — $ 5,000.00
3. Emotional distress future — $ –0–
4. Punitive damages — $ 30,000.00

D. *Racial Harassment*
1. Backpay and benefits — $ –0–
2. Emotional distress past — $ 150,000.00
3. Emotional distress future — $ –0–
4. Punitive damages — $ 900,000.00

E. *Retaliation*
1. Backpay and benefits — $ 25,000.00
2. Emotional distress past — $ –0–
3. Emotional distress future — $ –0–
4. Punitive damages — $ 150,000.00

F. *Constructive Demotion*
1. Backpay and benefits — $ 979.00
2. Emotional distress past — $ 1,750.00
3. Emotional distress future — $ –0–
4. Punitive damages — $ 25,000.00

Verdict Damages Total: $2,412,417.00

Special Verdict Form (Clerk's No. 196.)

After the parties briefed and argued the issue of how to apply the damages cap set by 42 U.S.C. § 1981a(b)(3), the emotional distress damages and punitive damages awarded under Title VII were reduced to $300,000. Accordingly, on March 19, 1999, judgment was entered as follows:

A. *Sex discrimination/harassment*
 1) Backpay $ 50,688.00
 2) Emotional distress ($110,000.00)
 and punitive damages ($964,000.00) $ 300,000.00
 Subtotal: $ 350,688.00

B. *Racial discrimination/harassment, retaliation, and constructive demotion*
 1) Backpay $ 25,979.00
 2) Emotional distress $ 156,750.00
 3) Punitive damages $1,105,000.00
 Subtotal: $1,287,729.00

*Total judgment entered:* **$1,638,417.00**

Order and Judgment (Clerk's No. 204.)

At trial, Madison introduced testimony and other evidence from which the jury found that she was subjected to harassment and discrimination based on sex and race. Madison's evidence showed IBP's lack of prompt and reasonable response to her complaints, and to sex-and race discrimination complaints generally. Madison also presented evidence from which the jury found she suffered from retaliatory, adverse employment actions. Additionally, the jury found Madison was constructively demoted when she voluntarily downbid to avoid ongoing harassment and discrimination.

D. Evidence Presented

To aid in assessing the challenges based on sufficiency of evidence, the Court will review the evidence that Madison presented at trial to support her claims. IBP's witnesses denied much of the evidence supporting Madison's claims. The Court, however, finds it unnecessary to set forth IBP's evidence, because the jury assessed the witnesses' credibility and resolved relevant conflicting evidence in Madison's favor as demonstrated by the verdict. The Court reviewed the transcript to determine whether the verdict: (1) was against the greater weight of the evidence; (2) contained manifest errors of law or fact; or, (3) was based on a legally insufficient evidentiary basis.

1. Madison's Background

Sheri Madison is 30 years old, and lives in Perry, Iowa. Perry lies 40 miles from Des Moines, and has a population of about 7,500. Madison dropped out of high school in 1987, on her 18th birthday. She has worked at Hardee's Restaurants, Meadow Gold Dairy, and Breadeaux Pizza.

IBP has over 40,000 employees, and is the world's largest producer of pork and beef products. In 1989, IBP acquired and re-opened Perry's former Oscar Mayer plant. With approximately 1,000 employees in Perry, IBP has more workers than any other employer in town. IBP Perry's annual payroll totals about $30 million. In 1997, IBP had net earnings of $117,014,000 and total assets of $2,838,941,000. (Pl.'s Ex. 62.)

In 1989, IBP hired Sheri's boyfriend, James Madison, who had worked at Oscar

Mayer. With James' encouragement, Sheri applied for work at IBP and was hired on August 14, 1989, as a meatcutter. She was 20 years old.

Sheri and James began living together in 1989, and they married in 1996. Sheri is Caucasian, and James is African American. Periodically during this litigation, James and Sheri have separated, but they have reconciled and are presently living together. The couple have two children, James Jr., age 8, and Whitney, age 7. James currently works as a trainer in the maintenance department in IBP's powerhouse; his responsibilities include the plant's refrigeration systems.

In 1993, Sheri Madison enrolled in classes at Des Moines Area Community College (DMACC), while working simultaneously at Woodward Academy (a correctional facility) and IBP. This schedule, added to her family responsibilities, was too burdensome, and she dropped the classes and the Woodward Academy job. She later resumed school part-time, taking two classes, and in 1998 Madison received a General Education Development (GED) degree from DMACC. Madison testified that she wanted to complete an Associate of Arts degree at DMACC and pursue a career as a probation officer. IBP pays the tuition at DMACC for its employees. Madison has taken only two classes in the past 10 years. (Tr., Madison, 2/3/99 at 281, 284.)

Madison, a skilled meatcutter, belongs to the United Food and Commercial Worker's Union, Local 1149. She has served as a union steward. She presently operates a forklift in the box department.

### 2. IBP's Facility

IBP's Perry plant processes up to 885 hogs per hour, or 6,700 hogs a day, and spends $210 million annually for hogs and supplies. The plant has a ·"hot" side, where hogs are killed, and a "cold" side, where workers cut the hog carcasses. On the cold, or "cut," side, workers split hog carcasses on the main break line, and hog pieces move along various work lines on overhead hooks or table-level conveyor belts until they are fully trimmed and packaged under contract and United States Department of Agriculture· specifications.

Temperature on the cold side ranges from 34° to 45° F; the hot side can reach 110° F in the summer. Noise from fans and equipment sometimes exceeds 85 decibels on the shop floor, requiring workers to wear ear plugs. Employees testified that they could talk to, and hear, the two or three workers nearest to them. Workers also communicate through hand signs and signals. Because of the loud noise, employees customarily tap other workers on the shoulder to get their attention before speaking. At times, when not all the equipment is running, workers can hear what is being said in a wider area.

### 3. Madison's Work History at IBP

Madison liked her first job as a meatcutter on the cut-side jowl line. Her supervisors and co-workers who testified agreed that Madison had excellent knife skills, was a reliable worker, and produced a quality meat product. As a meatcutter, Madison wore a uniform and protective clothing, consisting of a white smock, hairnet, hard hat (various colors and stripes denote job assignment and status), ear plugs, mesh gauntlets, arm guards, and a mesh apron or belly guard. While on the cut line, Madison routinely worked significant overtime, earning up to an additional $8,000 a year on that basis. (Tr., Madison, 2/3/99 at 298; Pl's.Ex. 54A.) Madison was earning $10.38 an hour as a trainer, in 1997 she earned $26,560, which included $6,694 for 324 hours overtime and other

pay above her base amount. (Pl.'s Ex. 54A.) At the time of trial, Madison earned $9.60 an hour as a forklift operator. (Tr., Madison, 2/3/99 at 253.)

Madison regularly expressed an interest in getting a promotion. A line worker who qualifies for promotion generally moves up to a utility job. A utility worker fills in for line workers when they are absent, or on breaks. Utility workers must know all the line jobs so they can fill in where needed. The utility position is a step toward promotion to management-support jobs such as quality-control supervisor or trainer. Usually IBP chose as trainers only those who had experience as utility workers.

Madison produced evidence showing that men were regularly promoted or hired to positions over her, even though the men were less qualified than she was. Many of these failures to promote are listed below. IBP explained this situation by saying variously that Madison was not a team player, because she sometimes disagreed with supervisors; she bypassed the chain of command and used IBP's open-door complaint policy; she used vulgar language; she engaged in horseplay, which invited sexual harassment; she needed better math and communication skills; and she did not speak Spanish.

Evidence showed also that Madison complained to management about several incidents of race and sex discrimination, including harassment by co-workers and supervisors. Dissatisfied with management's response to her complaints, Madison tried to resolve workplace difficulties by confronting the persons involved, quitting, or downbidding to another job away from the immediate problem. After unsuccessfully trying all the informal and formal procedures available to her at IBP, Madison filed a complaint with the ICRC charging sex discrimination and harassment. She later added a claim of race

discrimination and harassment, based on treatment she received at work due to her association with her African–American husband and their children.

Madison identified the following examples of harassment and discrimination affecting her employment.

In 1989, in the presence of co-workers and supervisors, co-workers addressed Madison with derogatory and racist terms concerning her relationship with James Madison. (Tr., Madison, 2/2/99 at 24–26.)

Sometime between 1989 and 1990, Floor Supervisor Larry Sippel told Madison: "[W]omen don't belong in packing houses"; they are "whores or dykes" and "can't do physical jobs." (Tr., Madison, 2/3/99 at 245.)

In 1989, Supervisor Bill Teeples, in referring to Madison's relationship with James, asked her, "why are you with a fucking nigger?", and told her that "niggers and whites should stay with their own." (Tr., Madison, 2/2/99 at 25.) Madison did not complain to management, but requested a co-worker to ask Teeples to stop making such comments to her. (Tr., Madison, 2/2/99 at 28.)

From 1990 to 1992, while Madison was pregnant and after the birth of her children, co-employee Gary Laird harassed her about having biracial children. He made racist comments directly to her, or to her mother and sister, who also worked at IBP. Madison's mother provided childcare for the children, which Laird knew. He told Madison she "had ruined herself," by having children with a black man, and "what are you doing with a fucking nigger having fucking nigger babies." (Tr., Madison, 2/2/99 at 40.) Laird sometimes referred to Madison's children as monkeys and zebras, causing Madison to leave the line crying.

Gary Laird's comments were occasionally made in front of Floor Supervisors Sippel and Gordy Laird (Gary's brother), but the two supervisors did not intervene, even when they observed or were told that Madison left the line crying after comments by Gary Laird. (Tr., Madison, 2/2/99 at 41–46; Carlson, 2/5/99 at 112–14; Petro, 2/3/99 at 8.) Madison began working a different shift from Gary Laird in 1993, but Laird continued the verbal harassment whenever he saw Madison, her mother or sister, until after his 1998 deposition.

In 1990, Gordy Laird told Madison that she could not learn to skin hams because "that's a man's job." (Tr., Madison, 2/2/99 at 37–39.) Other supervisors, Eugene Jackson and John McNamara, expressed this opinion also. (Tr., Madison, 2/3/99 at 245.) Madison took it upon herself to learn this job anyway.

On April 3, 1991, Madison applied for a utility position. No records exist of Madison's application for the April 1991 utility job, except for a comment in notes from Madison's later job-exit interview. (Pl.s Ex. 1.) IBP gave the job to Am Lovan.

In April 1991, Madison complained to Gordy Laird that male workers were "sandbagging," not doing their work and letting the unfinished work pass down the line to her, so that in effect she had to do three jobs. In response to her complaints, Laird told Madison not to hold up production. The co-workers Madison implicated said to her, in front of Laird, "fuck you bitch." (Tr., Madison, 2/2/99 at 49.) When Madison asked Laird if he heard the remarks, he said, "well, if you would quit telling them what to do and do your own fucking job, you wouldn't have to worry about it." (Tr., Madison, 2/2/99 at 48–50.) Upset, Madison left the line, claiming sore wrists, and went to the nurse's office.

When she returned, Laird assigned her to picking fat, an undesirable light-duty job that was off the line. Madison complained to Laird that the job assignment was unfair, and it was retaliation to take her off the line due to male workers' harassment. IBP claimed the light-duty assignment was due to orders from the nurse, to avoid injuries to Madison's wrists. At trial, Madison maintained the nurse gave no such order; IBP had no record of the order in her file. (Pl.'s Ex. 1.)

Because of this treatment, Madison quit her job April 4, 1991. At her exit interview, she told Personnel Manager Larry Cleary that she had applied for promotions to a utility job and another bid job, but she had not been promoted due to sex and race discrimination. She also told Cleary that men on her line were not doing their jobs and were making racist comments about her. (Tr., Madison, 2/2/99 at 51; Pl.'s Ex. 1.) No investigation occurred.

In June 1991, Madison returned to work at IBP after Gordy Laird assured her that conditions would be better.[2] (Tr., Madison, 2/2/99 at 52.)

On December 31, 1991, Madison applied for a Trainer IV job, which was awarded to Roger Baumgardner. No records remain for 1991 to 1995 job applications, but the parties included this position in the pretrial stipulation. (Pl.'s Ex. 653 at ¶ 8.)

On March 10, 1992, Madison applied for a utility job. Rogilio Roman got the position. IBP could not produce Madison's application, but listed this job in the pretrial stipulation. (Pl.'s Ex. 653 at ¶ 10.)

On May 26, 1992, Madison applied for a utility position, which was awarded to Gary Flinn. (Pl.'s Ex. 534.)

---

**2.** Keeping turnover low is one measure of management success, because IBP must pay approximately $4,000 to train each new employee.

On June 25, 1992, Madison sought a trainer job that was ultimately given to Am Lovan. IBP could not find Madison's application, but included this position in the pretrial stipulation. (Pl.'s Ex. 653 at ¶ 9.)

In May 1992, Madison bid on a utility job, which Barbara Waldo got. Waldo was the first female utility worker on that floor. After Waldo was appointed, Madison saw male line workers harass Waldo. Gordy Laird, the supervisor, did not intervene to stop the harassment, and he expressed disapproval of Waldo's ability as a utility worker. (Tr., Madison, 2/2/99 at 60–61.) Due to the harassment, Waldo downbid off the job and returned to the line. (Tr., Waldo, 2/3/99 at 40–41.)

In March 1993, Madison wanted to switch assignments to learn shank boning, which would increase her chances for promotion. John McNamara and Eugene Jackson, Madison's supervisors, told her that shank boning was a "man's job," and women could not do it. Jackson required a trainer to certify her for the job, which was not typical. Jackson's action caused a delay for her pay increase until May 1993. (Pl.'s Ex. 1, at 188–91; Tr., Madison, 2/3/99 at 244.)

On July 30, 1993, Madison applied for a utility position, which was awarded to Robert Boyd. IBP was unable to produce Madison's application for the position. On August 5, 1993, Madison applied for a trainer job, which IBP awarded to Gary Flinn. The company could not produce her application for the trainer job.

On November 10, 1993, Madison applied for a utility job. Candido Morales, a male, got the job. (Tr., Madison, 2/2/99 at 69.) McNamara affirmed Morales' appointment without looking at both candidates' entire personnel files. Laird and McNamara testified that Morales had better knife skills, more seniority, better attendance, and more knowledge about various jobs than did Madison. In approving Morales' selection over Madison, McNamara relied on advice from Jody Schick, Jackson and Andy Ruetter concerning Madison's job skills. (Tr., McNamara, 2/18/99 at 90.)

Madison filed a sex-discrimination grievance with the union over IBP's failure to appoint her to the utility job. (Tr., Madison, 2/2/99 at 70.) Only then did McNamara read Madison's and Morales' entire personnel files. (Tr., McNamara, 2/18/99 at 95.) Morales actually had a significant discipline and absentee record. (Pl.'s Ex. 213.) The plant manager resolving Madison's grievance found she was qualified, and recommended that she receive the next available trainer position.

In December 1993, Madison bid on and received the next vacant trainer job. She became the plant's first female trainer on the cold side. (Tr., Madison, 2/2/99 at 77.) Madison's promotion to trainer caused resentment among utility workers, because she did not have experience as a utility worker before her promotion. (Tr., Madison, 2/2/99 at 73–76.)

From December 1993 to March 1994, Jackson and Madison continually clashed over the nature of her duties as a trainer. Madison complained to Mike Miller, her direct supervisor, about Jackson, the floor supervisor. Madison said Jackson assigned her to utility worker's duties, while Morales, still nominally a utility worker, performed the trainer's job. Madison told Miller that supervisors Jackson and Schick were discriminating against her because of her gender. (Tr., Madison, 2/2/99 at 77–79.)

On another occasion, Madison told Miller and McNamara she also believed Jackson disapproved of her social relationship with a black man, and that race, as well as gender, was a factor in their disagree-

ments over job assignments. (Tr., Madison, 2/2/99 at 103; McNamara, 2/18/99 at 110.) Jackson, who is African American, had told Madison she would not get special treatment because her boyfriend was black, and Jackson questioned whether races should mix, telling Madison his wife was black.

In February or March 1994, Madison complained to Assistant Personnel Director Sue Menhusen that Jackson treated her unfairly because of James Madison's race. (Tr., Menhusen, 2/16/99 at 81.)

Schick told Olguin that because Madison had a black boyfriend, Jackson did not like her. Olguin took no action, because Jackson denied discriminating against Madison. (Tr., Olguin, 2/19/99 at 311–13.)

From December 1993 to March 1994, certain line workers harassed Madison verbally and physically, grabbing her almost daily, sometimes in front of Line Supervisors Jackson and Schick. The workers would say, "fuck you bitch, suck my dick." (Tr., Madison, 2/2/99 at 86.) The harassing workers included Morales, who grabbed Madison's buttocks; Torres, who shoved her; and Gary Zierke, who bumped or rubbed his belly or genitals against Madison. (Tr., Madison, 2/2/99 at 85–95.) Once when Zierke inappropriately touched Madison in front of Jackson the supervisor refused Madison's request to help get Zierke to return to his work station. (Tr., Madison, 2/2/99 at 86.)

Madison complained to Miller that she received no help from Jackson and Schick when line workers harassed her. Madison complained that this harassment and disrespect interfered with her ability to do the training job. Jackson expressed displeasure that Madison went over his head to complain to Miller. (Tr., Madison, 2/2/99 at 99.) Jackson and Schick told Madison that if she continued to complain, "they could make her life miserable." (Tr., Madison, 2/2/99 at 80.) Miller told McNamara that Madison's complaints about Jackson were unfounded. He reported that the "grab-ass" and horseplay between Madison and co-workers was consensual and mutual. McNamara spoke to Madison and the male workers about "horseplay," but took no action against anyone, nor were Madison's complaints recorded in any of the male worker's files. (Tr., McNamara, 2/18/99 at 17–25; 105–109; Tr., Miller, 2/12/99 at 66.)

In February 1994, Madison complained to McNamara that Torres shoved her, said "fuck you bitch," and would not return to work on the line. McNamara replied that was "part of being a trainer," and that she had to get employees to do what she wanted them to do. (Tr., Madison, 2/2/99 at 89–90.) He told her that as a manager, she had to be able to take care of herself. He did not intervene. (Tr., Madison, 2/2/99 at 89.)

In March 1994, Jackson and Schick criticized Madison for leaving the line when authorized to do so, such as when another supervisor, Andy Ruetter, asked her to go to the knife room or return safety equipment, or when she left to talk to her supervisor, Miller. (Tr., Madison, 2/2/99 at 91; 96–97.)

From December 1993 to March 1994, line workers periodically instigated unscheduled work breaks by pulling a safety chain to stop the line, and when Madison restarted the line, the workers shouted at her, "fuck you bitch," "suck my dick," and *"pinche puta,"* which is Spanish for "fucking whore." [3] (Tr., Madison, 2/2/99 at 86.) When such incidents occurred, Jackson and Schick failed to stop the verbal harassment, and instead they yelled at Madison

---

**3.** Linton H. Robinson, Mexican Slang: A Guide 46, 48 (4th ed. 1998)

because production was interrupted. (Tr., Madison, 2/2/99 at 95–96.)

In March 1994, Madison complained to Miller about three male line workers—Ignacio,[4] Morales and Zierke—who were offensively touching her, and she again protested being assigned utility duties when male utility employees loafed. (Tr., Madison, 2/2/99 at 87.) Miller testified that he did not consider the information from Madison about offensive touching by line workers to be a complaint he was required to investigate. (Tr., Miller, 2/12/99 at 69.) Madison reported that Jackson and Schick saw Morales grab her buttocks whenever she went by. On March 18, 1994, Jackson—angry with Madison for "going over his head" with complaints—assigned her to utility jobs instead of training jobs. (Tr., Madison, 2/2/99 at 97.)

Madison again complained to Miller of sex and race discrimination, including harassment. The same day, Madison complained about Jackson's actions to Olguin. Madison alleged she was subjected to sex and race discrimination. She told Olguin she was prohibited from performing her job as trainer due to her gender, and that supervisors did not treat her as a "team player," which interfered with her ability to instruct workers. (Tr., Madison, 2/2/99 at 102–05.)

Madison sought Olguin's and Miller's approval of a transfer she had arranged by trading assignments with another trainer, which meant she would be working on the day shift rather than the night shift. Olguin and Miller asked Jackson if any race- or sex-discrimination problems concerning Madison existed, and whether Madison should be transferred. Jackson said no race- or sex-discrimination problems existed and that Madison should be allowed to

transfer. (Tr., Olguin, 2/19/99 at 311–14.) McNamara was aware that Madison was seeking the transfer due to her claim of sexual harassment. (Tr., McNamara, 2/18/99 at 18.)

After Olguin and Miller approved the transfer in March 1994, Madison returned to the day shift on Gordy Laird's line as, she thought, a trainer. Laird, however, did not want Madison to work for him as a trainer, and he told her to work the cut line in a utility position. Madison believed the supervisors now labeled her as a troublemaker. She noted that other trainers—all males—did not have to work on the cut line as often as she did. When Madison started to lift neck bones, Laird stopped her because, "that's a man's job." (Tr., Madison, 2/2/99 at 111.) After a discussion, Laird let her learn this job. (Tr., Madison, 2/2/99 at 109.)

After a few weeks, Madison complained about being used as a utility worker to Miller, who said he would do nothing, because a floor supervisor or the training department could put her on any line where a trainer was needed. Madison then complained to a union steward, saw the plant nurse, and took a sick day. At this point, because she was frustrated at not receiving the trainer assignment she believed Olguin and Miller had approved when she transferred from nights, she considered downbidding to a utility position. (Tr., Madison, 2/2/99 at 104–15.)

Madison next complained to McNamara that she was working the line instead of training. He told her to record her time as training, so it would be billed to the training department. (Tr., Madison, 2/2/99 at 117–20.)

Whenever Lyle Rychnovski, another trainer, could not keep up with his work, supervisors complained to Madison about

4. The record does not reveal Ignacio's last name.

his speed, and required her to redo his work in addition to her own. (Tr., Madison, 2/2/99 at 115–118.)

When line employees called Madison "fucking bitch" on a regular basis in front of Supervisors McNamara and Dan Hacker, the supervisors responded to Madison's complaints, "Welcome to being a manager." (Tr., Madison, 2/2/99 at 119.) When she asked if the supervisors heard how workers addressed her, McNamara replied, "If you want to be a supervisor, this is what you've got to put up with sometimes." (Tr., Madison, 2/2/99 at 119.) No IBP manager investigated or intervened to remedy the situation for Madison.

McNamara told Madison she was "too intimidating" to Asian male workers, and that she should defer to them in training more than she had done before. (Tr., Madison, 2/2/99 at 122.) He said she should keep in mind that in the Asian workers' culture, women walk behind men. He advised her to be "extra careful" around them. (Tr., Madison, 2/2/99 at 123.) Menhusen also advised Madison to not be assertive around Hispanic males, who might not be used to taking instruction from a woman. (Tr., Menhusen, 2/16/99 at 71.)

On April 16, 1994, Madison applied to be a cut-floor supervisor. IBP chose Gary Flinn for the job. (Tr., Madison, 2/2/99 at 126.) Flinn was hired in 1990, fired in May 1991 for excessive absenteeism, and rehired in July 1991. He became a utility worker in 1992 and a trainer in 1993. (Pl.'s Ex. 534.)

In April 1994, Madison applied for a job as converting-floor supervisor, but Darrell Hose got the job. IBP could not locate Madison's application. (Tr., Jepsen, 2/22/99 at 84–85.)

In October 1994, Madison applied for a quality-control position. IBP awarded the job to James Davis, whom Madison had trained. Madison challenged the decision, stating she had more seniority and job-related knowledge than Davis. The quality-control director said he believed Davis was a better choice for the job. (Tr., Madison, 2/2/99 at 123–125.) Madison did not grieve through the union or complain to the human resources department. IBP could not find Madison's application, but included the job in the pretrial stipulation. (Tr., Jepsen, 2/22/99 at 85; Pl.'s Ex. 653 at ¶ 17, Pretrial Stipulation.)

In November 1994, Madison applied for the supervisor job vacated by Schick. IBP did not interview or hire Madison. (Tr., Madison, 2/2/99 at 125.)

On December 22, 1994, Madison told Miller, Olguin and Plant Manager Larry Moser that she would downbid to a cut-floor utility position because her supervisors did not support her as trainer, and because she had to undergo sexual discrimination and harassment while she tried to train employees. McNamara said if she gave up the trainer job, she would never get a promotion from him. (Tr., Madison, 2/2/99 at 133.) The supervisors asked her to sign a statement saying she downbid voluntarily. Madison refused, stating her decision was due to discrimination. IBP conducted no investigation of her complaints. (Tr., Madison, 2/2/99 at 130–33; Tr., McNamara, 2/18/99 at 111–13.)

On December 22, 1994, Madison reported to Gordy Laird as a utility worker. She wore her trainer gear and a blue hat because the knife room, which stored safety equipment worn by utility workers, was closed. Laird told her, "Get your fucking ass in the knife room and get your fucking white hat on and get on the line." (Tr., Madison, 2/2/99 at 136.)

Laird would not authorize Madison to wear the blue stripes on her hat that

would designate her as a utility worker. (Tr., Madison, 2/2/99 at 133–38.) When Laird went on vacation, Supervisors Gary Flinn and Marty Godfrey authorized Madison to put utility-worker stripes on her hat, and they finished the paperwork for Madison's assignment. (Tr., Madison, 2/2/99 at 139.)

In January 1995, in an effort to improve efficiency, Laird changed the utility-worker assignment system. The former system called for job assignments by the supervisor, based on seniority; Laird's system required rotation. The change caused problems among some utility workers. One worker, Saul Villa, following Laird's rotation system, refused to go to a different job assignment, prohibiting Madison, who had more seniority, to have the first choice of jobs. (Tr., Madison, 2/2/99 at 142.)

Madison complained about Villa to Front Line Supervisor Marty Godfrey, taking a union steward with her as a witness. Godfrey thought that Villa's position was correct, and that the rotation system applied. The union steward, Sharon McCoy, believed the union contract called for seniority to be the basis for assignments. Laird disagreed.

During a break, Madison went with the union steward to Plant Manager Larry Moser, and told him that the new assignment system was different than when she last was on this shift. Madison asked, "[W]hy do the rules change when I'm involved?" (Tr., Madison, 2/2/99 at 149.) Madison told Moser that dissension on the line existed due to the rotation system, but that it seemed to be a problem only because she was involved. Moser ordered the former assignment system reinstated, overruling Laird's decision. (Tr., Gordy Laird, 2/17/99 at 40.)

Laird was angry with Madison because she had gone over his head. The reinstated seniority system gave Madison the work assignment that Villa preferred. Villa told her, "fuck you bitch, suck my dick." (Tr., Madison, 2/2/99 at 146.) Villa told Madison that she could complain about Villa's remarks to Laird, but that Laird would always side with him. Villa told Madison that since she was always in Gordy Laird's office complaining, she should "suck his dick" too. (Tr., Madison, 2/2/99 at 146–47.) Madison complained to Laird about Villa's comments and asked for help. Laird said he would talk to Villa, but he did not document any counseling or discipline. He also did not force Villa to rotate with Madison. (Tr., Madison, 2/2/99 at 145–149.)

On January 13, 1995, Madison filed a civil rights complaint with the ICRC. Union President Jim Olson helped her file the complaint. (Tr., Madison, 2/2/99 at 140.)

In 1995, Gary Laird continued harassing Madison. He remarked to her about her children, "How can you take them fucking niggers to the grocery store? I'd be embarrassed toting them fucking niggers around." (Tr., Madison, 2/2/99 at 46–47.) Laird also made racist comments to Madison's mother, sister, and other co-workers about how to care for Madison's children: "[J]ust lick their lips and stick them to the wall," and "Let them jump on the bed and put velcro on the ceiling." (Tr., Madison, 2/2/99 at 46.) Madison's family and friends told her about these comments. They agreed not to tell James Madison, however, to avoid the chance of any workplace altercation that could result in James' termination. (Tr., Madison, 2/2/99 at 46, 127–29.)

Madison and two co-workers, Rhonda Carlson and Tom Morrell, complained to Supervisors Gordy Laird, Larry Sipple, and Gary Flinn, and to Olguin about Gary Laird's racist remarks. The supervisors

took Gary Laird's remarks lightly. (Tr., Morrell, 2/4/99 at 7–8; Tr., Carlson, 2/5/99 at 112.) Once, when Carlson heard Madison tell Gary she would report him for making racist remarks, Gary replied, "I don't give a fuck." (Tr., Carlson, 2/5/99 at 113.) Carlson found it futile to complain about Gary to supervisors. (Tr., Carlson, 2/5/99 at 112–13, 160.)

From May through August 1995, Madison's co-worker Khristy Lovan overheard Gary Laird make racist comments about Madison's children in front of Supervisor Roger Baumgardner, who laughed and took no remedial action. (Tr., Lovan, 2/4/99 at 83.)

No supervisor took action regarding Gary's racist language until August 1995, when Gordy Laird told Gary to avoid Madison and her family. This meeting was undocumented until 1998. Gordy Laird testified that no one ever told him to follow up on complaints of sexual or racial harassment to see if the offending behavior had ceased. (Tr., Gordy Laird, 2/16/99 at 19.) At his deposition in 1998, Gary Laird admitted to continuing to make racist comments at IBP to Madison's mother and sister on a regular basis up to that time. (Tr., Gary Laird, 2/8/99 at 53–62.)

Throughout 1994 and 1995, Madison applied for supervisory openings, but did not get one. (Tr., Madison, 2/2/99 at 175–80.) On June 27, 1995, for example, Madison applied to be a cut-floor trainer. (Pl.'s Ex. 17.) When she learned Jose Fuentes would be awarded the job, Madison complained to Plant Manager Moser, who told her that although she had more seniority and had held the position previously, Fuentes was awarded the job because he was bilingual. (Tr., Madison, 2/2/99 at 150–53.) At some undocumented point in the mid–1990's, the trainer job announcements were changed to include "bilingual a plus" as one of the skills sought. Because the entire application file for this position is missing, it is unknown whether being bilingual was a skill listed when this job was posted in 1995. (Tr., Olguin, 2/19/99 at 259.) Moser also told Madison she had a bad attitude and complained too much. Madison testified that Moser said he would consider her for a promotion when she acknowledged him in the hallways, and acted more politely and displayed a better attitude than she had previously. (Tr., Madison, 2/2/99 at 154.) He advised Madison to put up with sexual and racial harassment as part of being a manager. (Tr., Madison, 2/2/99 at 155.)

On August 25, 1995, the ICRC hosted a mediation session to resolve Madison's complaint. Madison attended with Olson. (Tr., Ott, 2/10/99 at 47.) Ott, Olguin, Miller and Curtis Dixon represented IBP. Madison told IBP representatives about the pattern of sex and race discrimination, including harassment, to which she had been subjected, but she wanted the discussion to focus on IBP's failure to promote her to the trainer job given to Fuentes, which she identified as the most recent example of sex discrimination. She then asked for a trainer position, which IBP did not award her.

Following the mediation session, Ott told Gordy Laird to warn his brother Gary, not to use the word "nigger" around Madison or her family. (Tr., Ott, 2/11/99 at 75.) Gordy Laird met with Gary and told him to have nothing to do with Madison or her family members who worked at IBP. (Tr., Gordy Laird, 2/16/99 at 58, 62, 140.) This meeting is not documented or noted in Gary Laird's disciplinary file until after his 1998 deposition. (Tr., Ott, 2/11/99 at 76; Tr., Gary Laird, 2/8/99 at 58; Tr., Gordy Laird, 2/16/99 at 48.)

In September 1995, Madison filed a union grievance concerning IBP's failure to promote her to the cut-floor trainer job

given to Fuentes. IBP denied the grievance. Moser stated Fuentes received the trainer position because he had more job knowledge and seniority than did Madison. (Tr., Madison, 2/2/99 at 150–158; Pl.'s Ex. 45.) In November 1995, IBP denied Madison's appeal, again citing seniority as the reason for the decision. (Pl.'s Ex. 45.) Olguin and Jepsen testified that seniority is not a factor in appointment to trainer positions. (Tr., Olguin, 2/19/99 at 299; Tr., Jepsen, 2/23/99 at 30.)

From December 1994 to March 1996, Madison was subjected to regular verbal and physical abuse. Line workers threw blood clots at her, grabbed her buttocks and breasts, rubbed up against her, and humped her leg, and Marcelino Alarcon carried her around. (Tr., Madison, 2/2/99 at 159.) Certain workers called Madison vulgar names. Villa told her, "all American women are whores." (Tr., Madison, 2/2/99 at 165.) Madison complained directly to these men, telling them to stop, and to her supervisors. At times, these incidents were witnessed by supervisors Gary Flinn and Marty Godfrey, who did not intervene, in spite of Madison's direct request for help, such as when she told the supervisors to "get him [Alarcon] away from me before I hurt him." (Tr., Madison, 2/2/99 at 164.) To stop the men from harassing her, Madison kneed the harassers in their groins.

The supervisors told everyone to stop the "horseplay." Gordy Laird gave Villa and Gregario Sarcino a verbal warning notation on their records for sexual harassment. There is no counseling noted in Alarcon's file. (Tr., Madison, 2/2/99 at 161; Tr., Olguin, 2/19/99 at 278; Pl.'s Ex. 215, 219, 220.) Madison was not given a disciplinary report for the "horseplay." Laird, however, told Madison that if she continued to complain, he would see that she was written up for discipline, as having "started it"; and that for each complaint she

made against a male worker, he would give her a disciplinary report, so that accruing reports would quickly lead to her dismissal. (Tr., Madison, 2/2/99 at 160–63.)

On February 1, 1996, IBP appointed Gary Hedlund as cut-floor supervisor. Madison may have applied. No completed application forms for this job remain in IBP's files.

In February 1996, Madison complained to Moser that Alarcon had repeatedly grabbed her. Madison tried to avoid Alarcon, but was required to give him breaks from the line. He continued to grab her when she worked near him. Alarcon's actions affected Madison's work, and she always brought a witness when she had contact with him. She asked Godfrey to stop Alarcon from grabbing her, but Godfrey just laughed. (Tr., Madison, 2/2/99 at 164.) In response to Madison's complaints about Alarcon's behavior, Supervisor Moser told Madison the world was not perfect, and that if she wanted to be a manager, she would have to "deal with it." (Tr., Madison, 2/2/99 at 162–63.) Alarcon was not disciplined for his actions toward Madison. (Pl.'s Ex. 220.)

On February 9, 1996, Madison complained again about physical and verbal sexual harassment by Villa, Sarcino, and Alarcon. Madison told Olguin these men were harassing her and other women on the line, by calling them vulgar names; grabbing them; carving hog fat into penises that they sent down the line to female workers; and starting rumors that two of the women, Esmeralda Garrido and Eva Salcedo, were having an affair with Supervisor Godfrey. (Tr., Madison, 2/2/99 at 169–170.) The other two women went with Madison to complain to Olguin. The women brought the union steward as a witness. Olguin said the male workers would be disciplined "this time." (Tr., Madison, 2/2/99 at 170.) The three men

received verbal warnings for starting rumors and "horseplay." (Tr., Madison, 2/2/99 at 169; Tr., Olguin, 2/19/99 at 329; Pl.'s Ex. 26.)

In March 1996, Madison took a lateral transfer to work in the laundry room to learn more jobs to increase her chance for promotion. (Tr., Madison, 2/2/99 at 174.) The laundry room adjoined the men's locker room, which contained graffiti on the lockers, including gang signs, signs depicting KKK, swastikas, and the term *puta,* which is Spanish for "whore."[5] Madison complained about the graffiti to Grothe, who took no action in response to her complaints. (Tr., Madison, 2/2/99 at 204.) Grothe noted the company repaints lockers regularly. (Tr., Grothe, 2/9/99 at 61, 74.) Morrell testified that between 1996 and 1998, he saw racial slurs such as, "the only good nigger is a dead nigger," and racial epithets written in English and Spanish on the lockers. (Tr., Morrell, 2/4/99 at 25.)

On April 3, 1996, Madison amended her ICRC complaint to add a racial discrimination and harassment claim. (Tr., Madison, 2/3/99 at 326.)

On April 18, 1996, at Gordy Laird's request Madison returned to the cut floor as a utility worker. On one occasion, Godfrey assigned Madison to rework product. Reworking is a quality-control process in which workers spot check cryovac-packaged meat for air pockets. Laird thought Madison was working too slowly. He told her to work faster by checking fewer boxes than quality-control rules required. A quality-control inspector saw Madison checking fewer than the required number of boxes. The inspector reported Madison to Laird, who wrote a disciplinary report on Madison for "failure to follow instructions." (Pl.'s Ex. 1G.) Madison grieved this discipline, and the grievance was de-

nied. (Tr., Madison, 2/2/99 at 175–78; Pl.'s Ex. 1G; Pl.'s Ex. 605.)

On April 26, 1996, David Pfalzgraff was appointed cut-floor supervisor, a job for which Madison applied and received an interview. (Tr., Madison, 2/2/99 at 178.) She complained to Laird. On the applicant flow log, it was noted that Pfalzgraff "has most experience in management," while Madison had "poor attendance and poor work history." (Pl.'s Ex. 589.) Madison believed she was more qualified than Pfalzgraff for the job. Discouraged, Madison asked Olguin if he thought she would ever be promoted. (Tr., Madison, 2/2/99 at 179–80.) He suggested she keep trying.

On June 17, 1996, Jose Fuentes was promoted to a quality-control job for which Madison may have applied. At the time of trial, Madison's application was missing from the files. (Tr., Jepsen, 2/23/99 at 9.)

On June 24, 1996, Madison applied for a management-support job in the knife room, at the urging of Gordy Laird and Steve Keifer. They said more experience in a management-support position would make her more eligible for promotion. Moser, however, appointed Bacaam to the job. (Tr., Madison, 2/2/99 at 178–182.)

On July 12, 1996, Madison applied for a trainer position; she did not receive an interview. Jesus Torres got the job. (Tr., Madison, 2/2/99 at 184.) Madison filed a grievance with the company and union. She was awarded a B-shift trainer position in September 1996, nearly two years after she downbid from her first trainer job to a utility position to escape discrimination and harassment. (Tr., Madison, 2/2/99 at 185, 194; Pl.'s Ex. 44, 46.) On September 5, 1996, her first day as B-shift trainer, Madison had a heated argument on the floor with Supervisor Deb Cook over

---

5. Robinson, *supra,* note 3, at 46.

whether Madison would act as a trainer or utility worker.

During September 1996, in her capacity as a union steward, Madison intervened with Gordy Laird on behalf of Rhonda Carlson. (Tr., Madison, 2/2/99 at 187; Tr., Carlson, 2/5/99 at 129–30.) Laird had awarded a utility job to a male line worker with less skill and seniority than Carlson, who had also applied. Laird told Madison he did not promote Carlson because she could not pull ribs, which is "a man's job." (Tr., Madison, 2/2/99 at 188; Tr., Carlson, 2/5/99 at 130.) Madison enlisted the help of Menhusen, who told Laird he had to let Carlson try the rib-pulling job, and that he could not discriminate based on sex. (Tr., Madison, 2/2/99 at 188; Tr., Menhusen, 2/16/99 at 75.) Laird was not disciplined for this incident. IBP gave Carlson the next available utility position a few weeks later. (Tr., Carlson, 2/5/99 at 132.)

On September 18, 1996, Madison filed her Complaint in the United States District Court.

On September 25, 1996, Deb Cook wrote a disciplinary report on Madison for insubordination in connection with their September 5 argument. Madison grieved this discipline as untimely and unwarranted. (Pl.'s Ex. 29.) IBP ultimately granted Madison's grievance.

In November 1996, McNamara gave Madison a disciplinary report for smoking in the knife room. Madison maintained that three male employees were also smoking there, but were not disciplined. McNamara said he did not see anyone else smoking. Madison grieved the disciplinary report, and Menhusen said she would void the report. (Tr., Madison, 2/2/99 at 193; Tr., McNamara, 2/18/99 at 122.) It remains in Madison's file. (Pl.'s Ex. 1, p. 155; Pl.'s Ex. 605.)

In October 1996, Madison applied for a quality-control vacancy. (Tr., Madison, 2/3/99 at 254.) Supervisor James Frye filled the vacancy by appointing Aaron Muhr, who was a utility worker on probation for attendance problems. (Tr., Madison, 2/2/99 at 200, 254.) Madison's application is missing from the file. (Tr., Jepsen, 2/22/99 at 12.) Madison's supervisors Moser and Sutherland would have had input into this decision.

On December 1, 1996, Madison applied for a B-shift cut-floor supervisor's job, to which Gary Hedlund was appointed. (Tr., Madison, 2/2/99 at 201; Tr., Madison, 2/3/99 at 254.) The file does not contain Madison's application, but the parties stipulated that she applied. (Tr., Jepsen, 2/22/99 at 12–13; Pl.'s Ex. 653 at ¶ 31.)

On January 2, 1997, Madison, as union steward, presented line workers' complaints to Olguin about mandatory overtime worked on December 31, 1996, due to the speed of the line run by Supervisors Tom Ford and McNamara. All the workers reported to work early to attend a meeting to address these complaints. McNamara and Ford forbade Madison to attend the meeting, and they assigned her to work in the box room during the meeting. (Tr., Madison, 2/2/99 at 206.) Madison thought McNamara and Ford were retaliating against her because of her civil rights complaints and union activity.

In March 1997, Madison, as union steward, presented Olguin complaints on behalf of newly hired workers who believed Ford promised them a higher pay rate than they were getting. Madison backed the workers' claims. (Tr., Madison, 2/2/99 at 208; Pl.'s Ex. 23.) Madison's actions caused more friction with Ford. (Tr., Madison, 2/2/99 at 209–212.) He asked her to meet with him in his office after the shift ended. When Madison arrived, Ford was talking in his office with McNamara, but neither

supervisor acknowledged her. After waiting 20 minutes to meet with Ford, Madison was called away by Pfalzgraff to attend another meeting. Ford wrote Madison a disciplinary report and a one-day suspension on March 12, 1997, for not meeting him at his office. In anticipation of retaliation from Ford, Madison, however, had arranged for witnesses who verified that she reported on time to Ford's office for the meeting. Madison grieved Ford's March 12 discipline, and it was ultimately voided. (Tr., Madison, 2/2/99 at 210–212.)

In June 1997, Madison applied for a cut-floor supervisor job, which was given to Fuentes.

In July 1997, Madison applied for the kill-floor supervisor job, which was given to Mike Costello. This was the last promotion for which she applied. Supervisor Grothe testified that it "never occurred to him" to ask Madison why she stopped applying for promotions. (Tr., Grothe, 2/9/99 at 99.)

In September 1997, Madison was asked to fill in as a trainer on the kill floor. Because McNamara was supervisor on the kill floor, Madison declined to fill in as trainer, to avoid confrontation or further difficulties. (Tr., Madison, 2/2/99 at 212.) After Miller told her the assignment was ordered by Grothe, Madison took the assignment. To avoid complaints from McNamara, Miller explained to him that Madison was the next available trainer. (Tr., Madison, 2/2/99 at 212–13.) Madison worked for McNamara for two months. As requested, she reported to Grothe and Miller her observations about poor working conditions on the kill floor.

In November 1997, Miller asked Madison to transfer from the night-time, B-shift trainer job, to a daytime A-shift trainer job. IBP was closing the night shift and transferring the majority of employees to days. Workers with the most seniority,

however, could choose the shift they wanted. To accommodate Miller, Madison agreed to make a temporary shift change, but only after Miller assured her she could switch back to the night shift in summer 1998 so she could take college classes. (Tr., Madison, 2/2/99 at 215.)

In June 1998, despite Miller's earlier promise that Madison could return to working nights in her trainer position, IBP denied Madison a transfer back to the B-shift. Miller denied promising the shift change to Madison. Olguin and Miller told Madison the only way she could transfer was by using seniority rights to bump the current night trainer, but Madison believed that would create friction within the training department, and Grothe told her it would be unfair if she used her seniority rights to bump the night trainer. (Tr., Grothe, 2/9/99 at 77.) Olguin gave Madison another option: She could transfer to the night-shift as a "nonjob owner," which meant she might be assigned to any task, and would have no specific assignment. Madison declined to transfer as a nonjob owner. (Tr., Madison, 2/2/99 at 214; Tr., Madison, 2/3/99 at 253.)

From November 1997 to September 1998, while Madison was working on the A-shift, Gary Laird continued to make comments about the appearance of her children, using epithets such as "nigger," "monkey," "zebra," and "jungle bunny"; voice opinions that "niggers are only good for welfare and prison"; and make other offensive comments. Madison asked Gordy Laird to stop his brother Gary from making such comments to or near her. Gordy Laird, however, did not intervene. (Tr., Madison, 2/2/99 at 218–219.) Madison testified that these comments were degrading and humiliating, and occasionally caused her to leave the line crying. (Tr., Madison, 2/2/99 at 222.)

In September 1998, Madison downbid to a job as box-room forklift operator, the position she currently holds. (Pl.'s Ex. 1.) Madison believed downbidding was her only viable option for returning to the night shift. By returning to the night shift, Madison could escape the offensive environment and take college classes. The forklift job paid about $0.80 per hour less than a trainer position.

On December 22, 1998, while Madison attended the court-ordered settlement conference in this case, Supervisor Ford wrote three disciplinary reports for Madison being a "no-call, no-show" to work as assigned. (Tr., Madison, 2/3/99 at 269; Pl.'s Ex. 64.) Discipline relating to attendance proceeded in points, with 14 points resulting in discharge. The three reports Ford wrote totaled eight points. (Tr., Grothe, 2/9/99 at 72.) Madison refused to sign the reports, because Ford had orally given her permission to miss work for the settlement conference. She believed the reports were part of a continuing pattern of retaliation for her EEOC complaint and this lawsuit. Ford claimed he forgot to record Madison's oral leave request and his oral authorization for her to attend the settlement conference, and when she did not come to work, he proceeded with discipline. Madison had to grieve the disciplinary reports, before they were voided from her record on January 5, 1999. (Tr., Madison, 2/3/99 at 267–69; Tr., Grothe, 2/9/99 at 72–73; Pl.'s Ex. 64.)

On January 23, 1999, Madison was in the knife room with Khong Bacaam. He was later charged with a crime alleged to have occurred in the knife room on that date. IBP's investigation included asking Bacaam about Madison's culpability, if any. Because the trial would start within days, and the parties were heatedly disputing discovery and other issues, IBP did not interview Madison about the alleged crime that occurred on January 23, 1999. Later, at the front-pay hearing, IBP pointed to Madison's proximity to the criminal activity and the fact she did not report the crime as evidence of her lack of management qualities. (Tr., Att'y. Hanson, 3/10/99 at 11.) Madison denied seeing any criminal acts by Bacaam on January 23, 1999. (Tr., Madison, 3/10/99 at 29.) Because the criminal matter was pending during Madison's trial, this Court's record about the investigation and incident was sealed.

### 4. Complaint Process

IBP's written policies prohibit sex and race discrimination, including harassment. (Pl.'s Ex. 25.) IBP also maintains an affirmative action plan for each plant, including Perry (Pl.'s Ex. 502.) Madison produced evidence, as outlined below, showing implementation of these policies is hampered by procedures used by IBP's corporate and Perry management, combined with managers' lack of knowledge about recognizing and preventing discrimination and harassment.

### a. Training

IBP notified and trained most employees concerning the discrimination and harassment policies only at new-employee orientations. (Tr., Hofer, 2/16/99 at 147; Tr., Grothe, 2/9/99 at 109.) Managers got additional training during a two-hour annual program on "Legal Aspects of Supervision" provided by Ott, which covered a variety of topics. (Tr., Ott, 2/11/99 at 64–65; Tr., Olguin, 2/19/99 at 250; Tr., Grothe, 2/9/99 at 107.) Ott believed many sexual-harassment complaints were merely cultural misunderstandings, because many IBP workers came from countries where people did not understand sexual harassment. (Tr., Ott, 2/11/99 at 82.) Ott testified, "These people don't even have gar-

bage pickup, so they don't realize you can't treat women this way." (Tr., Ott, 2/11/99 at 82.)

Managers were to send employees who complained of sexual harassment to the human resources department. (Tr., Ott, 2/11/99 at 64–66; Tr., Grothe, 2/9/99 at 51.) Ott believed that when Olguin handled a harassment complaint, he should first counsel both the complainant and alleged harasser.

Although IBP maintained it enforces its policies against sexual and racial harassment and discrimination, Madison provided evidence that supervisors are not trained to enforce the policies, including the affirmative-action plan. Only Ott, for example, mentioned, IBP's affirmative-action plan as a criteria for performance reviews of supervisors. (Tr., Ott, 2/11/99 at 78.) Testimony indicated that Gordy Laird's efforts to promote women and minorities under the affirmative-action plan were congratulated in his annual review for 1994–96. (Tr., Laird, 2/16/99 at 160–62.) All other managers who testified said their goals and employee evaluations were based on productivity and profitability; they mentioned no civil rights criteria. (Tr., Menhusen, 2/16/99 at 67; Tr., McNamara, 2/18/99 at 55, 80; Tr., Gordy Laird, 2/16/99 at 163; Tr., Grothe, 2/9/99 at 57.) One manager, McNamara, said that although he received training about parts of the EEO guidelines, he had never seen an EEO manual, (Pl.'s Ex. 25), nor been trained in document production or retention when a complaint or lawsuit was filed. (Tr., McNamara, 2/18/99 at 138–145.) IBP never trained Miller, who investigated some of Madison's complaints, to investigate or document complaints of discrimination or harassment. (Tr., Miller, 2/12/99 at 92.)

b. Presenting A Complaint

IBP maintains it has an "open door" policy, under which an employee can complain about any job-related issue to any manager any time. (Tr., Olguin, 2/19/99 at 249; Tr., Grothe, 2/9/99 at 52; Tr., Jepsen, 2/22/99 at 55; Pl.'s Ex. 1.) In practice, however, some employees were unaware they could bypass their direct supervisor with a complaint. For other employees, a problem could arise if they were perceived as going outside the chain of command. (Tr., Olguin, 2/19/99 at 249.) Madison, for example, was criticized for going over her immediate supervisor's head with ·a discrimination complaint. (Tr., McNamara, 2/18/99 at 51, 80–82; Tr., Ott, 2/11/99 at 20, 94; Tr., Jepsen, 2/22/99 at 42–43.)

From approximately February 1994 until recently, employees who complained of unlawful discriminatory treatment, including harassment, were asked to sign a form that cautioned, "I understand that any future violations of this policy will result in discipline, up to and including termination." (Pl's.Ex. 528.) The form also contained Ott's telephone number and advised the victim of his or her "rights and obligations." (Tr., Ott, 2/11/99 at 17; Tr., Olguin, 2/19/99 at 268; Tr., Menhusen, 2/16/99 at 104.)

Olguin testified that Perry IBP used this form when he came in 1994, and he did not change it. (Tr., Olguin, 2/22/99 at 435.) Jepsen testified that he used a similar form when working as a personnel manager at other plants, and he considered the form an appropriate way to provide Ott's telephone number to victims. (Tr., Jepsen, 2/22/99 at 56.) Considering issues raised in this litigation, however, he came to view the form as intimidating, and has ordered its use stopped. (Tr., Jepsen, 2/23/99 at 49.)

The complainant's signature on the form resulted in a "counseling for sexual harass-

ment" notation being placed in the disciplinary part of the complainant's personnel file. (Tr., Grothe, 2/10/99 at 247–50.) Plant Supervisor Grothe explained that both the complainant and the alleged harasser received a counseling notation in their file, "so we have a written record that they were a part" of the incident, or to designate that they were "involved in a situation." (Tr., Grothe, 2/10/99 at 247–49.)

Counseling is the first step in the progressive discipline system, a record of which was stored on computer. (Tr., Grothe, 2/10/99 at 170–71; Tr., Olguin, 2/19/99 at 297–98.) Although a manager could view an employee's complete file in the personnel office, in making employment decisions, managers generally checked only the computer. The computer screen showed the notation "C," for "counseling," on a complainant's, as well as the harasser's, record. Without checking further, a manager who saw a "C" on an employee's record, would not know whether the employee was the complainant or the harasser. Disciplinary reports involving counseling are a factor in promotion decisions.

Hofer, personnel manager at IBP Perry from April 1992 to February 1994, did not ask complainants to sign the sexual-harassment form and did not put counseling notations in complainants' file, because he believed those procedures discouraged employees from submitting complaints. (Tr., Hofer, 2/16/99 at 157–58.)

c. Identifying the Problem

Managers frequently did not consider the identified problem behavior to be harassment. For example:

■ Training Supervisor Miller, who admitted Madison told him of co-workers grabbing her and calling her offensive names while she worked on the B-shift, said he did not consider Madison's statements to be a sexual-harassment complaint, and he did not investigate. (Tr., Miller, 2/12/99 at 69.)

■ Miller told Olguin that employee Lisa Remark reported Madison was a participant in "grab-ass" on the line; neither Miller nor Olguin investigated employees' participation in such behavior, however, because no men had complained about Madison's purported actions. (Tr., Olguin, 2/19/99 at 312.)

All witnesses who testified about coarse language at the plant noted that vulgarity, profanity, and "rough language" were commonplace among both employees and supervisors, as illustrated by the following:

■ Everyone uses such language (Tr., Jackson, 2/11/99 at 169);

■ rough language is "typical" (Tr., Baumgardner, 2/12/99 at 118);

■ "fuck" is normal packing-house language (Tr., Baumgardner, 2/12/99 at 130);

■ profanity is commonplace and used by line workers and supervisors (Tr., Grothe, 2/9/99 at 119–20);

■ all line workers and supervisors use profanity (Tr., Lovan, 2/4/99 at 85);

■ sexually explicit drawings are in locker rooms (Tr., Morrell, 2/4/99 at 29);

■ use of profanity, including the word "fuck," by supervisors and co-workers is commonplace (Tr., Gordy Laird, 2/16/99 at 85);

■ "fuck you" and "suck my dick" are said daily by line workers in front of supervisors (Tr., Waldo, 2/3/99 at 34);

- "normal profanity" is used daily at the packing-house (Tr., Pfalzgraff, 2/11/99 at 138–39); and
- profanity is typical packing-house language (Tr., McNamara, 2/18/99 at 105).

At the trial, Madison explained she did not complain about "fuck" used alone, but she had complained to supervisors when employees combined the word with names such as "nigger, bitch, cunt, whore and slut," or used the word in expressions such as, "fuck you," or "suck my dick." Several managers struggled to answer the question from Madison's counsel concerning whether they would always find offensive such words as, nigger, bitch, cunt, *puta*, whore, and slut, words which were common at IBP. Most managers said they would have to receive a complaint, understand the context of the word's use, or know whether a black or female employee overheard the word, before they could determine its offensiveness. (Tr., McNamara, 2/18/99 at 85–89; Tr., Gordy Laird, 2/16/99 at 9; Tr., Olguin, 2/19/99 at 294.)

### d. Investigating the Complaint

IBP managers believed they were not required to investigate instances of sexual or racial harassment unless there was a specific complaint, labeled as such, with an identifiable victim and an identified harasser. IBP's practice calls for investigating only those events that the complainant identifies, and not considering the possibility of other problems around the complainant's work area. (Tr., Olguin, 2/19/99 at 311–13; Tr., Grothe, 2/10/99 at 172; Tr., Miller, 2/12/99 at 69.)

After he received a complaint, Olguin followed IBP's policies for investigation as outlined in Exhibit 25. (Tr., Olguin, 2/22/99 at 418.) He interviewed witnesses identified by the complainant, and always told the alleged harasser who had lodged the complaint, although IBP knew that identifying the complainant to the harasser could lead to retaliation. (Tr., Olguin, 2/19/99 at 296; 2/22/99 at 418). Olguin would next consult the plant manager, the labor relations manager, and occasionally the EEO coordinator to determine what action to take. (Tr., Olguin, 2/19/99 at 296.)

In 1992, Hofer, McNamara, and Ott investigated sexual harassment and race discrimination in the plant. The investigation began after Olson, the union president, delivered a confidential complaint to the human resources department. (Tr., Hofer, 2/16/99 at 132.) The complaint alleged race discrimination and sexual harassment in the cold-side cellars. Investigators interviewed or surveyed many employees. (Tr., Hofer, 2/16/99 at 134; Tr., Ott, 2/11/99 at 68.) However, once investigators discovered the complaining employee was a female line worker, who was also an anthropologist surreptitiously writing a book about IBP, investigators focused on her. Plant Manager Prochek reportedly said that the complaint would be "shoved down her throat," if unfounded. (Tr., Hofer, 2/16/99 at 194.) Managers circulated rumors about the complainant's having sex with co-workers at work. (Tr., Hofer, 2/16/99 at 192.) No disciplinary reports resulted and no action was taken, because IBP determined no problems existed, notwithstanding the fact that investigators documented instances of sexual harassment in the cellars (Tr., Hofer, 2/16/99 at 15–17, 40, 137, 180, 192; Tr., Ott, 2/11/99 at 68.)

From the time the 1992 investigation was completed to the present, investigators filed their reports in the human resources office, under either the victim's name or the year, but not under the harasser's name. (Tr., Hofer, 2/16/99 at 37; 2/16/99 at 166–69; Tr., Olguin, 2/22/99 at

283–84.) Consequently, IBP has a readily available record of complainants, but not of those who discriminated or harassed, including repeat offenders. (Tr., Hofer, 2/16/99 at 169; Tr., Olguin, 2/22/99 at 508, 518.) IBP maintained that evidence of the 1992 investigation was irrelevant to this case, other than an interview with Madison's mother (who reported no problems with sexual harassment), because the 1992 investigation did not involve a complaint by Madison.

The record showed that many times a supervisor counseled a harasser but recorded nothing in his personnel file, which made it hard to determine whether a harasser had prior offenses. For example:

■ In 1992, Lisa Elliott complained of sexual harassment by Kevin Nickel. While Nickel's file showed no evidence of the complaint, Elliott's file noted her complaint. (Tr., Hofer, 2/16/99 at 169; Pl.'s Ex. 543.)

■ In 1993, Deb Hollings complained of sexual harassment by her supervisor. IBP recorded nothing in the supervisor's file concerning the complaint. (Tr., Hofer, 2/16/99 at 159; Pl.'s Ex. 587.)

■ In 1994, Supervisor McNamara interviewed those involved in Madison's claim of sexual harassment on the B-shift line supervised by Jackson. Co-workers Zierke, Morales, Torres and Ignacio, were purportedly counseled, but nothing in their personnel files recorded the counseling or complaint. (Tr., McNamara, 2/18/99 at 18–26; Pl.'s Ex. 213, 218.)

■ In 1994, McNamara spoke to Jackson and Schick in response to Madison's complaint of sex discrimination by co-workers. McNamara took no disciplinary action and made no notes of Madison's complaint. (Tr., McNamara, 2/18/99 at 112–114.)

■ Madison complained in 1994 of Jackson's discrimination based on sex and race. McNamara spoke to Madison about her complaint, but he did not take notes because he believed that was the human relations department's job. (Tr., McNamara, 2/18/99 at 69–70.) McNamara took no remedial action, because Jackson denied there was a problem and Miller had approved Madison's transfer out of Jackson's line. (Tr., McNamara, 2/18/99 at 71.)

■ In 1994, Lisa McCloud complained to her supervisor about two male co-workers sexually harassing her. Both men received written warnings, but the warnings were "whited-out," or removed, from their files because the supervisor delivered the warnings to the men too late to satisfy the union contract. (Tr., Olguin, 2/22/99 at 465–70.) The warnings' removal meant IBP could not base any current or future discipline on the warnings.

■ In 1995, a line worker complained he was offended when a supervisor, Johnson, used the word "nigger." Olguin counseled Johnson, but he did not record anything in Johnson's file concerning the complaint or counseling because, he explained, the plant manager maintained Johnson's files. (Tr., Olguin, 2/22/99 at 443–48.)

■ On October 3, 1996, line worker Maria Roe complained that Supervisor Randy Overman verbally harassed her. She first complained to Supervisor Roger Baumgardner, who treated her complaint as a joke. She then complained to Olguin, who gave Overman a written warning for

sexual harassment. (Tr., Olguin, 2/22/99 at 453–55; Pl.'s Ex. 562.)

■ In 1996, Patricia Flannery complained to Sotos of verbal and physical harassment by Pascual Delgadillo. Sotos counseled Delgadillo and had him sign the sexual-harassment form. However, no record of the counseling appeared on Delgadillo's calendar card. (Tr., Sotos, 2/16/99 at 17–20; Pl.'s Ex. 566.)

■ Olguin received a complaint on January 6, 1999, from Rachael Sanchez alleging that after she refused to date Supervisor Balboa, he retaliated against her by issuing her a disciplinary report for walking off the line. Sanchez said she left the line to go to the bathroom after Balboa had, for over an hour, refused her requests for a restroom break. Olguin testified he counseled Balboa to "conduct himself professionally," but did not record anything in Balboa's file, because the plant manager maintained the file. (Tr., Olguin, 2/22/99 at 460–62; Pl.'s Ex. 522.)

■ In 1993, Alma Rivera complained of repeated offensive touching by Victor Lopez. Although Olguin told Rivera that Lopez would receive a written warning, nothing was recorded in Lopez's file. (Tr., Olguin, 2/22/99 at 439–442; Pl.'s Ex. 546.)

■ On December 28, 1995, Christy Schultz and Julie Ellsberry complained of physical harassment by Gordon Tuong. Olguin did not write a report of this complaint, but Menhusen did. (Pl.'s Ex. 504; Tr., Olguin, 2/22/99 at 483.) The reports relating to this incident, used at trial, came from the union, not IBP's records. *Id.* Previously, Lydia Garcia had complained of Tuong's grab-

bing her breasts; Garcia was fired when she hit back. (Pl.'s Ex. 652.)

■ McNamara did not record the complaint of an employee who alleged Supervisor Schick harassed her, because McNamara determined the harassment was "personal," not sexual in nature. (Tr., McNamara, 2/18/99 at 117.)

■ Because Chris Steburg's file contained no record of the warning he got after his threat to Rhonda Arbuckle, his later assault against Khristy Lovan was not recorded as a second offense. (Tr., Sotos, 2/12/99 at 9–10; Pl.'s Ex. 571.)

Grothe testified that he discounted reports of harassment witnessed only by a co-employee line worker, because the co-employee could be lying to get the alleged harasser in trouble. (Tr., Grothe, 2/10/99 at 173.) If, however, the victim was harassed in front of a manager, and the manager backed up her story, then the manager would be believed because, "managers never lie." (Tr., Olguin, 2/19/99 at 280–81; Tr., Grothe, 2/10/99 at 175.)

IBP treats a complainant's report as unfounded if she has had any voluntary contact with the alleged perpetrator prior to the incident, unless the harasser admits assaulting her. (Tr., Grothe, 2/10/99 at 174–77.) The company used this approach in resolving Khristy Lovan's 1997 complaint concerning unwelcome behavior by a male co-worker, Chris Steenberg, who grabbed her crotch while passing her in a hall. A co-worker witness said that Steenberg grabbed Lovan between the legs "hard," and not accidently. (Tr., Lovan, 2/4/99 at 92; Pl.'s Ex. 36.) Steenberg denied grabbing Lovan, saying he accidently brushed her arm, and that she welcomed any contact from him, as evidenced by her socializing with him after hours and at work. Investigators considered wheth-

er Lovan spoke socially with Steenberg at work. IBP sanctioned Steenberg for sexual harassment, imposing a one-day suspension on him. (Tr., Sotos, 2/12/99 at 199–203.) In comparison, the penalty for dropping a hog from a forklift can be a five-day suspension. IBP also sanctioned Lovan, giving her a disciplinary report for "being out of her place of assignment," when she left her work area to talk to Steenberg in his work area earlier on the day he grabbed her. Managers setting the sanctions believed Lovan "encouraged that type of behavior," from Steenberg. (Tr., Grothe, 2/10/99 at 185–189; 2/10/99 at 248–49; Tr., Olguin 2/22/99 at 435–39.) Olguin testified that for six months in 1997 he received no complaint. (Tr., Olguin, 2/22/99 at 433). In his opinion, the complaint process was "quite effective," because complainants rarely came back to him with additional complaints. (Tr., Olguin, 2/19/99 at 266–67).

e. Remedies, Including Discipline

Madison offered evidence to show that IBP did not act promptly and reasonably to end unlawful discrimination and harassment. For example, following the ICRC mediation in 1995, where Madison noted IBP employees' vulgar and racist language, Ott told Olguin to "take care of" Gary Laird's use of the word "nigger," (Tr., Ott, 2/10/99 at 75; Tr., Olguin, 2/19/99 at 275; Tr., Gordy Laird, 2/16/99 at 138–40), but IBP took no further action to investigate or curtail employees' vulgar and racist language, (Tr., Ott, 2/10/99 at 54; Tr., Menhusen, 2/16/99 at 71). Ott, however, called Madison after the ICRC mediation and chastised her for using the word "fuck," advising her to comport herself in a more genteel way if she wanted to be considered for promotion. (Tr., Ott, 2/10/99 at 53–54.) Similarly, sometime in 1994, Menhusen had also advised Madison to try to be "professional" and avoid using

profanity at work in order to be accepted as a trainer. (Tr., Menhusen, 2/16/99 at 71.)

If a woman strikes a co-employee who has physically assaulted her, she risks being fired under IBP's "no fighting" disciplinary rule. The rule provides that when a physical fight occurs, all employees involved will be discharged. (Tr., Grothe, 2/10/99 at 177.) The rule is intended to prevent fights, which are especially dangerous at IBP because most employees work with knives, including high-speed rotary blades. Evidence, however, showed IBP does not consistently enforce the "no fighting" rule, although the company usually enforces the rule immediately to terminate women after they hit men who have grabbed the women's private body parts. The women may grieve their terminations, and they are sometimes re-instated if their witnesses corroborate that they were not the initial aggressors.

For example, McNamara fired Rosa Dunbar on June 12, 1997, for striking Anthony Leah after he grabbed her breast. Before firing Dunbar, McNamara interviewed only the witnesses she identified. He did not do a general investigation by interviewing all line workers in the area. While Dunbar's grievance of the discharge was pending, a new witness voluntarily confirmed that Leah grabbed Dunbar before she struck him. (Tr., McNamara, 2/19/99 at 195.)

IBP denied Dunbar's grievance, but based on the new evidence, the company granted her appeal and authorized her to return to work. (Tr., McNamara, 2/19/99 at 204–05, 208.) Olguin testified that Dunbar was fired because, "fighting always results in termination." (Tr., Olguin, 2/22/99 at 418–20; *see also* Tr., Jepsen, 2/22/99 at 45–46; Pl.'s Ex. 572.) No male worker has ever been terminated on a

first-offense sexual-harassment complaint. (Tr., Olguin, 2/22/99 at 418.)

Jepsen testified he assesses a woman's report of what language or actions are offensive by judging whether the complainant responded to a situation as his wife would. (Tr., Jepsen, 2/22/99 at 46.) He believes women should "just walk away," and not respond physically to assaults. (Tr., Jepsen, 2/22/99 at 54.)

Consistently managers told complainants and alleged harassers to "just stay away from each other" or "quit playing around." Examples of this policy included the following:

- In 1995, as noted above, Gordy Laird told Gary Laird to stay away from Madison and her family after complaints of racial harassment. (Tr., Gary Laird, 2/8/99 at 58–60; Tr., Gordy Laird, 2/16/99 at 139.)

- In July 1996, Olguin told Borges to stay away from, and not talk to, a female co-worker who alleged Borges verbally harassed her. (Tr., Olguin, 2/22/99 at 481; Pl.'s Ex. 41, 559.) No documentation of this warning appears in Borges' file.

- In 1996, when women employees complained of sexual harassment by male employees who carved fat into penises and passed them to women line workers, Supervisor Gary Flinn told the entire line to "quit playing around." (Tr., Carlson, 2/5/99 at 121.)

- In 1997, Olguin counseled Supervisor Roger Carlson to stay away from female line workers who complained about him sexually harassing them. (Pl.'s Ex. 569.) There is nothing in Carlson's file about the complaint. (Pl.'s Ex. 568.)

- In 1998, Bob Leesley, who supervised Sonjie Johnson and Michael Roe, advised the two co-workers to "stay away" from each other following an argument where, Johnson alleged, Roe called her a "stupid cunt." Leesley's advice angered Roe, who slammed a door so hard it broke the jamb. IBP disciplined Roe with a three-day suspension for damage to property. (Tr., Olguin, 2/22/99 at 458, 509, 520; Pl.'s Ex. 526, 581.)

- On February 3, 1998, Assistant Personnel Director Julio Sotos advised line-worker Tout Nguygen to avoid, and not even look at, a female co-employee, who complained that Nguygen had grabbed her breast. (Tr., Sotos, 2/16/99 at 25–27; Pl.'s Ex. 577.)

- In 1998, Sotos counseled line-worker Efran Ortega, in response to a female co-worker's complaint of sexual harassment, to "avoid her and don't even look at her." (Tr., Sotos 2/16/99 at 38–40.)

- On behalf of a female line worker, Tom Morrell complained in 1996 to Supervisor Laird about sexual harassment of the woman. Laird suggested the woman walk to her assigned work area by a route that avoided the harassers. (Tr., Morrell, 2/4/99 at 19.)

Evidence showed the managers' practice of telling complainants and alleged harassers to avoid each other often impeded the women complainants' ability to work efficiently.

f. Follow-up Monitoring; Retaliation

Madison produced evidence to show that IBP maintained inadequate follow-up procedures after imposing sanctions. For example, Olguin testified he had no routine follow-up procedure after a harasser was sanctioned; if Olguin happened to see the

victim in passing, he informally checked with her. (Tr., Olguin, 2/19/99 at 309–10.) After Gordy Laird told Gary Laird to stop using racial epithets, no supervisor checked to see if Gary Laird had indeed stopped. (Tr., Gordy Laird, 2/16/99 at 48; Tr., Ott, 2/11/99 at 75.) Gordy Laird testified that no one ever told him to follow up after complaints of sexual or racial harassment to see if the offending behavior had ceased. (Tr., Gordy Laird, 2/16/99 at 19.) After Miller investigated Madison's complaints about Jackson, he did not initiate any follow-up measures. (Tr., Miller, 2/12/99 at 69.)

Madison's evidence showed that because of the lax follow-up procedures, retaliation often went unchecked, leaving the victim believing she had little recourse because she had tried to use the established procedures and they had not worked. Madison was the first IBP Perry employee to file an ICRC complaint and continue to work at the plant. Managers did not consider a correlation between women complaining of discrimination or harassment, and then quitting or downbidding, to be a sign of ongoing discrimination or retaliation. (Tr., Ott, 2/11/99 at 78; Tr., Sotos, 2/16/99 at 42.)

Madison complained of retaliation in the form of adverse job assignments, continued verbal and physical harassment, close scrutiny, increased disciplinary reports and failures to promote her. IBP viewed these acts as personality conflicts. IBP did not seriously consider the existence of retaliation, because IBP managers believed the conduct of each and every manager was "entirely appropriate at all times" and that all co-employee conduct was "quickly and adequately remedied." (Def.'s, Ex. AAAA.)

Employees complained of retaliation when Olguin disclosed their identities to the co-employees they had complained about. IBP, however, did not change its policy to provide confidentiality in the complaint process. (Tr., Olguin, 2/22/99 at 460–66; Tr., Madren, 2/23/99 at 106; Tr., McCloud, 2/4/99 at 133; Tr., Petro, 2/3/99 at 32–33.)

Managers' frequent failure to document warnings inhibited the tracking of repeat offenders and retaliators. Olguin testified that based on a review of the records, he believed IBP had only two repeat offenders. (Tr., McNamara, 2/18/99 at 26–27; Tr., Olguin, 2/19/99 at 265, 278; 2/22/99 at 433; 443–47; 462–63; 470; Tr., Sotos, 2/16/99 at 9–10, 17–21.)

5. Promotion Process

IBP had two promotion processes: interest postings and bid sheets. Interest postings allowed employees to submit resumes or applications for jobs in which they were interested. It was a way to solicit in-house applicants for certain vacancies. Bid sheets announced vacancies, and any interested employee could sign the bid sheet. Appointments were usually based on seniority, but vacancies were sometimes filled without employees signing the bid sheet.

A union contract purportedly governed the application process. Madison, however, provided evidence from which a jury could find that IBP conducted the promotion process arbitrarily, in that managers were allowed to solicit applications, and sometimes to promote employees who had not applied for an opening. (Tr., Pfalzgraff, 2/11/99 at 151; Tr., Dixon, 2/8/99 at 91–94; Tr., Waldo, 2/3/99 at 35–39; Tr., Hillyer, 2/10/99 at 16; Tr., Jepsen 2/22/99 at 12–16.) Evidence also showed that in making their employment decisions, managers used subjective criteria such as whether an applicant had a good attitude, people skills, work ethic or judgment, was a team player, or carried himself well.

(Tr., Ott, 2/11/99 at 20–21, 60, 94; Tr., Pfalzgraff, 2/11/99 at 151; Tr., Menhusen, 2/16/99 at 110; Tr., McNamara, 2/18/99 at 50, 81–82, 133, 139, 155; Tr., Grothe, 2/9/99 at 57–58, 78–80; Tr., Miller, 2/12/99 at 85–86; Tr., Olguin, 2/19/99 at 318–20; Tr., Jepsen, 2/22/99 at 42.) Managers could promote without interviewing applicants. (Tr., Grothe, 2/9/99 at 33–34.) Grothe testified he interviewed only those employees he did not know. (Tr., Grothe, 2/9/99 at 57.) These features of the promotion process caused some employees to believe managers promoted their favorite employees, or would protect their favorites from being disciplined. (Tr., Smith, 2/5/99 at 160; Tr., Zoch, 2/8/99 at 27.)

As a rule, managers did not check applicants' personnel files before giving promotions, but merely looked at the computer version of the calendar. (Tr., McNamara, 2/18/99 at 136.) When deciding on promotions, therefore, managers were usually unaware of the applicants' complete records of attendance, discipline, skill level, and promotion history. (Tr., Jepsen, 2/22/99 at 32; Tr., Grothe, 2/9/99 at 33, 57–58; Tr., McNamara, 2/18/99 at 95; Tr., Laird, 2/17/99 at 63.)

Madison also provided evidence that the decision-making process was tainted in two respects and hurt her promotional opportunities. First, decision-makers relied on misinformation from certain supervisors, who had sexist attitudes, about Madison's qualifications and interest in promotions, and the decision-makers often did not interview her. (Tr., McNamara, 2/18/99 at 99, 131, 150–53; Tr., Jepsen, 2/23/99 at 43; Tr., Ott, 2/10/99 at 23; 2/11/99 at 100–01; Tr., Grothe, 2/10/99 at 33, 120–122). For example, Grothe testified that Supervisor Jamie Frye said Madison was not seriously interested in the quality-control position for which she applied in 1994. (Tr., Grothe, 2/10/99 at 207.) Similarly, McNa-

mara testified that when he denied Madison the utility position he gave to Morales in 1993, he was relying on Supervisor Reuter's report that Madison did not know how to do all the jobs required for the position. (Tr., McNamara, 2/18/99 at 93.) When McNamara appointed Fuentes to a trainer position, McNamara relied on, without checking, Gordy Laird's report that Fuentes was more experienced than Madison. (Tr., McNamara, 2/18/99 at 150–53.)

Madison's evidence showed Gordy Laird, who was Madison's supervisor when she worked the day shift as a line worker, utility worker, and trainer, exhibited sexist attitudes. In 1992, for example, he asked a less-qualified male line worker to accept a utility position the man did not apply for, in an apparent effort to block Barbara Waldo from getting the position. (Tr., Waldo, 2/3/99 at 35.) When Waldo received another utility position later, Madison, as union steward, intervened with Laird for Waldo regarding her pay rate. Waldo claimed Laird was creating additional requirements solely for her because he would authorize the pay increase to which she was entitled as a utility worker. (Tr., Waldo, 2/3/99 at 36–40.)

In the past 10 years, under Laird's supervision, approximately 100 utility workers were hired, of which four were female. (Tr., Laird, 2/16/99 at 155.) About 25 percent to 30 percent of the production workers at IBP are female. (Tr., Jepsen, 2/22/99 at 64; Pl.'s Ex. 54B.) In one case, Laird told Rhonda Carlson in 1996 that she could not have a utility job pulling ribs because that's a "man's job." (Tr., Carlson, 2/5/99 at 126–29.) He had assigned only men to this job previously, having determined that women could not pull ribs. Laird promoted Bill Hovey over Carlson, even though Hovey had not applied for the job and Carlson had. (Tr., Laird, 2/16/99

at 58.) Madison, as union steward, intervened. Menhusen arranged for Carlson to try the assignment and Carlson succeeded in the work. In the meantime, with Madison's assistance as union steward, Carlson grieved. (Tr., Carlson, 2/5/99 at 130.) Carlson was awarded a utility job six weeks later.

Menhusen suggested that Gordy Laird was "old school," based on his 30-year career in meat packing. When he worked for Oscar Mayer before 1989, only one to two women worked on the line. (Tr., Menhusen, 2/16/99 at 77; Tr., Miller, 2/11/99 at 192.) Laird is 48 years old. (Tr., Laird, 2/16/99 at 116.)

Supervisor Grothe also demonstrated gender stereotyping, as evidenced by his opinion that females "make as good, if not better supervisors. They seem to be more empathetic...." (Tr., Grothe, 2/10/99 at 49.) Menhusen and Laird also suggested that women make good meatcutters because they shop for groceries and thus know what the product should look like. (Tr., Menhusen, 2/16/99 at 77; Tr., Gordy Laird, 2/16/99 at 151.) The entire output of the Perry plant is exported to Japan, and specially cut to the Nipon contract specifications. (Tr., Jepsen, 2/23/99 at 74.)

Madison's evidence indicated a second way in which the decision-making process was tainted in regards to her promotion applications. She showed that the primary decision-makers for promotions she sought were the managers who, by their lack of investigation and intervention, made possible a work atmosphere containing sexual and racial harassment and discrimination.

In 1994, McNamara cautioned Madison that if she downbid from a trainer position, she would not receive any future promotions. Yet IBP promoted Robert Balboa to kill-floor supervisor in 1997, a year after he downbid from another job; Curtis Dixon and Khong Bacaam were also promoted to trainer after they downbid. (Tr., Miller, 2/12/99 at 49; Tr., Madison, 2/2/99 at 130–33; Tr., Olguin, 2/22/99 at 463; Tr., McNamara, 2/18/99 at 48–49.)

Madison offered evidence to show decision-makers used shifting criteria to evaluate women, including her, for promotions. One such criteria was bilingualism. As workplace demographics have changed, being bilingual has become a valued skill, and a factor in promotions. (Tr., Olguin, 2/19/99 at 259; Tr., Grothe, 2/10/99 at 214; Tr., Ott, 2/11/99 at 61.) Thus, Fuentes, who speaks Spanish and English, got a trainer's position in 1995 instead of Madison, who is not bilingual. Yet one reason IBP gave for promoting few, if any, females to management positions was that they did not speak English as a first language. (Tr., Ott, 2/11/99 at 103; Tr., Jepsen, 2/22/99 at 64.) Neither did Fuentes— when he started at IBP in 1990, he listed Spanish as his preferred language. (Tr., Ott, 2/11/99 at 54; Pl.'s Ex. 206.) Most managers do not speak Spanish; they use the staff interpreters.

IBP's reasons for not promoting Madison to trainer in 1995 (the Fuentes position) changed as this case developed. The first reason asserted was Fuentes' better job skills. (Tr., McNamara, 2/18/99 at 45–47, 153; Pl's.Ex. 45.) Later, the fact that Fuentes had more seniority than Madison became a determining factor. (Tr., Olguin, 2/19/99 at 342; Pl's.Ex. 45.) When it was pointed out that seniority had never been a factor in appointment of trainers, and that Madison had more seniority than Fuentes, the criterion changed to bilingual ability. (Tr., McNamara, 2/18/99 at 47; Tr., Olguin, 2/19/99 at 323.) Laird told McNamara that Fuentes had more experience on the belly line, which was inaccurate. (Tr., McNamara, 2/18/99 at 150–154.)

Between 1989 and 1998, IBP Perry employed only one female front-line supervisor until shortly before trial, when Michelle Hillyer became the second. (Tr., Jepsen, 2/23/99 at 33.) Hillyer progressed from line worker to supervisor without serving as a utility worker or trainer, although Grothe (who approved the promotion) thought she had been a utility worker. (Tr., Grothe, 2/9/99 at 129.)

Madison's evidence of shifting criteria used to evaluate her for promotions included Ott's continued reliance on results from a test Madison took in August 1997 while she was in the training department. At one point, all the trainers took the standardized test, which was being considered for use in the maintenance department. (Tr., Madison, 2/23/99 at 128–130.) Madison believed the trainers were trying to see how long it would take to administer the test. A computer-assisted learning module accompanied the test, to help maintenance workers practice English and math skills to improve their performance as mechanics. (Tr., Grothe, 2/9/99 at 62.) Madison never saw the test results until trial. (Tr., Madison, 2/23/99 at 67.) IBP never told Madison the test was important to her job or promotion opportunities until at the trial and front-pay hearing, when Ott testified that Madison's test results indicated she had inadequate English and math skills for a management job. (Tr., Madison, 2/2/99 at 129–130; Tr., Ott, 2/11/99 at 94.)

Another example of ambiguous criteria relating to promotions was the weight given to use of vulgar language at work. Ott cited Madison's coarse language as one reason IBP did not consider her management material. (Tr., Ott, 2/11/99 at 20–21, 53–54.) Other managers did not express concerns about Madison's language, and most believed she used less vulgarity than her co-workers; no manager ever heard her use any racial or sexual slurs. (Tr., Grothe, 2/9/99 at 117; Tr., Miller, 2/12/99 at 85–86; Tr., Menhusen, 2/16/99 at 103; Tr., Jepsen, 2/23/99 at 36–37.)

E. Events After Trial

A hearing was held on front pay and equitable relief on March 10, 1999. The parties stipulated to certain facts relating to Madison's post-verdict employment. On March 9, 1999, Madison had returned to work as a forklift operator on the B-shift. She testified she believed a new acting supervisor was closely monitoring her, at a level she had never before experienced. As a result, Madison left work before completing her shift, and she did not return to work before beginning an unpaid leave on April 5, 1999. Evidence showed that Madison did not complain to any IBP managers or employees about the supervisor's close monitoring.

At the front-pay hearing, Madison claimed she had been constructively discharged on March 9, 1999, and sought an appropriate equitable remedy. IBP explained that the close monitoring was because the supervisor was new; the monitoring was not done in retaliation or as harassment. Madison further testified at the hearing that she thought she was entitled to a trainer position on the B-shift.

IBP personnel testified they had no hard feelings against Madison as a result of the lawsuit and they desired to get along with her. As evidence of IBP's desire to treat Madison fairly, IBP offered into evidence a March 4, 1999, memorandum from Grothe read to all management employees, which stated in part as follows:

[T]he Company suffered a setback in its defense of discrimination/harassment claims brought by Mrs. Madison. It remains the company's position that our conduct and that of each of you, our managers, with regard to Mrs. Madison

was entirely appropriate at all times. We do not believe that racial or sexual harassment or discrimination occurred at the hands of management employees and that every instance of co-employee conduct brought to the attention of management was quickly and adequately remedied.

. . . . .

Your conduct toward Mrs. Madison, her husband and all other employees, should remain consistent with your past practices. In other words, they should be treated like any other employee—as though the lawsuit never existed.

. . . . .

Document immediately any complaints made by Mrs. Madison, her husband or others, so that those matters may be effectively handled by our management team.

. . . . .

You should document daily instructions and work assignments given to Mrs. Madison, her husband or others, as you would with every other employee and maintain a work environment that will ensure maximum productivity, despite our differences.

Def.'s Ex. AAAA.

Gordy Laird, Olguin and McNamara received copies of the memorandum. Grothe testified that IBP's position was that the conduct of Gordy Laird, Olguin, and McNamara toward Madison was entirely appropriate at all times. (Tr., Grothe, 3/10/99 at 97.)

Grothe, with the assistance of outside counsel, also drafted a script for supervisors to read, in all five languages spoken at the plant, to employees on all shifts before Madison returned to work March 9, 1999. The script stated in part as follows:

Recently, the Company suffered a setback in defending claims of unlawful discrimination and harassment brought by one of your co-workers, Sherri [sic] Madison. While this is not a popular result to us or many of you, it is a fact of life that each of us will now need to deal with.

Def.'s Ex. AAAA. Supervisors further stated to all employees, "any conduct by our employees contrary to these objectives [of equal employment opportunity] will be dealt with appropriately, as they have been in the past." (Def.'s Ex. AAAA; Tr., Grothe, 3/10/99 at 95.)

Ott testified she doubted that Madison would be able to perform adequately as a supervisor, based on results from the sample test that Madison took in 1997. Ott stated that a court-ordered promotion to supervisor could ultimately result in Madison's discharge, because when the company promoted an employee from a union to a supervisory job, and the employee failed to adequately perform, IBP's policy generally called for firing the supervisor, an at-will employee, rather than demoting her back to the union job. Thus, Ott believed, it was in Madison's best interests not to be promoted to supervisor.

During the trial, a trainer job, like that from which Madison downbid in September 1998, become available. IBP did not inform Madison of the vacancy before the front-pay hearing. (Brf. Res. Claim Front Pay, at 8.) In March 1999, soon after the front-pay hearing, IBP notified Madison's counsel that an A-shift trainer job was open and would be held open if Madison wanted to apply, and that a B-shift trainer job—the job she wanted, and which was the focus of her EEOC complaint—would become available for bid the next week. Madison applied for neither job, and both were filled with other IBP employees by May 19, 1999. Madison contends she did

not apply for these jobs because her supervisors would have been men whom she alleged had harassed, discriminated and retaliated against her.

Beginning April 5, 1999, Madison took an unpaid leave of absence according to the terms of her union contract.

On April 16, 1999, Madison filed a Second Amended Complaint (Clerk's No. 227) to add a claim of constructive discharge. IBP filed an Answer on May 10, 1999, and a resisted Motion to Amend the Answer (Clerk's No. 253) on May 20, 1999, which the Court granted. In the Amended Answer, IBP pleaded the damages cap under 42 U.S.C. § 1981a(b)(3) as an affirmative defense. On May 20, the parties filed a stipulation of dismissal (Clerk's No. 255) of Madison's constructive discharge claim.

On July 19, 1999, Madison returned to her union job as forklift operator. The record is silent as to what she did during her leave. IBP did not have any supervisor jobs open between the end of Madison's trial and April 5, 1999.

II. Post-trial Motions

Madison and IBP raise numerous grounds for objection to the evidence, instructions and judgment. IBP asserts many of the same objections in its three post-trial motions. Additionally, Madison requests equitable relief, including front pay. IBP resists.

A. Standards of Review

1. Motion for Judgment as a Matter of Law

■ Judgment as a matter of law is warranted "when no 'legally sufficient evidentiary basis' exists for a reasonable jury to have found in favor of a party on an issue on which the party has been fully heard." *Dominium Management Servs. v. Nationwide Hous. Group*, 195 F.3d 358,

363 (8th Cir.1999) (quoting Fed.R.Civ.P. 50(a)(1)). In making this determination, a court must view the evidence in the light most favorable to the nonmoving party, resolving all conflicts in favor of the nonmoving party and giving it the benefit of all reasonable inferences. *See id.; Weber v. Strippit, Inc.*, 186 F.3d 907, 912 (8th Cir.1999). Judgment as a matter of law is appropriate only when the evidence points entirely one way and no reasonable interpretation would support the jury's verdict. *See Dominium*, 195 F.3d at 363.

■ Iowa's standard for determining motions for judgment as a matter of law is essentially the same as the standard under Federal Rule of Civil Procedure 50. *See East Broadway Corp. v. Taco Bell Corp.*, 542 N.W.2d 816, 820 (Iowa 1996) (stating trial court must consider evidence in light most favorable to nonmoving party) (quoting *Stover v. Lakeland Square Owners Ass'n*, 434 N.W.2d 866, 873 (Iowa 1989)); *Carr v. San–Tan, Inc.*, 543 N.W.2d 303, 305 (Iowa Ct.App.1995).

2. Motion to Alter or Amend Judgment

■ A district court has wide discretion in deciding whether to grant a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e). *Cf. Norman v. Arkansas Dep't of Educ.*, 79 F.3d 748, 750 (8th Cir.1996). Such a motion should be made only to present evidence that is newly discovered or to correct manifest errors of fact or law. *See Innovative Home Health Care v. P.T.–O.T. Assocs.*, 141 F.3d 1284, 1286 (8th Cir.1998). A Rule 59(e) motion cannot be used to raise arguments and evidence that could, or should, have been raised before the trial court entered final judgment. *Bannister v. Delo*, 100 F.3d 610, 621 (8th Cir.1996) *cert. denied*, 521 U.S. 1126, 117 S.Ct. 2526, 138 L.Ed.2d 1026 (1997); *Garner v. Arvin*

*Indus., Inc.*, 77 F.3d 255, 258 (8th Cir. 1996).

### 3. Motion for New Trial

 District courts enjoy broad discretion in deciding whether to grant a motion for new trial under Rule 59. *See Pulla v. Amoco Oil Co.*, 72 F.3d 648, 656 (8th Cir.1995). A court should grant a motion for a new trial only if the jury's verdict was "against the great weight of the evidence so as to constitute a miscarriage of justice." *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 497 (8th Cir. 1998) (internal quotation omitted), *cert. denied*, 526 U.S. 1115, 119 S.Ct. 1763, 143 L.Ed.2d 794 (1999). Under this standard, the court analyzes the evidence, and "where the district court balances and weighs the evidence based upon the proper legal standards, the court's denial of a Rule 59 motion is virtually unassailable." *Pulla*, 72 F.3d at 656 (internal citations omitted).

 A federal court is guided by the law of the forum state in determining questions as to the adequacy or excessiveness of a verdict. *See Keenan v. Computer Assocs. Int'l*, 13 F.3d 1266, 1273 (8th Cir.1994); *Johnson v. Cowell Steel Structures, Inc.*, 991 F.2d 474, 477 (8th Cir. 1993). In Iowa, a party may obtain a new trial where the damages awarded are "[e]xcessive or inadequate ... appearing to have been influenced by passion or prejudice," or where the verdict "is not sustained by sufficient evidence, or is contrary to law." Iowa R.Civ.P. 244(d), (f). An Iowa court will not set aside or alter a verdict unless it is: "(1) flagrantly excessive or inadequate; or (2) so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption it is the result of passion, prejudice or other ulterior motives; or (4) is lacking in evidential support." *Kautman v. Mar–Mac*

*Community Sch. Dist.*, 255 N.W.2d 146, 147–48 (Iowa 1977) (internal citations omitted); *see Cowan v. Flannery*, 461 N.W.2d 155, 157–58 (Iowa 1990); *Jackson v. Roger*, 507 N.W.2d 585, 589 (Iowa Ct.App.1993). The key question is the amount and sufficiency of evidence to support the award. *See, Cowan*, 461 N.W.2d at 158. "[W]here the verdict is within a reasonable range as indicated by the evidence the courts should not interfere with what is primarily a jury question." *Kautman*, 255 N.W.2d at 147. The determinative question is whether, under the record, "the verdict effects substantial justice between the parties." *Cowan*, 461 N.W.2d at 158.

 As with motions for judgment as a matter of law, the federal and Iowa standards governing the granting of a new trial do not differ in any significant way applicable to this case. *Cf. Cowan*, 461 N.W.2d at 157–58; *Kautman*, 255 N.W.2d at 147–48; *Jackson*, 507 N.W.2d at 589.

### B. Madison's Motion to Amend Judgment Under Fed.R.Civ.P. 50, 58, and 59(e) (Clerk's No. 209)

Madison asks the Court to amend its judgment by rescinding its reduction of damages, reallocating damages, and awarding interest. Madison also requests equitable relief, including front pay, and attorney fees and costs, which the Court addresses separately below.

### 1. Reduction of Damages Under 42 U.S.C. § 1981a(b)(3)

When judgment was entered, in accord with the compensatory and punitive damages the jury awarded Madison under Title VII, the Court applied the damages cap provision of 42 U.S.C. § 1981a(b)(3), and reduced the award accordingly. Madison contends the reduction of damages should be rescinded because the cap in section 1981a(b)(3) must be deemed waived, and

the damages cap under section 1981a(b)(3) is unconstitutional. Alternatively, Madison asserts, the cap should be applied separately to each discriminatory and retaliatory claim.

### a. Waiver of Affirmative Defense

Madison argues the damages cap in section 1981a(b)(3) is an affirmative defense, which IBP waived because it did not plead the defense in its Answer or other pleadings before or during trial. IBP counters that the section 1981a(b)(3) cap is not an affirmative defense in that it limits, rather than bars, recovery of damages. IBP further asserts that even if section 1981a(b)(3) is an affirmative defense, the company did not waive the defense because applicability of the cap does not require resolution of factual issues, but is a purely legal issue, and therefore Madison was not unfairly surprised or prejudiced by IBP's failure to plead the section as an affirmative defense before trial.

Madison acknowledges she has found no federal court decision addressing whether the requirements of Federal Rule of Civil Procedure 8(c), which requires the pleading of an affirmative defense, applies to section 1981a(b)(3)'s statutory-cap provision. Assuming without deciding, for purposes of this ruling that the provision is an affirmative defense, the issue is then whether IBP waived the right to assert the defense by failing to plead it sooner. On June 8, 1999, the Court granted IBP's Motion to Amend its Answer (Clerk's No. 252) to plead section § 1981a(b)(3) as an affirmative defense. Madison is, therefore, essentially asking for reconsideration of the grant of leave to amend.

 A court has the discretion to grant leave to amend an answer to include an omitted Rule 8(c) defense. *Zotos v. Lindbergh Sch. Dist.,* 121 F.3d 356, 360 (8th Cir.1997). Although leave should "be

freely given when justice so requires," Fed.R.Civ.P. 15(a), a court may deny a motion to amend if the movant does not have any colorable grounds for relief, if permission to amend would unduly prejudice the opposing party, or if the movant is responsible for undue delay, bad faith, or a dilatory motive. *Williams v. Little Rock Mun. Water Works,* 21 F.3d 218, 224 (8th Cir.1994) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *accord Swanson v. Van Otterloo,* 177 F.R.D. 645, 649 (N.D.Iowa 1998) ("Most courts hold that mere delay that is not accompanied by actual prejudice, bad faith, or futility, is not sufficient ground to deny leave to amend an answer to assert an affirmative defense.") When a defendant raises an affirmative defense in the trial court "in a manner that does not result in unfair surprise, ... technical failure to comply with Rule 8(c) is not fatal." *Financial Timing Pub., Inc. v. Compugraphic Corp.,* 893 F.2d 936, 944 n. 9 (8th Cir.1990) (internal quotation omitted).

 In her Resistance to the Motion to Amend Answer (Clerk's No. 264), Madison asserted she was prejudiced by IBP's pleading of a section 1981a(b)(3) defense not previously raised, but she did not explain how she was prejudiced. The asserted affirmative defense appears in the statute first pleaded by Madison herself. At the hearing on March 10, 1999, the parties argued application of the damages cap. Unlike in *Ingraham v. United States,* 808 F.2d 1075 (5th Cir.1987), the case on which Madison relies to support her waiver argument, the parties here had an opportunity to brief the legal issues before the Court entered judgment, and the parties did not contest the only fact—the number of IBP's employees—relevant to applicability of the affirmative defense. *Cf. Ingraham,* 808 F.2d at 1077–79 (holding defendant waived affirmative defense of damages limit in

Medical Liability and Insurance Improvement Act of Texas, when no reference was made to Act before judgment was entered). Further, after the United States intervened and briefed on the issue of the constitutionality of the caps. Madison submitted a supplemental brief and argument in response.

Under the circumstances, Madison was neither prejudiced nor unfairly surprised by IBP's assertion of the damages cap as an affirmative defense. Because no manifest errors of fact or law exist, the Court denies Madison's Motion to Alter or Amend the Judgment on this basis.

b. Constitutionality of Section 1981a(b)(3)

■ Madison next argues the damages cap in section 1981a(b)(3) is unconstitutional because the provision: (1) violates the right to trial under the Seventh Amendment, in that the cap interferes with the right to have a jury determine damages; (2) violates the Separation of Powers Doctrine, in that the cap undercuts the judiciary's power and obligation to reduce an excessive award based on a case's specific facts; (3) violates women's rights under the Equal Protection Clause, because damages for victims of job discrimination on the basis of race or national origin are not subject to similar caps; and (4) violates due process, in that the cap places the costs of intended benefits to the general public solely on the class consisting of those most severely injured by the discriminatory practice at issue.

Neither the United States Supreme Court nor the Eighth Circuit Court of Appeals has ruled on the constitutionality of section 1981a(b)(3)'s damages cap. The few courts that have considered the issue, however, have found the provision constitutional. *See Means v. Shyam Corp.*, 44 F.Supp.2d 129, 133 (D.N.H.1999) (holding

§ 1981a(b)(3)'s cap on compensatory and punitive damages did not violate Equal Protection Clause under rational relationship analysis); *Passantino v. Johnson & Johnson Consumer Prods.*, 982 F.Supp. 786, 789 (W.D.Wash.1997) (holding § 1981a(b)(3) damages cap was not unconstitutional and did not violate right to jury trial under Seventh Amendment of United States Constitution) (cited in *Hemmings v. Tidyman's, Inc.*, 65 F.Supp.2d 1157, 1162 (E.D.Wash.1999)); *Channon v. UPS*, 76 Fair Empl.Prac.Cas. (BNA) 1697 (Iowa Dist. Ct. Polk County 1998) (holding § 1981a(b)(3) did not violate separation-of-powers doctrine of Article III of United States Constitution, the Equal Protection Clause of Fourteenth Amendment, or the Due Process Clause of Fifth and Fourteenth Amendments; and stating in dicta that statute did not violate right to jury trial under Seventh Amendment).

Following the persuasive reasoning in these cases, the Court holds the damages cap provision in section 1981a(b)(3) to be constitutional.

c. Application of Cap to Individual Claims

■ Madison next contends that if the Court holds the damages cap is constitutional, it must apply the cap separately to each claim of discrimination and retaliation that could have been brought. Specifically, Madison lists 16 instances of alleged discriminatory and retaliatory acts that occurred after IBP had notice of Madison's filing of a complaint with the ICRC and the EEOC. She alleges each of these acts represents a distinct claim to which a $300,000 cap should apply, with the aggregate capped amounts totaling at least $4.4 million.

Madison has not cited, nor has the Court found, any cases in support of her contention. *Cf. Passantino*, 982 F.Supp. at 788

(stating "[t]here is no legal authority for multiple 'caps' on the verdict"; and declining to apply multiple caps based on each distinct retaliatory act alleged by plaintiff and included in jury's verdict). The Court finds no reason exists to alter or amend judgment on this basis.

### 2. Reallocation of Damages

■ Alternatively, Madison asks the Court to amend the judgment to allocate the compensatory damages ($110,000) awarded for her sexual harassment and discrimination claims to her claims under the ICRA, enabling her to recover that amount in addition to the capped punitive damages ($300,000) to which she is entitled under Title VII. IBP argues the award for sexual harassment and discrimination cannot be split, with part allocated to Madison's state claims, and part to her federal claims. IBP contends that Madison can recover under either Title VII or the ICRA, but not under both.

Madison's theory is a logical approach to the dual right of recovery for civil rights claims under federal and state law. The court in *Martini v. Federal Nat'l Mortgage Ass'n,* 178 F.3d 1336 (D.C.Cir. 1999), *petition for cert. filed* (U.S. Nov. 29, 1999) (No. 99–908), for example, reallocated a portion of Title VII damages exceeding the statutory cap to the plaintiff's recovery under the HRA. *Id.* at 1349. "Were we not to treat damages under federal and local law as fungible where the standards of liability are the same, we would effectively limit the local jurisdiction's prerogative to provide greater remedies for employment discrimination than those Congress has afforded under Title VII," in violation of Title VII's express terms. *Id.* at 1349–50 (citing *Kimzey v. Wal–Mart Stores,* 107 F.3d 568, 576 (8th Cir.), *rev'd in part on other grounds,* 124 F.3d 208, 1997 WL 572149 (8th Cir.1997)

(unpublished)). Title VII states that nothing in its provisions, "shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State." 42 U.S.C. § 2000e–7.

Courts allocate compensatory damage awards to the state claims and punitive damages to the Title VII claims, "to permit the plaintiff to receive the full amount awarded by the jury without exceeding the legal limits placed upon sexual harassment claims under Title VII and [the state statute]." *Funk v. F & K Supply, Inc.,* 43 F.Supp.2d 205, 226 (N.D.N.Y.1999) (internal quotation and citation omitted).

Here, liability standards under federal and state law are the same, but the state law imposes no cap on damages. *See Martini,* 178 F.3d at 1349; *Kimzey,* 107 F.3d at 576; *Funk,* 43 F.Supp.2d at 225; *Passantino,* 982 F.Supp. at 788; *Luciano v. Olsten Corp.,* 912 F.Supp. 663, 674 (E.D.N.Y.1996), *aff'd* 110 F.3d 210 (2d Cir. 1997). Unlike Title VII, the ICRA allows no punitive damages.

The verdict form did not differentiate between Madison's federal and state damages. In accordance with federal law, the Court did not instruct the jury about Title VII's damages cap. 42 U.S.C. § 1981a(c)(2).

The reasons given in the above cases for allocating compensatory damages to a plaintiff's state claims, and punitive damages to her Title VII claims are persuasive. IBP has cited no cases on point to the contrary.

The Court grants Madison's Motion to Alter or Amend the Judgment to the extent she seeks allocation of all compensatory damages for her sexual discrimination and harassment claims ($110,000) to her ICRA claims, and all corresponding punitive damages to her Title VII claims,

which are subject to the damages cap. Madison's total compensatory damages award for her sex discrimination and harassment claims will thus increase from $50,688 to $160,688.

3. Interest

a. Prejudgment Interest

■ Madison first seeks prejudgment interest under Iowa law on her awards of backpay ($50,688) and emotional distress ($110,000) under the ICRA.

Iowa law provides that interest shall be allowed on all money due on judgments and decrees of courts. Iowa Code § 535.3 (1999). Interest awarded under section 535.3 is generally mandatory. *Barske v. Rockwell Internat'l Corp.*, 514 N.W.2d 917, 925 (Iowa 1994). Such interest includes interest for compensatory damages, *see Wilson v. IBP*, 589 N.W.2d 729, 730 (Iowa 1999), and applies to awards under the Iowa Civil Rights Act, including backpay, *see Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 896 (Iowa 1990).

Except for interest awarded for future damages, interest accrues from the date of the commencement of the action. Iowa Code § 668.13. The interest is computed on a simple rather than a compound basis in the absence of express authorization to the contrary. *Landals*, 454 N.W.2d at 896; *Davidson v. Bruce*, 594 N.W.2d 833, 837 (Iowa Ct.App.1999).

Madison's motion for prejudgment interest for backpay and emotional distress awards for past damages under the ICRA is granted and she is entitled to interest at the statutory rate set forth in Iowa Code § 668.13(3), with interest accruing from the date of the commencement of her action, and computed on a simple rather than a compound basis.

■ Madison next moves for prejudgment interest on the punitive damages award under Title VII. IBP contends Madison is not entitled to prejudgment interest, because punitive damages are penalties. IBP is correct on this point.

■ Federal courts have been "concerned that prejudgment interest not be awarded where punitive damages are at issue, lest a double penalty be inflicted or the maximum penalty be exceeded." *Board of Gov. of Fed. Reserve Sys. v. Pharaon*, 169 F.3d 110, 115–16 (2d Cir. 1999) (citing *Rodgers v. United States*, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947)); *cf. Wickham Contracting v. Local Union No. 3, IBEW*, 955 F.2d 831, 834 (2d Cir.1992) ("Prejudgment interest is improper where statute itself already provides for full compensation or punitive damages."); *Emmel v. Coca–Cola Bottling Co.*, 904 F.Supp. 723, 734 (N.D.Ill.1995). An award of prejudgment interest includes, "at least two considerations: (1) it compensates a plaintiff for the money damages incurred and (2) where liability and the amount of damages are fairly certain, it promotes settlement and deters an attempt to benefit unfairly from the inherent delays of litigation." *Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 674 (8th Cir.1995) (denying interest on backpay awarded for demotion and retaliatory-refusal-to-rehire claims); *accord, Mennen v. Easter Stores*, 951 F.Supp. 838, 862 (N.D.Iowa 1997).

Madison has been fully compensated for the money damages she incurred, and the amount of punitive damages were not fairly certain before trial. For these reasons, prejudgment interest on the award of punitive damages on Madison's section 1981 claim for race discrimination is denied.

■ The issue of prejudgment interest on Madison's section 1981 backpay award must be considered. To compensate Madison adequately for the money damages she incurred, prejudgment inter-

est on the backpay award at the rate specified in section 1961(a), compounded annually, is authorized. *See Mennen,* 951 F.Supp. at 863 n. 28 (calculating prejudgment interest at current 52–week U.S. Treasury bill rate, and compounding annually); *Davis v. Kansas City Hous. Auth.,* 822 F.Supp. 609, 617 (W.D.Mo.1993) (appropriate rate of interest used to calculate prejudgment interest is the statutory rate, provided in § 1961, compounded annually). Prejudgment interest is, however, inappropriate for Madison's emotional distress award under section 1981. *See O'Neal v. Ferguson Construction Co.,* 35 F.Supp.2d 832, 841 (D.N.M.1999) (granting prejudgment interest for backpay award in discrimination case brought under § 1981, when amount of backpay was readily determinable as separate from rest of compensatory damage award); *Place v. Abbott Laboratories, Inc.,* No. 94 C 5491, 1999 WL 569580, at *2 (N.D.Ill. July 30, 1999) (holding prejudgment interest was not appropriate for portion of verdict that jury designated as compensatory damages).

### b. Post-judgment Interest

Federal law, under 28 U.S.C. § 1961, rather than state law, governs post-judgment interest in this case. *See United States Fidelity and Guar. Co. v. Housing Auth.,* 114 F.3d 693, 697 (8th Cir.1997) (citing *Weitz Co. v. Mo–Kan Carpet, Inc.,* 723 F.2d 1382, 1385–86 (8th Cir. 1983) (per curiam)).

Madison requests post-judgment interest, including post-judgment interest under Iowa law on her backpay and emotional-distress awards under the ICRA. Because she is a prevailing party in federal court, Madison is entitled to post-judgment interest. *See* 28 U.S.C. § 1961(a); *United States Fidelity and Guar. Co.,* 114 F.3d at 697. Post-judgment interest is awarded, and shall be calculated in accordance with

28 U.S.C. § 1961(a), from the date of entry of the judgment. *See* 28 U.S.C. § 1961(a).

As the Court discusses below, Madison is entitled to attorney fees. She is also entitled to post-judgment interest on that award in accordance with 28 U.S.C. § 1961(a), accruing from the date of this Order. *See Jenkins v. State of Missouri,* 931 F.2d 1273, 1277 (8th Cir.) (holding plaintiffs' entitlement to post-judgment interest on attorney fees accrued from order declaring entitlement to fees) *cert. denied,* 502 U.S. 925, 112 S.Ct. 338, 116 L.Ed.2d 278 (1991).

### C. Madison's Claim for Equitable Relief, Including Front Pay (Clerk's No. 174)

Madison asserts that reinstatement or promotion is unfeasible, because of IBP's ongoing hostile attitude toward Madison, as evidenced by IBP's investigation of Madison's involvement in Khong Baccam's alleged criminal acts on January 20, 1999; Grothe's March 4, 1999, memorandum to managers and the script read to all employees concerning Madison before her return to work on March 9, 1999; management's continued reliance on Madison's performance on a sample test she took in 1997; and the close monitoring Madison received when she returned to work March 9, 1999.

In lieu of reinstatement, Madison seeks front pay in the amounts of either $2,040.40, $1,335.10, or $630.20. Madison reached these amounts based on the claim she is entitled to front pay for the five-week period between February 26, 1999, the verdict date, and April 5, 1999, the date she began her unpaid leave of absence. The figures represent, alternatively, the prorated earnings and benefits of three supervisors. Madison chose supervisors' salaries because, even though she is not seeking reinstatement, she argues that

her only chance for fair treatment at IBP would be to have a supervisory job, with authority equivalent to those persons who discriminated and retaliated against her.

Madison also seeks additional equitable relief. First, Madison asks the Court to order IBP to make substantial changes in its training program, including the following: (1) distribute a court-approved written policy against sexual harassment, discrimination and retaliation to every employee annually until at least the year 2009; (2) provide at least 100 hours of court-approved, equal-opportunity training to existing and any newly-appointed personnel directors in each plant for the next 10 years, and 40 hours annually for the next 10 years; and (3) provide 40 hours annually of such training for Grade 10 managers for the next 10 years. Next, Madison asks for establishment of a First Response Team of mentors and an equal-access committee acting independently of IBP. Madison further seeks a permanent injunction ordering IBP to cease its discriminatory practices, and asks the Court to retain jurisdiction for 10 years to monitor IBP's compliance with the Court's order.

IBP argues that the Court should not consider any equitable remedy. IBP maintains that both reinstatement and front pay would be inappropriate because there has been no constructive discharge, the jury compensated Madison for constructive demotion, and the jury awarded no future compensatory damages on any theory. Alternatively, IBP challenges the amount of Madison's front-pay request on the grounds that Madison has failed to mitigate her damages, in that her decision to take a leave of absence indicated she was not interested in applying for a trainer or supervisor job, or in otherwise working at the plant. IBP maintains that if any front pay is awarded, it should be limited to cover the period following the verdict to approximately March 10, 1999, when Madison first heard about the job opening for trainer.

1. Standard

Under Title VII, 42 U.S.C. § 1981, and the ICRA, the Court has the discretion to award equitable remedies, including reinstatement and front pay. *See Gumbhir v. Curators of Univ. of Missouri*, 157 F.3d 1141, 1145 (8th Cir.1998) (Title VII case), *cert. denied*, 526 U.S. 1005, 119 S.Ct. 1143, 143 L.Ed.2d 210 (1999); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063, 1064–65 (8th Cir.1997) (Title VII and § 1981 case); *Davis v. City of Waterloo*, 551 N.W.2d 876, 884 (Iowa 1996) (ICRA case). In shaping a remedy to compensate Madison for what she lost due to the discrimination, the Court cannot reject or contradict the jury's findings. *See Gumbhir*, 157 F.3d at 1145.

Front pay is an equitable remedy that may be granted in lieu of reinstatement in situations where reinstatement would be impracticable or impossible. *Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir.1999). Such situations may include hostility between the parties that makes a productive and amicable working relationship impossible. *Cox v. Dubuque Bank & Trust Co.*, 163 F.3d 492, 498 (8th Cir.1998) (internal citations and quotations omitted). Before awarding front pay in lieu of reinstatement, a district court need not find that the hostility arises from a discriminatory animus, but only that the animosity is so extreme that it makes an amicable, productive work relationship impossible. *Id.*

The amount of front pay is also an equitable matter to be determined at the district court's discretion. *Id.* at 498. The plaintiff bears the burden of proving the basis for a front pay award, after

which the burden shifts to the defendant to prove front pay is unwarranted. *Curtis v. Electronics & Space Corp.*, 113 F.3d 1498, 1503 (8th Cir.1997); *Rasmussen v. Quaker Chem. Corp.*, 993 F.Supp. 677, 683 (N.D.Iowa 1998). In setting the amount of a front pay award, a court may consider any relevant factors, including the plaintiff's duty to mitigate and the availability of employment opportunities. *Rasmussen*, 993 F.Supp. at 683 (citing *Roush v. KFC Nat'l Management Co.*, 10 F.3d 392 (6th Cir.1993), *cert. denied*, 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994)).

 A Title VII claimant seeking front pay has a duty to mitigate damages by exercising reasonable diligence to locate and maintain other suitable employment. *Excel*, 165 F.3d at 639; *Equal Employment Opportunity Comm'n v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992). The defendant has the burden of proving that the employee did not make reasonable mitigation efforts. *Excel*, 165 F.3d at 639. In considering whether a plaintiff has failed to mitigate, a court may consider the temporal length of the job search. *See id.* at 640 ("[A]t the time of the front pay determination, sufficient time had passed, such that [the plaintiff's] failure to find comparable employment was due to a failure to mitigate.")

2. Discussion

Here, both parties assert that reinstatement is not appropriate. Since Madison seeks front pay for February 26 to April 5, 1999, that will be considered as the relevant period regarding the reinstatement issue. Reinstatement during the period February 26 to April 5, 1999, is moot, because it is no longer possible. Therefore, reinstatement is not ordered.

 Concerning the amount of front pay to be awarded, if any, I first hold that the amount should not be set on the basis of IBP's failure to promote Madison to a supervisory position, because that basis is too speculative. Rather, if any amount of front pay were awarded, it would be only on the basis of a trainer job.

In its brief, IBP asserts Madison failed to exercise reasonable diligence to mitigate her damages because she did not apply for the two trainer jobs available in March 1999. Madison argues her failure to apply for the jobs was not unreasonable, because her supervisors would have been men who had discriminated and retaliated against her.

IBP further contends Madison failed to exercise reasonable diligence to mitigate her damages, in that she took a leave of absence after she left work on March 9, 1999. Madison counters that she left work on March 9, 1999, because she felt she was being too closely monitored and was, in effect, constructively discharged. The evidence, however, belies this claim: Madison told no IBP supervisors of her complaint about close supervision before she left work and took a leave of absence. *See Tork v. St. Luke's Hosp.*, 181 F.3d 918, 920 (8th Cir.1999) ("An employee who quits without giving [the] employer a reasonable chance to work out a problem has not been constructively discharged.") (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996)). During her leave, Madison risked not learning of suitable openings at IBP for which she could qualify. Madison's failure to apply for the two trainer jobs open in March 1999, along with her action in leaving work on March 9, 1999, and taking a leave of absence, support a finding that she failed to exercise reasonable diligence to mitigate her damages. Considering all the relevant factors, including Madison's duty to mitigate, and the availability of employment opportunities, the Court holds that Madison is not entitled to front pay.

 The Court next considers Madison's request for additional equitable re-

lief, including implementation of discrimination-intervention First Response Teams, rewriting of IBP's civil rights policies, and court monitoring for 10 years. Madison has been adequately compensated by the jury's damages award, and although some of IBP's employment and discovery practices need review, the requested extraordinary injunctive relief seems unnecessary to modify IBP's behavior and educate its employees, considering the amount of public attention, union focus, and employee interest generated by this case, as well as the fact that IBP must pay Madison over $1.7 million in compensatory and punitive damages, and significant attorney fees. *Compare Ward v. Tipton County Sheriff Dep't,* 937 F.Supp. 791, 800 (S.D.Ind.1996) (denying Title VII plaintiff's request for injunction requiring employer to provide seminars and training for staff on equal employment rights, when employment-discrimination case generated publicity and plaintiff received $80,000 in damages and $60,000 in attorney fees), *with Lynch v. City of Des Moines,* 454 N.W.2d 827, 835 (Iowa 1990) (affirming court's order under ICRA that city develop police department-wide education and training in prevention and correction of sexual harassment, when court awarded plaintiff attorney fees and $10,000 for emotional distress, finding much of emotional distress was attributable to turmoil in plaintiff's personal life, and impliedly gave no award for other items of requested damages). The Court therefore denies Madison's requested injunctive relief.

For the reasons outlined above, the Court denies Madison's claims for front pay and additional equitable relief.

### D. IBP's Post-trial Motions

#### 1. Motion for New Trial (Clerk's No. 212)

IBP seeks a new trial based on 129 counts of error concerning the claims submitted, instructions, insufficient evidence, duplicate damages, and evidentiary rulings.

#### a. Constructive Demotion

IBP maintains that the constructive-demotion claim (Instruction Nos. 4, 17, and the verdict form) should not have been submitted for the following four reasons: (1) it is not a recognized cause of action; (2) Madison did not specifically plead constructive-demotion; (3) the claim was subsumed in claims of discrimination or harassment and should not have been submitted as a separate cause of action; and (4) the instruction incorrectly states the elements of a constructive-demotion claim. Alternatively, IBP asserts that the evidence was insufficient to support Madison's constructive-demotion claim, and the evidence does not support characterizing this claim as a section 1981 claim.

#### 1) Errors in Submission

IBP argues that the constructive-demotion claim is invalid because the Eighth Circuit Court of Appeals has not adopted this theory of recovery. However, there are no Eighth Circuit cases that explicitly reject the theory. Without an explicit rejection in this circuit, the issue of constructive demotion remains an open question and the theory may be recognized here, as it has been in several other jurisdictions. The decisions recognizing constructive-demotion are analogous and persuasive. *See Sharp v. City of Houston,* 164 F.3d 923, 933–34 (5th Cir.1999) (recognizing constructive-demotion theory as sufficient to constitute "adverse action" in retaliation context); *Dowling v. Prudential Ins. Co.,* No. 87 Civ. 2189(JFK), 1988 WL 3418, at *2 (S.D.N.Y. Jan.12, 1988) (unpublished) (stating first, "this court

finds that the constructive demotion theory could only be possible in this circuit if an employer had made conditions so unbearable that a reasonable person in the employee's shoes would have felt compelled to accept a demotion, rather than either remaining in his current position, or resigning" and then analyzing claim under such theory but holding, "the plaintiffs cannot state a valid claim, even if the constructive demotion cause of action existed in this circuit"); *Toscano v. Nimmo,* 570 F.Supp. 1197 (D.Del.1983) ("To reject such a constructive demotion theory would, in effect, penalize an employee for conduct amounting to a mitigation of damages."). Accordingly, this Court recognizes the constructive-demotion theory of recovery.

 IBP further argues that even if constructive demotion is a legitimate theory, it is not a separate claim, but is instead indistinct from either Madison's retaliation or discrimination claims. The constructive-demotion claim submitted to the jury was modeled after the instruction for a claim of constructive discharge. The Eighth Circuit has recognized that constructive discharge claims can exist as separate and independent causes of action. *See, e.g., Phillips v. Taco Bell Corp.,* 156 F.3d 884, 890 (8th Cir.1998). After a careful review of the applicable case law and analysis of the jury instructions, the Court holds it is more appropriate to view constructive-demotion as a separate theory.

IBP also attacks the constructive-demotion jury instruction, arguing that if such a claim exists, the instruction should have contained an intent element.

In regard to constructive demotion, the Court instructed the jury as follows:

> Your verdict must be for Plaintiff Sheri Madison and against Defendant IBP in Plaintiff's constructive demotion claim if each of the following numbered elements has been proved by a preponderance or greater weight of the evidence:
>
> 1. Madison had to accept a demotion at IBP because of racial and/or sexual harassment and discrimination.
>
> 2. IBP or its management-level employees deliberately made her working conditions so intolerable that it was reasonably foreseeable that a reasonable person in the same position as Madison would have taken a demotion in an attempt to separate herself from the harassment and discrimination. An employee may take a demotion if she reasonably believes there is no chance for fair treatment, or that the employer cannot or will not protect her from future harassment in the position which she currently holds.
>
> 3. Damages that she proved arose as a result of her having to take the demotion. If Madison has failed to prove any of the numbers 1 through 3, she is not entitled to recover on her claims of constructive demotion.

Instruction No. 17. The instruction does not contain the specific word "intent." The instruction does, however, precisely track the standard for analyzing a constructive-discharge claim. *See Phillips,* 156 F.3d at 890. The *Phillips* court stated, "[c]onstructive discharge occurs 'when an employer *deliberately* renders the employee's working conditions intolerable and thus forces [her] to quit [her] job.'" *Id.* (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981) (alterations in original) (emphasis added)).

 Furthermore, the words "intent" and "deliberate" are interchangeable. *See Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1354 (4th Cir.1995). Just as the jury was instructed in this case, plaintiffs can prove intent " 'by showing their resignation was a reasonably foreseeable conse-

quence of their employers' discriminatory actions.'" *Gartman v. Gencorp Inc.,* 120 F.3d 127, 130 (8th Cir.1997) (quoting *Hukkanen v. International Union of Operating Eng'rs,* 3 F.3d 281, 285 (8th Cir.1993)). Jury instructions need not include any one particular recitation of an applicable legal standard, as long as the jury is properly instructed as to the substance or essence of the claim. *See White v. Honeywell, Inc.,* 141 F.3d 1270, 1278 (8th Cir.1998). In form and substance the claim of constructive demotion was not improperly submitted to the jury so as to constitute a manifest error of law.

 Next, IBP argues the instructions were unclear concerning the basis for Madison's retaliation and constructive-demotion claims—whether the claims were based on Title VII, 42 U.S.C. § 1981, or the ICRA, and whether the claims were based on sexual discrimination, sexual harassment, racial discrimination or racial harassment. IBP further asserts the instructions improperly combined retaliation based on sex discrimination or harassment with retaliation based on race discrimination or harassment. The instructions and verdict form, IBP asserts, improperly combined in the same instructions the sex- and race-based harassment and discrimination claims under Title VII, section 1981, and the ICRA. IBP also argues that the Court should have required Madison to elect or identify whether the basis of each claim was Title VII, section 1981 or the ICRA, because different limitations apply to the statutes, punitive damages are not recoverable under the ICRA, and emotional distress damages should be limited under Title VII. ·

For all purposes relevant to this case, the standard of proof is the same for discrimination and retaliation claims based on Title VII, section 1981, and the Iowa Civil Rights Act. *See Hulme v. Barrett,* 449 N.W.2d 629, 631 (Iowa 1989) (stating Iowa courts evaluating cases under ICRA turn to analytical framework used by federal courts in assessing federal law), *cited in Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (stating ICRA was modeled after Title VII); *Roark v. City of Hazen,* 189 F.3d 758, 761 (8th Cir.1999) (applying same standard to Title VII and § 1981 claims). Therefore, the instructions were adequate.

The Court holds that IBP's assertions regarding errors in submission do not provide a basis to order a new trial.

2) Sufficiency of Evidence; Treating as Section 1981 Claim

IBP argues that the evidence was insufficient to support Madison's constructive-demotion claim, and that the evidence does not support characterizing this claim as a section 1981 claim.

Madison asserted constructive demotion based on both gender and race, and Instruction No. 17 included both. The verdict form did not specify whether the jury's finding of constructive demotion was based on gender or race. For purposes of deciding whether to apply the section 1981a(b) damages cap to the damages awarded for the claim, the Court treated the constructive-demotion claim as a section 1981 claim. The claim is analyzed here under both Title VII and section 1981.

 The evidence showed that over several years while Madison was a trainer, she complained to managers on different occasions about the racial and sexual harassment by supervisors and co-workers, but management either took no action, or took action that was not reasonably calculated to remedy the situation. On the few occasions when supervisors or human resources managers investigated one of

Madison's complaints, little was done except to note Madison's "troublemaker" status.

From the evidence presented, a reasonable jury could find supervisors' conduct and management's indifference to her complaints increasingly upset Madison. The jury could also find that Madison was subjected to increased disciplinary reports, which were set aside only after Madison filed grievances; assignments to utility-worker duties while she held a trainer position; and supervisors' threats to "make her life miserable," or to have her terminated because she complained of discrimination and harassment. Based on the evidence, the jury could find that IBP deliberately rendered Madison's work conditions so intolerable that it was reasonably foreseeable she would accept a demotion to escape from the discriminatory environment.

Giving Madison the benefit of all reasonable inferences, the Court holds that sufficient evidence existed, under either Title VII or section 1981, to support Madison's constructive-demotion claim. IBP's remaining challenges to the claim are discussed in the jury instruction section.

b. Punitive Damages

■ IBP challenges the punitive damages award on many grounds. IBP first argues that the decision to provide a supplemental jury instruction on punitive damages in response to the jury's written request is a sufficient basis to grant a new trial. The decision whether to provide a supplemental jury instruction rests within a trial court's discretion. *See Jackson v. City of Little Rock*, 26 F.3d 88, 91 (8th Cir.1994). Exercising this discretion did not cause a miscarriage of justice as IBP argues, nor was it a manifest error of law.

IBP next challenges the substance of the supplemental instruction, contending the instruction incorrectly stated the law, was unsupported by the evidence, and unduly emphasized one factor and type of evidence. IBP bases these objections on the United States Supreme Court's decision in *BMW of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the Eighth Circuit Court of Appeals' decision in *Kim v. Nash Finch Co.,* 123 F.3d 1046 (8th Cir.1997).

In question 4, the jury asked:

Dear Judge—Please clarify the portion [of Instruction 20, Punitive Damages] that we have underlined....

Clerk's No. 195. Attached to the jury's question was Instruction No. 20. The portion of Instruction No. 20 underlined by the jury stated, "[you should consider] whether the amount of punitive damages bears a reasonable relationship to the actual damages you have awarded." *Id.*

■ The responsive supplemental jury instruction stated as follows:

There is no exact or specific mathematical formula for you to use to determine the relationship between actual and punitive damages. Punitive damages must be based upon calm discretion and sound reasoning. You are instructed that you may consider the degree of reprehensibility of the parties' actions and the ratio between the actual harm inflicted and the punitive damages.

Clerk's No. 195. The nature of a supplemental instruction is within the court's discretion. *See Victorian House v. Fisher Camuto Corp.,* 769 F.2d 466, 470 (8th Cir. 1985) (stating that the character of supplemental jury instructions is a discretionary matter for the district court). Moreover, in light of the evidence presented at trial, neither *BMW* nor *Kim* conflicts with the nature of the supplemental instruction. The supplemental instruction was within the Court's discretion, and did not cause a

miscarriage of justice, nor was it a manifest error of law. *See BMW*, 517 U.S. at 575, 116 S.Ct. 1589 ("Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.").

IBP argues that under the Supreme Court's recent holding in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the court improperly instructed the jury. In *Kolstad*, the Supreme Court held that a Title VII plaintiff is eligible to receive punitive damages when the employer acted "with 'malice or with reckless indifference to [the plaintiff's] federally protected rights.'" *Kolstad*, 119 S.Ct. at 2124 (quoting 42 U.S.C. § 1981a(b)(1)) (alteration in original).[6] The Supreme Court interpreted the terms "malice" and "reckless indifference" in reference to an employer's knowledge that it is violating federally protected rights, not that it is engaging in discrimi-

nation. *See id.* The punitive damages instruction given to the Madison jury closely tracked *Kolstad*'s language. *See* Instruction No. 20, Punitive Damages ("[Y]ou must find ... that the acts or omissions of IBP were done with malice or recklessly indifference or callously indifference to Madison's rights.").[7] One difference is that Instruction No. 20 did not contain the word "federally" as a modifier for protected "rights." The absence of the word "federally," however, did not change the substance of the instruction when all the instructions are read together, and any challenge made by IBP on this basis fails. *See White*, 141 F.3d at 1278.

The *Kolstad* Court then discussed when an employer is liable for punitive damages as the result of discriminatory acts of employees serving in managerial capacities, noting agency principles establish that the company may be liable for those employees' acts, if the employees have sufficient

6. This discussion pertains to all awarded punitive damages, because the jury was given one single instruction and the standards under Title VII and section 1981 have been held to be the same. *See Blackmon v. Pinkerton Sec. & Investigative Servs.*, 182 F.3d 629, 635 (8th Cir.1999) (citing *Kim*, 123 F.3d 1046 (8th Cir.1997), for the 'principle that the same standard applies to punitive damages under Title VII and § 1981).

7. Instruction 20 provided:

The law allows, but does not require, you to award punitive damages in addition to actual damages to Sheri Madison. For each claim you find that Madison has proved, if any, you must consider what, if any, punitive damages you should award for that claim. Punitive damages are limited to conduct occurring after January 13, 1993.

Punitive damages are awarded in the jury's discretion to punish a defendant for acting with malice, or with reckless or callous indifference to a plaintiff's rights in order to deter the defendant and others like it from the same or similar conduct in the

future. Therefore, in order to award Madison punitive damages for each specific claim, you must find, by a preponderance or greater weight of the evidence, that the acts or omissions of IBP were done with malice or recklessly indifference or callously indifference to Madison's rights.

In deciding on the amount of punitive damages, if any, you should consider how offensive the conduct of IBP was; what amount is needed, considering IBP's financial condition, to punish the defendant for its wrongful conduct toward Madison and to prevent a future repetition of IBP's wrongful conduct; whether the amount of punitive damages bears a reasonable relationship to the actual damages you have awarded; and what sum is sufficient to deter defendant and others from wrongful conduct in the future.

You should fix any amount of any punitive damages using calm discretion and sound reasoning. You must not be influenced by sympathy or dislike for any party. The Court gave no instruction on the Title VII damages limitation in § 1981a(b)(3), but it reduced the award after trial.

managerial authority and discretion in job execution, even if they are not top managers. *See Kolstad,* 119 S.Ct. at 2128–29. Instruction No. 2, Corporation's Actions, sufficiently tracked this discussion.[8]

The *Kolstad* Court also held that an employee's discriminatory actions do not automatically bind a corporation, but only do so when the employer has not acted in good-faith compliance with Title VII. *See id.* at 2129. IBP challenges the jury instructions for not explicitly stating this good-faith directive. This Court concludes that such a directive was unnecessary in light of an additional holding in *Kolstad:* an employer will be liable for an employee's actions if the employer authorizes or ratifies the employee's acts. *See id.* The evidence more than sufficiently demonstrates that IBP both ratified and authorized managers' and supervisors' discriminatory conduct perpetrated against Madison. This evidence includes, but is not limited to, the many instances of managers' and supervisors' failures to intervene after receiving and reviewing Madison's complaints about discriminatory disparate treatment and harassment.[9]

Even if IBP's conduct did not render unnecessary a good-faith instruction, in light of the jury instructions as a whole, and the overwhelming evidence proving liability, the absence of such instruction by no means prejudiced IBP. *See Equal Employment Opportunity Comm'n v. Wal–Mart Stores, Inc.,* 187 F.3d 1241, 1248–49 (10th Cir.1999) (holding that employers must do more than adopt policies against discrimination to satisfy the goodfaith standard set forth in *Kolstad* ); *Cf.* Instruction No. 11, Hostile Work Environment—Sexual and/or Racial Harassment Essential Elements (stating that IBP must be found liable if, and only if, *inter alia,* it failed to take prompt and reasonable corrective action).

The evidence presented allowed the jury to find that supervisors participated in, or did not take prompt and reasonable action to correct, incidents of sexual discrimination, including unlawful harassment and disparate treatment based on gender. Evidence also showed that Jackson, Gordy Laird and Olguin participated in, or did not take prompt and reasonable action to correct, many incidents of racial discrimination, including harassment, based on the race of Madison's family. IBP's managers repeatedly ignored Madison's complaints about this conduct. Evidence indicated the written corporate policy was not carried out at the Perry facility, with the knowledge of IBP corporate-office staff Ott and Jepsen. The human resources manager and EEO coordinator learned of the offending conduct, but either did not investigate, or made no attempts to disci-

---

8. Instruction 2, regarding a corporation's actions, provided:

 A corporation acts only through its management-level employees, and any management-level employee of a corporation may bind the corporation by acts and statements made while acting within the scope of his or her duties as an employee of the corporation.

 To determine what IBP knew or should have known, you shall consider something known by a management-level employee to be known by the corporation. Likewise, you shall consider actions, statements, and decisions by IBP's management-level employees to be IBP's actions, statements, and decisions.

9. IBP's post-verdict memorandum to managers reflected the opinions expressed by IBP's supervisors and managers in testimony, when the memorandum stated: "[O]ur conduct and that of each of you, our managers, with regard to Mrs. Madison was entirely appropriate at all times," and, "We do not believe that racial or sexual harassment or discrimination occurred at the hands of management employees." (Def.'s Ex. AAAA.)

pline—other than disciplining Madison—as a result.

Madison complained to her supervisors, the human resources department, the EEO coordinator, and labor relations staff. None of those to whom Madison complained took prompt and reasonable corrective action. Madison also offered evidence that other employees complained about sexual and/or racial discrimination, including harassment, but managers took no reasonable remedial action. Avoidance was management's coping response. Viewing the evidence in total, and giving Madison the benefit of all reasonable inferences, this evidence was more than sufficient to establish the level of malice, or reckless or intentional indifference to Madison's rights, needed in order to submit punitive damages to the jury under federal law.

■■■■ IBP also argues that the punitive damages award was excessive, and the result of passion or prejudice. In light of the evidence and applicable case law, these objections lack merit. In *BMW* the Supreme Court provided a detailed discussion of three factors to consider when evaluating the excessive nature of an award. *See BMW*, 517 U.S. at 575, 116 S.Ct. 1589. These non-exclusive factors include the degree of reprehensibility of the conduct, the disparity between the award and harm suffered, and the difference between the award and other penalties authorized in comparable cases. *See id.* The punitive damages awarded by the jury in this case were approximately six times the award of actual damages. The application of the cap in this case reduces this ratio in the judgment to approximately four times the award of actual damages. Courts have upheld much greater punitive damage ratios for comparable conduct. *Cf. Kimbrough v. Loma Linda Dev., Inc.*, 183 F.3d 782 (8th Cir.1999); *Shea v. Galaxie Lum-*

*ber & Constr. Co.*, 152 F.3d 729, 736 (7th Cir.1998).

■■■ The defendant's wealth may be considered as one factor. *See Pulla v. Amoco Oil Co.*, 72 F.3d 648, 659 n. 17 (8th Cir.1995) (citing *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). In 1997 alone, IBP posted net earnings of $117,014,000 and its total assets were worth $2,838,941,000. The total damage award was only a fraction of these figures. For the Perry plant itself, the payroll represents $30 million, and hog purchases $210 million annually. Thus $1.4 million in punitive damages does not seem excessive given Defendant's wealth, the degree of reprehensibility of IBP's conduct, and the award of $343,417 for compensatory damages.

■■■■ IBP next argues that the evidence at trial was insufficient to meet the federal standard for punitive damages. Federal law is the focus, because the Iowa Civil Rights Act does not allow for punitive damages. *See Rasmussen v. Quaker Chem. Corp.*, 993 F.Supp. 677, 681 (N.D.Iowa 1998); *City of Hampton v. Iowa Civil Rights Comm'n*, 554 N.W.2d 532, 537 (Iowa 1996). The requisite level of recklessness or outrageousness can be inferred from management's participation in the discriminatory conduct. *Compare Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1062 (8th Cir.1993) (awarding punitive damages where supervisor disciplined female employee more harshly than male employees who violated similar rules), *with Varner v. National Super Markets, Inc.*, 94 F.3d 1209, 1214 (8th Cir.1996) (denying punitive damages where only one co-worker who was not a supervisor or manager harassed plain-

tiff).[10] The evidence was sufficient to meet the federal standard for punitive damages.

■ Finally, IBP argues that the jury improperly awarded punitive damages on the race discrimination claim because it did not award backpay. An award of backpay is not an essential prerequisite for a punitive damages award. *Cf. Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1352 (7th Cir.1995). The jury did award emotional distress damages for race discrimination. In light of this compensatory award and the evidence produced at trial demonstrating racial hostility to Madison from coworkers and supervisors, the Court holds that the punitive damage award was appropriate.

c. Other Claims of Insufficient Evidence

IBP argues that insufficient evidence existed to sustain the verdict on all claims submitted to the jury and on which the jury rendered a verdict. IBP asserts the verdict was thus against the weight of the evidence. Madison counters that the jury's verdict was not against the weight of the evidence, and that for each claim, the evidence was overwhelming and credible.

A court will uphold a jury verdict "if the evidence, viewed in the light most favorable to the prevailing party, is sufficient for a reasonable jury to have found for that party." *Kimzey*, 107 F.3d at 573 (citing *Chicago Title Ins. Co. v. Resolution Trust Corp.*, 53 F.3d 899, 904 (8th Cir. 1995)). Evidence presented to the jury was previously outlined. The evidence was sufficient to submit the claims of sexual and racial discrimination based on failure to promote, hostile work environment,

retaliation, and constructive demotion, and the evidence was sufficient to support the damages awarded.

1) Failure to Promote

■ For Madison to prevail on the claim of disparate treatment based on failure to promote, the jury had to find that Madison proved by a preponderance of the evidence that IBP failed to promote Madison to a job for which she was qualified, and that Madison's gender or the race of her family members was a motivating factor in IBP's decision. *See Lyoch v. Anheuser–Busch Co.*, 139 F.3d 612, 614 (8th Cir. 1998).

■ Madison produced evidence that she was repeatedly passed over for promotion in favor of less qualified men, and that the promotion system was tainted with biased decision-makers. As outlined above, the evidence was sufficient for a jury to find Madison established IBP's liability for discriminatory failure-to-promote on the basis of both gender and race.

■ The jury was instructed that even if it found in favor of Madison on the liability issue, it could not award damages for the claim if it found by a preponderance of the evidence that IBP would have made the same promotional decision regardless of her gender and/or the race of her family members.

■ Madison produced evidence that the decision-making process was managed and controlled by supervisors who discriminated on the basis of race and sex. Even if the ultimate promotion decision was made by a manager who was not biased,

---

10. Because the punitive damage award is sufficiently in line with the evidence produced at trial, the Court declines to address IBP's arguments regarding remittitur. *See American Bus. Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1146 (8th Cir.1986) ("A district court should grant remittitur only when the verdict is so grossly excessive as to shock the court's conscience.").

the decision was premised on information provided by those who were. Further, IBP allowed the decision-making process to be so loosely managed, that discrimination in the decision-making process was perpetuated. The fact the jury awarded damages means that the jury found IBP would not have made the same promotional decision absent discrimination. As outlined above, the evidence was sufficient for a jury to find that IBP would not have made the same promotional decision regardless of Madison's gender and the race of her family members.

### 2) Hostile Work Environment

■ A plaintiff may advance two theories of employer liability for sexual or racial harassment based on creation of a hostile work environment. *See Sims v. Health Midwest Physician Serv. Corp.*, 196 F.3d 915, 918–19, 921 (8th Cir.1999). First, the employer can be subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *Id.* at 918–19 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998)). Second, the employer can be liable for co-employee harassment under a negligence theory, because the employer "knew or should have known of the harassment and failed to remedy it." *Id.* at 921. In this case, to simplify the instructions, Madison assumed the burden of meeting the heightened negligence theory for both co-employee and supervisor harassment, as reflected in Instruction Nos. 10 and 11.

■ To show an actionable hostile work environment, a plaintiff must establish (1) the plaintiff belongs to a protected class; (2) the plaintiff was subject to unwelcome sexual or racial harassment; (3) the harassment was based on sex or race;

(4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. *Schmedding v. Tnemec Co., Inc.*, 187 F.3d 862, 864 (8th Cir.1999); *Kim*, 123 F.3d at 1063; *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir.1996); *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir.1993); *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 563 (8th Cir.1992).

■ To constitute harassment, "the conduct must be 'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive." *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014 (8th Cir. 1988) (citing *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir.1986)). Another consideration in determining whether the harassment was unwelcome is the plaintiff's own behavior. The proper inquiry is whether the plaintiff indicated by her conduct "that the alleged harassment was unwelcome." *Quick*, 90 F.3d at 1377. The offending conduct must be sufficiently severe or pervasive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Kimzey*, 107 F.3d at 573. The standard requires more than a few isolated incidents. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Kimzey*, 107 F.3d at 573. Unless a harassment victim subjectively believes she is working in a hostile environment, the harassment has not "actually altered the conditions of the victim's employment." *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367; *Kimzey*, 107 F.3d at 573. A workplace permeated with "discriminatory intimidation, ridicule, and insult" is sufficiently severe to establish a hostile work environment. *Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Kimzey*, 107 F.3d at 573.

Here, Madison introduced evidence that could establish her hostile-work-environment claim based on sexual discrimination, including, but not limited to the following: She was continuously addressed by sexually derogatory names, including whore, slut, bitch, *puta,* and *pinche puta;* she was grabbed on the buttocks and breast; male co-workers carried or rubbed up against her; she was shoved; and she received unfavorable job assignments.

Madison also introduced evidence that could establish, within the limitations period, her hostile-work-environment claim based on racial discrimination, including, but not limited to the following: Supervisors and co-workers made offensive comments about the race of her husband and children, including referring to her family members as "fucking niggers," and joked about the hair and lips of her children, and racial epithets were written on locker room walls and spoken by employees in her presence.

To support all her hostile-work-environment claims, Madison showed supervisors did not act promptly and reasonably to remedy the situation after her complaints to them and the ICRC. She also showed IBP lacked adequate supervisor training on the requisites of harassment or on intervention in complaints.

Madison produced sufficient evidence for a reasonable jury to find she established her sex and race hostile-work-environment claims as a matter of law.

### 3) Retaliation

Madison claimed retaliation based on gender and race, and the jury instruction on retaliation included both bases for her claim. *See* Instruction No. 16, Retaliation—Essential Elements. The verdict form did not specify whether the jury's finding of retaliation was based on gender or race. For purposes of deciding whether to apply the section 1981a(b) damages cap to the damages awarded for retaliation, the retaliation claim was treated as a section 1981 claim. In this ruling, the claim is analyzed under Title VII, section 1981 and the ICRA.

Title VII prohibits an employer from retaliating against any employee because she "opposed any practice [that has been] made an unlawful employment practice by this subchapter," or "made a charge" or "participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a); *Scamardo v. Scott County,* 189 F.3d 707, 710 (8th Cir.1999). Iowa, too, provides a statutorily protected right to complain about prohibited workplace harassment. *See Hampton,* 554 N.W.2d at 535; *Clay v. City of Cedar Rapids,* 577 N.W.2d 862, 865 (Iowa Ct.App.1998). Similarly, section 1981 prohibits retaliation in a racial-discrimination context. *Kim,* 123 F.3d at 1059.

To establish a prima facie case of retaliation discrimination under Title VII, Madison must show (1) she engaged in a statutorily protected activity; (2) the defendant took an adverse employment action against her; and (3) a causal connection existed between the adverse employment action and the protected activity. *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 841 (8th Cir.1998); *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1245 (8th Cir.1998). The defendant may then rebut the plaintiff's prima facie case by advancing a legitimate, nonretaliatory reason for the adverse employment action. *Coffman,* 141 F.3d at 1245. If the defendant advances a nonretaliatory reason, the plaintiff must show the defendant's proffered reason was a pretext for illegal retaliation. *Id.* This burden-shifting standard is the

same under section 1981, *Kim*, 123 F.3d at 1059, and under Iowa law, *Hampton*, 554 N.W.2d at 535, *Hulme*, 449 N.W.2d at 633 (citing Eighth Circuit cases).

■■■ The jury heard evidence that after Madison complained about sexual and racial discrimination, IBP supervisors gave her more disciplinary reports than they had previously, many of which were unfounded; she was singled out and sanctioned for smoking when co-employees were not sanctioned; she received increased scrutiny at work; she was denied certain promotions; supervisors told Madison they would make her life miserable or write enough disciplinary reports to take her to the point of termination if she continued to complain of discrimination and harassment; supervisors labeled Madison a troublemaker who went outside the chain of command which prevented her promotions; and supervisors told co-workers to avoid Madison. The jury decided the extent to which it believed or disbelieved the testimony it heard. *See Scamardo*, 189 F.3d at 710. The jury could have disbelieved the "legitimate reasons" offered by IBP supervisors and managers for the actions they took.

Madison presented more than sufficient evidence from which a jury could find that IBP retaliated against her on the basis of gender and race under Title VII, the ICRA, and section 1981.

d. Other Errors in Jury Instructions and Verdict Forms

IBP asserts the Court should remand for a new trial even if Madison's claims were properly submitted to the jury, because the instructions to the jury were in error.

1) Preliminary Instructions

■■■ IBP first maintains the Court erred in giving the Preliminary Instruc-tions over its objections, and in not instructing on the statute of limitations in the preliminary instructions.

Ultimately, the jury was instructed that "Sheri Madison cannot recover for any unlawful incidents or damages prior to January 13, 1993," Final Jury Instruction No. 19, and that "Punitive damages are limited to conduct occurring after January 13, 1993," Final Jury Instruction No. 20. The Court holds that no reason exists to order a new trial on this basis. *See White*, 141 F.3d at 1278.

2) Submission of Claims

a) Insufficient Evidence Supported Claims

IBP alleges the evidence did not support submission of awards for backpay and emotional distress, and of causes of action for sex and race discrimination and harassment, retaliation, and constructive demotion.

The jury awarded backpay for Madison's claims of sexual discrimination ($50,688); retaliation ($25,000); and constructive demotion ($979). As outlined above, the evidence of the various circumstances and decision-makers for the various failures to promote were sufficient to warrant submission of back-pay awards under the separate theories.

■■■ IBP argues that the emotional-distress damages awarded by the jury are excessive and the evidence did not support submission of awards for emotional distress. The evidence more than sufficiently supports the jury's findings and its verdict. Based on her treatment at IBP, Madison and others testified that she experienced the following: near breakup of her marriage; added stress within her family; physical side effects including headaches, hives, weight loss, crying at work, and

sleeping difficulties; and hurt and anger over the comments about her children, as well as over how she was being treated. This evidence sufficiently supports the damages awarded by the jury. *See Kim,* 123 F.3d at 1065.

As discussed above, sufficient evidence existed to support submission of causes of action for race and sex discrimination and harassment, retaliation, and constructive discharge.

b) Duplicate Damages

■ IBP also argues that the backpay awards, along with the other damage awards, are duplicative. A commonly accepted principle provides that a plaintiff may not recover more than once for a single injury. *See, e.g., Cole v. Control Data Corp.,* 947 F.2d 313, 320 (8th Cir. 1991); *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1410–11 (8th Cir.1987). Each of Madison's submitted claims were separate and distinct from one another, incorporating different elements and predicated on unique facts. *See, e.g., Wallin v. Minnesota Dep't of Corrections,* 153 F.3d 681, 688 (8th Cir.1998) ("[I]t is well established that retaliation claims are not reasonably related to underlying discrimination claims.") (citing *Williams v. Little Rock Mun. Water Works,* 21 F.3d 218, 223 (8th Cir.1994) (stating that a race-discrimination claim can be separate and distinct from a retaliation claim)). Obviously, then, in cases where a plaintiff has submitted distinct claims, he or she may recover damages for each claim. *See Havoco of America, Ltd. v. Sumitomo Corp. of America,* 971 F.2d 1332, 1346 (7th Cir.1992).

Moreover, at IBP's request, the court instructed the jury regarding duplicate damages:

If you determine that any damages should be awarded, you must enter separate amounts for each type of damages

you find pursuant to the instructions, and must not award duplicate damages in more than one category or claim. Plaintiff has made six different claims. You must consider each claim separately, and award the damages she has proven for that claim. If you find damages are based on two or more claims combined, and it is impossible to separate the damages, you should request further instructions.

Instruction No. 18, No Quotient Verdict or Duplicate Damages. This same directive also appears again in Instruction No. 19.

During deliberation, the jury asked the Court several questions but requested no further instruction regarding duplicate damages. It is reasonable to infer that had jurors been confused about duplicate damages, or had trouble separating damages, they would have inquired about this issue. The record lacks any indication that the jury did not follow the Court's directive not to award duplicate damages. The jury awarded no damages for future emotional distress on any of the six claims, and no damages for backpay on racial or sexual discrimination or harassment. Accordingly, the Court presumes the jury followed the instructions. *Cf. Havoco,* 971 F.2d at 1346 (upholding the damage awards on four separate claims because the jury was specifically instructed not to award duplicate damages for the same injury). The damage awards were not duplicative and IBP's challenge on this basis fails.

On a related ground, IBP also argues the damages awarded on constructive demotion should have been subsumed in the discrimination and/or retaliation damages. In light of the determination that constructive demotion is a distinct claim and no damages were duplicative, this challenge also fails.

3) Instruction on Undisclosed Evidence

IBP next asserts that Instruction No. 7 regarding an adverse inference from undisclosed evidence was submitted in error, because the inference was unsupported by evidence, and for reasons previously stated on the record.

Instruction No. 7 provided:

### Undisclosed Evidence

IBP failed to disclose to Sheri Madison certain employment records: the Applicant Flow Logs for 1993, 1994, 1995 and part of 1996, and certain Application/Promotional personnel documents relating to positions for which Madison has applied, that IBP had an obligation to disclose to her in this case. You may infer that these materials were unfavorable to IBP, or would have benefitted Madison's case.

 Under its inherent power, a court can impose a sanction for spoliation—the destroying of, or obstructing access to, evidence—including an adverse-inference instruction, on a party that has destroyed relevant evidence. *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.,* 47 F.3d 277, 280 (8th Cir.1995), *cert. denied,* 516 U.S. 822, 116 S.Ct. 84, 133 L.Ed.2d 42 (1995). Before imposing such a sanction, the court must determine whether the following three requirements were met: (1) The destruction of evidence prejudiced the opposing party; (2) the party against whom the sanction is sought had ownership or custody of the evidence when it was destroyed; and (3) the party against whom the sanction is sought knew or should have known that evidence would be relevant and should be preserved as evidence. *Id.* Iowa law requires more than mere negligence for spoliation to raise an inference against the spoliator; imposition of an adverse inference requires intentional destruction of evidence. *State v. Lan-*

*glet,* 283 N.W.2d 330, 333 (Iowa 1979). A court may impose an adverse inference instruction, when the party against whom the sanction is sought had an obligation to preserve the information at the time it was destroyed. *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 73 (S.D.N.Y. 1991).

 Here, IBP argues it unintentionally destroyed certain employment documents while adhering to its established policy of document retention. Federal regulations, however, required IBP to maintain all relevant employment records—including application forms from all employees who applied for jobs for which Madison unsuccessfully applied—after it received notice of Madison's EEOC discrimination charge, filed January 13, 1995. *See* 42 U.S.C. § 1602.14 (1998). Furthermore, some of the missing records were for 1996, which was when Madison served her Interrogatories and Requests for Production of Documents. If IBP had been following its normal document-retention policy, no 1996 records would yet have been destroyed.

Included among the documents IBP never produced were Khristy Lovan's ICRC file, even though a portion of her ICRC charge of sex discrimination was marked as an exhibit, and a sexual-harassment complaint made by Joscelyn Madren in February 1998, even though in her Request for Production No. 2, Madison sought a "Complete copy of all other complaints, formal or informal, against defendant for discrimination or harassment on the basis of sex or race in Iowa from January 1, 1989 to the present." (Pl.'s Brf. Supp. Res. Def.'s M. New Trial, Clerk's No. 308, at 5–6.)

Initially, it appeared that IBP's failure to produce documents was due to negligence, and that lack of attention to detail early in the case caused the problems that

arose shortly before and during trial. However, after hearing the testimony of IBP's management witnesses, it became apparent to the Court that IBP acted knowingly in designing and implementing a discovery-response procedure that was likely to lead to destruction of relevant employment records. The procedure included decisions and lack of training concerning what records to retain after an employee filed a civil rights complaint. Substantial evidence existed that IBP acted recklessly, in that the company destroyed relevant employment records knowing or having reason to know that its conduct created an unreasonable risk of harming Madison's case, or that harm to her litigation efforts was highly probable to follow its actions. *See Leonard v. Behrens*, 601 N.W.2d 76, 80 (1999) (discussing recklessness standard). IBP's acts were more than mere negligence.

This finding served as the basis for Instruction 7, dealing with spoliation of evidence. The instruction was limited to only the documents that had been clearly requested and destroyed. Other sanctions— including allowing the continuation of trial; ordering payment of $500 for one week's salary to Madison in lieu of attorney fees for the motion to compel that was granted; compelling extensive production of documents (originals, complete files, and broader time ranges) on the eve of trial; and refusing to allow IBP to withdraw portions of the Pretrial Stipulation—were imposed to resolve discovery disputes and sanction IBP's behavior concerning late-produced documents. The Court repeatedly denied Madison's frequent and heated requests for the Answer to be stricken.

Because federal regulations required IBP to preserve the information at the time it was destroyed, the company knew or should have known that it had an obligation to preserve the documents at issue.

Further, the Federal Rules of Civil Procedure imposed an obligation on IBP to seek and preserve the information Madison specifically requested. IBP had ownership or custody of the evidence when it was destroyed. Instruction 7 was warranted due to IBP's failure to intervene in the "normal" document destruction process after Madison filed her ICRC complaint, and the company's failure to instruct managers on the significance of the pending litigation to the ongoing retention of documents. For example, no one instructed McNamara to keep his notes and promotion-decision documents from jobs Madison applied for in 1996 and 1997, so the documents were destroyed; and certain employment files were missing information only about Madison. The testimony and all the circumstances indicated that the destruction of relevant evidence was the likely, and intended result of IBP's deliberately chosen procedures and lack of training.

The destruction of the evidence at issue prejudiced Madison in her ability to supply circumstantial evidence to establish her discrimination claims. Furthermore, IBP criticized Madison at trial for not accurately recounting all the jobs for which she applied, when it was IBP that allowed operation of the document-retention plan to destroy the evidence of her applications and the company's decision-making process. The fact that Madison obtained a favorable jury verdict on all her claims does not negate the Court's finding, made before submission of the case to the jury, that Madison was prejudiced as a result of IBP's destruction of relevant employment records.

For these reasons, the Court did not err in submitting the adverse-inference instruction.

4) Other Instructions, Verdict Form

IBP asserts the Court committed reversible error in the following three ways:

(1) submitting final jury instructions Nos. 8, 10–12, 14, 16–20, and the verdict form; (2) failing to give IBP's Requested Verdict Form, with special interrogatories that gave the jury a chance to find IBP would have made the same decisions regardless of discrimination; and (3) failing to give IBP's requested instructions Nos. 4, 10–20, 24, 25, and 29–35.

 When a proposed instruction addresses an issue crucial to fair presentation of the case to the jury, the trial court is obliged to give an appropriate instruction on that issue, although not necessarily in the wording of the proposed instruction. *Scamardo,* 189 F.3d at 711. Jury instructions must be read as a whole and considered in light of the entire charge. *Id.* (citing *Walker v. AT & T Technologies,* 995 F.2d 846, 849 (8th Cir.1993)). "[T]he form and language of jury instructions are committed to the sound discretion of the district court so long as the jury is correctly instructed on the substantive issues in the case." *Id.* (internal quotations and citation omitted) (alteration in original). Moreover, before relief is warranted, the error in not giving an instruction must be prejudicial. *Id.*

When read in their entirety, the Preliminary and Final Instructions properly instructed the jury on all claims. No new trial is warranted based upon the Instructions.

e. Mistrial Motions and Trial Conduct

IBP claims the Court erred in denying its many written and oral motions for mistrial. Upon review and further consideration of reasons stated on the record when the motions were made, the Court holds it did not err in denying IBP's mistrial motions.

 IBP further asserts that the Court denied it the chance to voir dire witnesses, object, sidebar, ask questions, and address matters outside the jury's presence. IBP's characterization is in error. A review of the transcript demonstrates that no substantial difference existed between IBP and Madison in terms of the relative percentage of times the Court permitted each to voir dire witnesses, object, side-bar, ask questions, and address matters outside the jury's presence. Further, the Court made extra efforts to ensure that at any conferences with counsel, both parties had an adequate opportunity to make their record, which could not be done with side-bar conferences. Due to the configuration of the courtrooms in which this case was tried, the court reporter could not report side-bars. Counsel were repeatedly advised of this and given the chance to take up matters out of the presence of the jury, which was facilitated by the use of a "compressed" trial schedule for the jurors, who were in attendance from 8:30 a.m. to 2 p.m. most days. Every day began with an attorneys' conference on the record at 8:00 a.m., continued with conferences during jurors' breaks, and concluded with a similar conference for at least an hour after the close of testimony. At no time did the parties lack a mechanism to address and make a complete record on legal or procedural issues.

Next, IBP contends the Court treated it and Madison unequally, in that the Court ordered IBP not to object and state in front of the jury that Madison was, during cross-examination, using exhibits not previously listed, marked, identified or provided to IBP, or using portions of exhibits without previously notifying IBP, while, however, allowing Madison to make such statements in front of the jury, even though incorrect. A review of the transcript shows that IBP and Madison were treated substantially the same in this regard, and that the Court's efforts to make a clear record were at times ignored by

both parties. There is no reason to award a new trial on this basis.

IBP maintains that the Court denied its request to require Madison to identify for the record what pages and portions of the employee files were being referenced. The Court did not deny IBP's request, but permitted identification of pages of the employee files through reference to Bates stamp numbers. Throughout, and at the end of trial, the Court required all counsel to clarify all exhibits, including Bates-numbered pages with the Clerk so everyone knew with certainty what was going to the jury as an exhibit, and what had been excluded.

IBP further alleges the Court erred in denying the company's oral and written Application for Election or Specification (Clerk's No. 197), asking Madison and the Court to specify under which statute or statutes each claim was submitted to the jury. As discussed above, the instructions submitted adequately covered the legal claims, required proof and jury's findings.

### f. Errors in Evidentiary Rulings

IBP argues it is entitled to a new trial due to several "Inexplicable" evidentiary rulings, including the following: (1) excluding Dr. Barbara Long's expert testimony; (2) admitting evidence of other incidents of sexual and racial harassment that were (a) irrelevant or outside the limitations period, (b) complaints to IBP about non-sex-or-race-based incidents, (c) employment decisions regarding Madison's husband, James Madison, and other African–American employees, and (d) evidence of isolated incidents of harassment not involving Madison, over a 10–year period; (3) overruling IBP's hearsay objections regarding Rev. Ratliff's statements, concerning evidence of harassing or discriminatory comments, and regarding Madison's testimony about James Madison's statements of concern for

his job; (4) overruling IBP's objections of lack of foundation and speculation concerning testimony about James Madison's concern for his job as a result of the present lawsuit, and about the Rev. Ratliff's testimony regarding Sheri and James Madison's feelings and the effect of harassment on them; (5) overruling IBP's objections to leading questions, especially during Madison's testimony, and when Madison's counsel displayed outlines and summaries on an overhead; (6) allowing Madison to introduce through other witnesses evidence of incidents relating to Rhonda Arbuckle, Deb Fink, and Kim Ponce, after granting IBP's Motion in Limine to exclude these three people from Madison's witness list; (7) allowing Madison to display summaries of personnel files, and of Madison's job history and testimony, when summaries were not admitted into evidence, and allegedly did not have a proper foundation; (8) admitting into evidence summaries of personnel files of employees who applied for jobs for which Madison allegedly applied, when the personnel files were inadmissible; (9) admitting into evidence personnel files, or parts of files, of employees who had not competed with Madison for jobs, had worked with or competed for jobs against James Madison, were alleged harassment victims, allegedly harassed others, or were candidates for jobs for which Madison applied, even though such evidence was irrelevant, over-inclusive, and contrary to the pretrial ruling limiting discovery of files; (10) admitting during Alberto Olguin's testimony a summary, (Pl.'s Ex. 503), listing harassment complaints and files and indicating when they were produced; (11) precluding IBP from introducing evidence of an incident involving Khong Bacaam and Madison, and evidence of drug-sale confession by Bacaam; (12) precluding IBP, while playing a videotape of an inspection of IBP's plant, from attempting to replicate in court the noise

level that existed in the plant when the videotape was made; (13) admitting part of Madison's discovery requests and IBP's responses (Pl.'s Ex. 600, 611–12, and 614–19), and requiring IBP to produce complete employee personnel files and other material; (14) denying IBP's request for admission of discovery material and pre-trial rulings on motions to compel; (15) overruling IBP's objection to admission of Exhibit 62, which contained financial information about IBP; (16) admitting Madison's exhibits supplied by Peter Mattila, Ph.D., concerning front pay (Pl.'s Ex. 54AA and 54AAA); (17) overruling IBP's objections as to certain of Madison's exhibits; (18) granting Madison's objections to IBP's exhibits that were not admitted and to IBP's testimony that was not allowed; (19) admitting Madison's Exhibits 652 (Lydia Garcia's complaint) and 576 (Madison's letter), not introduced until after Madison's case-in-chief; (20) excluding testimony of IBP's in-house expert, Burneill Ott, on issues relating to women's progress in management at IBP plants based upon evidence not produced in discovery, while allowing Madison's experts Eugene Borgida, Ph.D., and Mattila to testify regarding similar issues, based upon evidence produced in discovery; (21) excluding evidence of positive affirmative-action reviews of Gordy Laird; (22) denying IBP's motion to exclude Borgida's testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and (23) excluding IBP's proposed witnesses Donna Brunndage and Jennifer LeChuga. IBP further asserts that the cumulative effect of the above rulings denied IBP a fair trial.

The Court has reconsidered its rulings on these matters. For the reasons stated in its January 29, 1999, Order (Clerk's No. 147), and elsewhere in the record, the Court disagrees it erred in excluding Dr. Long's expert testimony as a discovery sanction, or that it erred in making the remaining evidentiary rulings that IBP challenges. Even if, in a particular instance, evidence should have been excluded because it was not directly relevant to issues in the case under Federal Rule of Evidence 402 and 403, admission of this evidence was harmless in the course of a three-week trial with a great volume of evidence. "Its impact would not have been great, and it cannot be said that it would have affected the outcome." *Equal Employment Opportunity Comm'n v. HBE Corp.*, 135 F.3d 543, 552 (8th Cir.1998) (citing *Campbell v. Vinjamuri*, 19 F.3d 1274, 1276 (8th Cir.1994)). The basis for all rulings was clearly explained at the time of the ruling, and, as became typical in this case, most rulings were reconsidered repeatedly at the request of the parties. Frequently, after heated arguments (such as those regarding the testimony by, or presence of, Madison's children, or whether certain pretrial stipulations should be withdrawn) the Court would rule, and then the parties would agree to do what one side had objected to originally. At no time did any party get "short changed" in their ability to make a record or have a ruling explained. IBP's motion for new trial based upon evidentiary rulings is denied.

### g. Statute of Limitations

In its Motion for a New Trial, IBP challenges various aspects of the rulings on the statute of limitations. IBP first challenges as prejudicial both the failure to preliminarily instruct on the statute of limitations, and the alleged change in position regarding the applicable statutes. These arguments lack merit. Trial management is within the discretion of the district court, and the "court has discretion to change its charge up until the time of its delivery." *Sagendorf–Teal v. County of*

*Rensselaer*, 904 F.Supp. 95, 97 (N.D.N.Y. 1995) (citing *Estate of Lutren v. Chesapeake & O.R.R.*, 592 F.2d 941, 945 (6th Cir.1979)), *aff'd*, 100 F.3d 270 (2d Cir. 1996); *cf. Territory of Guam v. Ignacio*, 852 F.2d 459, 461 (9th Cir.1988). The approach taken regarding preliminary instructions and any alleged changes in position did not cause a miscarriage of justice.

▆ IBP also argues, without supporting authority, that the statute of limitations for recovery of damages under Title VII and ICRA is 300 days prior to the filing of the administrative complaint. Regarding backpay, this position is contrary to the clear statutory language in 42 U.S.C. § 2000e–5(g)(1), which states, "back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission." *See also Winbush v. State of Iowa*, 66 F.3d 1471, 1477 n. 8 (8th Cir.1995); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1513 (10th Cir. 1997) (holding that general damages are not available if more than two years have passed prior to filing of an administrative complaint). Madison filed her administrative complaint on January 13, 1995.[11] The statutory directive regarding backpay was correctly followed by instructing the jury

that Madison was not entitled to damages, including backpay, prior to January 13, 1993. No manifest error of law was committed.[12]

The absence of authority regarding IBP's alleged applicable 300–day period for recovery of compensatory and punitive damages under Title VII and ICRA is fatal to IBP's challenge. Madison concedes that ICRA does not provide recovery for sex discrimination and harassment punitive damages; the 300–day period advanced by IBP is inapplicable. Neither ICRA nor Title VII contains specific provisions regarding temporal restrictions to compensatory and punitive damages, and neither the Eighth Circuit nor an Iowa court has provided a definitive ruling on an applicable time frame. Thus, it was within the proper discretion to direct the jury that "Madison cannot recover for any … damages prior to January 13, 1993." Instruction No. 19; *cf. Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 230 (8th Cir. 1996) (holding that where a continuing violation is at issue, recovery of damages is limited to the beginning of the limitation period).[13] IBP also challenges the statute of limitations ruling as it pertains to Madison's 42 U.S.C. § 1981 claim. IBP implic-

---

11. IBP has not disputed this date, notwithstanding that Madison's complaint states that she filed her administrative complaint on January 18, 1995. Because the January 13, 1995, date has been advanced by Madison and undisputed by IBP, and testified about throughout the trial, this Court accepted that date as the filing date.

12. At the instruction conference, Madison suggested that the imposed two-year time frame does not apply to compensatory damages under ICRA and punitive and compensatory damages under Title VII. This Court need not decide this issue here, as it is not raised as a challenge in the post-trial motions before the Court. In fact, Madison herself acknowledges that she agreed to the imposed period restricting recovery of damages prior to Janu-

ary 13, 1993. (Pl.'s Brf.Supp.Res. Def.'s M. New Trial (Clerk's No. 308), at 46). Even if Madison's suggestion is correct, the two-year period imposed by the Court helped, not hurt, IBP. On this basis, the Court did not prejudice IBP with the statute of limitations rulings.

13. On a related note, IBP challenges the application of continuing-violation theory to this case and, alternatively, its effect on the appropriate period to recover damages. Without question, Madison provided sufficient facts to support a continuing-violation theory, from the commencement of her career through her constructive demotion. *See Gipson*, 83 F.3d at 229. As discussed, damages were properly limited to the applicable limitation period.

itly acknowledges that this statute does not specify a certain statute of limitations period, but argues that the applicable statute of limitations period should be modeled after the two-year statute of limitations period employed for personal-injury actions in Iowa. *See* Iowa Code § 614.1(2); *Alvarez v. Meadow Lane Mall Ltd. Partnership,* 560 N.W.2d 588, 591 (Iowa 1997). *See generally Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). IBP contends that the limitations period accrual date should not begin when Madison filed her administrative complaint, because section 1981 does not contain an administrative exhaustion requirement. More specifically, IBP contends the accrual date is September 18, 1996, the date that Madison filed her federal claim.[14]

Madison resists this contention by noting that section 1981 does not contain any provisions limiting the recovery of damages, and arguing that if one were applicable, the statute of limitations period for her section 1981 claim would be four, rather than two, years prior to the filing of her federal complaint. Madison relies on 28 U.S.C. § 1658 to support this four-year statute of limitations argument.

■ Except as otherwise provided, section 1658 provides for a four-year statute of limitations period for any congressional act enacted after December 1, 1990. Madison argues that the Civil Rights Act of 1991, which amended section 1981 to provide a cause of action for post-contract formation discriminatory conduct, constitutes a post–section–1658 enactment. Several courts have addressed this issue and reached opposite conclusions regarding whether section 1658 applies to section 1981, as amended. This Court finds persuasive the reasoning of courts that have found section 1658 applicable to the Civil Rights Act of 1991. *See Rodgers v. Apple South, Inc.,* 35 F.Supp.2d 974 (W.D.Ky. 1999); *Alexander v. Precision Machining, Inc.,* 990 F.Supp. 1304 (D.Kan.1997); *Stewart v. Coors Brewing Co.,* No. Civ. A. 97–B–1467, 1998 WL 880462 (D.Colo. Dec.14, 1998); *cf. MCI Telecomms. Corp. v. Illinois Bell Tel. Co.,* No. 97–C–2225, 1998 WL 156674 (N.D.Ill. March 31, 1998). *But see Davis v. California Dep't of Corrections,* Civ. No. S–93–1307DFLGGH, 1996 WL 271001 (E.D.Cal. Feb.23, 1996). Accordingly, Madison was entitled to receive damages under section 1981 extending back four years from the date she filed her federal complaint for discriminatory conduct perpetrated by IBP. Notwithstanding an entitlement to a four-year period, for purposes of simplicity Madison agreed to a more restrictive statute of limitations period, a period beginning January 13, 1993. Madison was entitled to waive her right to a longer period, and her waiver was accepted. The four-year statute of limitations period ruling disposes of any further challenges by IBP regarding an even shorter limitations period.

Lastly, IBP contends that the jury awarded damages prior to the instructed statute of limitations. This argument was cursorily raised in IBP's Reply Brief to Plaintiff's Resistance to Motion for a New Trial, and is void of any support in the record or otherwise. This challenge falls in addition to all other challenges raised by IBP to the instructed statute of limitations.

h. Discovery Rulings

IBP contends the Court erred in several discovery rulings before and during trial,

---

**14.** Technically, Madison did not raise her section 1981 claim until she filed her amended complaint on February 25, 1998, but IBP concedes that under Fed.R.Civ.P. 15(c)(2), the section 1981 claim relates back to the original complaint filed in federal court on September 18, 1996.

including the following: (1) ordering, in response to Madison's Second Motion to Compel, production of complete, original personnel files of 51 employees subpoenaed January 18, 1999, and of an additional 14 employees; (2) ordering IBP during trial to produce employee personnel files not previously requested; (3) ordering IBP to produce all computer information pertaining to Madison and affirmative action plans that were not subjects of requests for production; and (4) ordering the following sanctions for late production: a trial continuance of one week, IBP's payment of one week of Madison's salary, preclusion of IBP's use of any document produced after discovery closed, and preclusion of IBP's withdrawal of paragraphs 26, 27, 29, and 31 of the Stipulation of Facts in the Pretrial Order.

For reasons already stated on the record, the Court disagrees that it erred in regards to these matters, and finds no basis to grant a new trial.

### i. Rulings on Motions in Limine

IBP challenges the Court's rulings on its motions in limine and its rulings on IBP's objections throughout the trial to the introduction of matters raised in its motions in limine, especially those relating to the admission of "other acts" of discrimination and harassment both outside the statute of limitations and as to other employees.

For reasons already stated on the record, the Court disagrees that it erred in regards to these matters, and finds no basis to grant a new trial.

### j. Errors in Rulings on Closing Arguments

IBP contends the Court erred in its closing argument rulings, including the following: (1) permitting Madison's counsel, over objection, to argue that Supervisor Roger Baumgartner's salary should be considered as a comparison for purposes of calculating Madison's backpay, when the Court precluded evidence from being offered through Matilla regarding Baumgartner's use as a comparator; (2) overruling IBP's objection to Madison's counsel reading and display in closing argument of transcribed trial testimony; and (3) allowing Madison's counsel, over objection, to display to the jury summary charts, Exhibit 650, which were not admitted into evidence because they were improper summaries, misleading and confusing.

For reasons previously stated on the record, the Court disagrees that it erred in regard to these matters, and finds no basis on which to grant a new trial.

### k. Verdict

IBP next challenges the jury's verdict. Specifically, the company asserts the verdict was internally inconsistent, in that the jury awarded no backpay and benefits on the race discrimination claim, which was based on a failure to promote; and IBP further asserts the verdict was excessive and was influenced by passion and prejudice.

The Court instructed the jury not to award duplicate damages. Both the sex- and race-discrimination claims were based on a failure to promote. The jury found IBP liable on both claims, but awarded backpay and benefits only once, on the sex-discrimination claim. The jury's award was consistent with its charge not to award duplicate damages.

The final judgment has been reduced by operation of the damages cap under 42 U.S.C. § 1981a(b)(3). The amount the jury originally awarded, $2,069,000, was neither excessive nor influenced by passion and prejudice considering the evidence of IBP's fostering of an unlawful hostile environment and biased promotion and job-

assignment processes, and the company's lack of an effective complaint process. As discussed above, the amount of punitive damages the Court awarded, $1,405,000, and the total judgment of $1,748,417 are not excessive.

The jury's verdict contains no basis on which to grant a new trial.

### 1. Jury Selection Process

IBP maintains the Court erred in striking, over objections, potential jury panel members before the start of jury selection, based on responses to juror questionnaires. IBP further asserts that the Court erred in overruling IBP's objection to use of the juror questionnaires.

For reasons already stated on the record, the Court disagrees that it erred in regards to these matters, and finds no basis to grant a new trial.

### 2. Motion for Judgment as a Matter of Law (Clerk's No. 213)

IBP moved for judgment as a matter of law at the close of Madison's evidence and at the close of all evidence. The Court denied IBP's previous motions for judgment as a matter of law, and for essentially the same reasons, does so again here.

Viewing the evidence in the light must favorable to Madison, resolving all conflicts in her favor, and giving her the benefit of all reasonable inferences, the Court cannot say that no legally sufficient evidentiary basis existed for a reasonable jury to have found in Madison's favor on compensatory and punitive damages. *See Dominium Management Serv. v. Nationwide Housing Group,* 195 F.3d 358, 363 (8th Cir. 1999). Judgment as a matter of law for IBP is therefore unwarranted.

### 3. IBP's Motion to Alter or Amend Judgment (Clerk's No. 214)

In its Motion to Alter or Amend Judgment, IBP repeats its objections discussed above. The Court denies IBP's Motion, because the company has not established the existence of newly discovered evidence, or the need to correct manifest errors of fact or law, and for all of the reasons and authorities cited above. *See Innovative Home Health Care. v. P.T.–O.T. Assocs.,* 141 F.3d 1284, 1286 (8th Cir.1998).

### III. Attorney Fees Award

On April 2, 1999, Madison filed an Application for Attorney Fees and Costs (Clerk's No. 215). She also filed supplements and responses to IBP's objections to the claimed fees and costs (Clerk's Nos. 248, 254, 299, 336, 343). IBP resists Madison's claim; the matter is fully submitted.

Madison initially requested fees of $596,914, including a multiplier for delay, and costs of $78,530.87. Madison filed supplemental motions, requesting post-trial attorney fees of $129,731.50, and costs of $6,724.16. Madison's ultimate claim for fees is $726,645.50 and for costs is $85,255.12, requesting a total award of $811,900.62.

In resistance, IBP claims Madison is entitled to no fee award, or alternatively, a substantially reduced fee award. IBP asserts that Madison initially failed to specify the judgment under 42 U.S.C. § 1981, and the right to attorney fees under 42 U.S.C. § 1988 as the basis for her request. IBP argues the attorney fees claimed are unreasonable and excessive, as well as inadequately documented.

In actions brought under 42 U.S.C. §§ 1981, 2000e–5(k), and Iowa Code Chapter 216, a court may exercise its discretion by awarding the prevailing party reasonable costs, including attorney fees.

*See* 28 U.S.C. § 1920; 42 U.S.C. §§ 1988(b), 2000e–5(k) (1994); Iowa Code ch. 216 (1999). The analysis of fee awards under 42 U.S.C. § 2000e–5(k) is analogous to the analysis under 42 U.S.C. § 1988. *See Parton v. GTE North, Inc.,* 971 F.2d 150, 155 (8th Cir.1992).

A party who substantially prevails on its complaint is entitled to all reasonable fees and costs. *Tuf Racing Prods. Inc. v. American Suzuki Motor Corp.,* No. 94 C 50392, 1999 WL 669226 (N.D.Ill. August 27, 1999). The degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical in determining the size of a reasonable fee, not whether to grant a fee award. *See id.* Madison meets this threshold requirement as evidenced by the amount of the February 26, 1999, jury verdict in her favor on all counts.

A. Lodestar for Fees

In civil rights cases, the attorney fees amount is generally determined by multiplying the reasonable number of hours spent on litigation by a reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Jensen v. Clarke,* 94 F.3d 1191, 1203 (8th Cir.1996). This is known as the lodestar. *See Casey v. City of Cabool,* 12 F.3d 799, 805 (8th Cir.1993) (citing *Hendrickson v. Branstad,* 934 F.2d 158, 162 (8th Cir.1991)). In evaluating the reasonable number of hours spent on litigation, unnecessary or redundant hours should be excluded. *Cf. Hawkins v. Anheuser–Busch, Inc.,* 697 F.2d 810, 817 (8th Cir.1983) (awarding paralegal fees because they were reasonable and not duplicative).

A reasonable hourly rate usually relates to the local legal market. *See Forshee v. Waterloo Indus., Inc.,* 178 F.3d 527, 532 (8th Cir.1999). In specialized areas of law, the national market may pro-

vide a reasonable hourly rate. *See Casey,* 12 F.3d at 805 (explaining that in some areas like civil rights, fees might more appropriately be determined by a national market.) "Reasonable fees" are to be calculated according to the similar services by lawyers of reasonably comparable skill, experience and reputation in the relevant community. *Blum v. Stenson,* 465 U.S. 886, 895, n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (cited in *McDonald v. Armontrout,* 860 F.2d 1456, 1458 (8th Cir.1988)).

Twelve factors help guide a court in determining the lodestar. These factors include:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley,* 461 U.S. at 429–30 & n. 3, 103 S.Ct. 1933, (quoting *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)); *St. Louis Fire Fighters Ass'n v. City of St. Louis,* 96 F.3d 323, 332, n. 10 (8th Cir.1996). In granting attorney fees in a civil rights discrimination case, the Eighth Circuit Court of Appeals has also recently emphasized the importance of considering fee awards in similar cases. *See Thorne v. Welk Inv., Inc.,* Nos. 98–3928, 98–4048, 1999 WL 1051110, at *6 (8th Cir., Nov.22, 1999). The court can also use its own knowledge, experience and exper-

tise in determining the fee to be awarded. *Gilbert v. City of Little Rock,* 867 F.2d 1063, 1066–67 (8th Cir.), *cert. denied,* 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

### 1. Hourly Rate

This action has been pending for over three years. The trial lasted three weeks, ending in a plaintiff's verdict on all counts. To assess the fee claim, the Court begins by determining whether Madison's counsel's requested hourly rate is reasonable. Five attorneys are requesting fees: lead counsel Roxanne Conlin, and associates Thomas Duff, Melinda Ellwanger, Tiffany Klosener, and Gretchen Jensen. The rates Madison seeks are as follows:

a) Roxanne Conlin: $300 per hour; in practice since 1966;
b) Thomas Duff: $150 per hour; in practice since 1988;
c) Melinda Ellwanger: $120 per hour; in practice since 1995;
d) Tiffany Klosener: $130 per hour; in practice since 1994;
e) Gretchen Jensen: $ 95 per hour; in practice since 1998.

Counsel have attached voluminous affidavits and supporting documentation regarding their qualifications and reasonableness of their hourly rates. Madison and IBP advance vastly different versions of Madison's entitlement to her requested attorney fees. Essentially, Madison argues that the type, complexity, and length of this case support her fee request, especially in light of the market rates. IBP objects on all fronts, urging this court to adopt a significantly lower figure.

#### a. Conlin

 Attorney Conlin claims she is entitled to a fee of $300 per hour, for a total of $413,100 ($300 per hour × 1,377 hours). All totals for attorneys' hours are based on Madison's original fee claims and her supplements. IBP provides affidavits from four lawyers providing similar services at reasonably comparable skill in Des Moines. The four attest that for lawyers of Attorney Conlin's age and experience, the typical hourly rate charged is between $150 and $180 per hour. IBP's lead trial counsel (one of four trial counsel and an in-house counsel who worked on this case) charged $150 an hour. Counsel who managed discovery and experts charged between $160 and $170 an hour.

Conlin was born in 1944 and graduated from law school in 1966. In 1989 she was named one of the nation's top ten litigators in an article in the *National Law Journal.* In 1991 she was named one of the 100 most influential lawyers in the nation by *National Law Journal.* In 1992 she became President of the Association of Trial Lawyers of America. In 1993 she was chosen to be a member of the International Academy of Trial Lawyers. In 1994, she was elected to membership in the American Law Institute. In 1995–96 she was featured in BEST LAWYERS IN AMERICA.

The *National Law Journal* named her in 1998 as one of the 50 most influential women lawyers in the United States.

In *Bleimehl v. Eastman Kodak Co.,* No. 4–93–CV–30702 (S.D.Iowa Jan. 27, 1997), the Court held that Conlin's reputation and service to the profession placed her at the high end of the market in Iowa, but because a large part of her practice was in Iowa, the court decided that the national market should not set the standard. Because of Conlin's background, the court rated her at the high end of the local market and awarded her $180 an hour. Similarly, in *Miller v. Woodharbor Molding Works, Inc.,* C95–3079–MWB (N.D.Iowa Apr. 24, 1998) the court also held that a national rate was an inappropriate benchmark, but awarded Conlin $275 an hour, the "outer limit" of fees for Iowa trial lawyers.

Based upon Conlin's skill, experience, reputation and the scope of her practice, the Court sets the reasonable hourly rate for Attorney Conlin in the Iowa market at $225 per hour.

b. Duff

 Thomas Duff, who served as lead discovery counsel and trial co-counsel, requests an hourly rate of $150, for a total $147,810 ($150 per hour × 985.4 hours). IBP's second-chair trial counsel also charged $150 an hour for this case. IBP's affidavits indicate the average hourly rate charged by Des Moines-area attorneys of Duff's age and experience is between $100 and $140.

Duff graduated from law school in 1988. From 1988 to 1989 he clerked for a judge. From 1989 to 1993 he worked as an associate in a law firm. Since 1993, he has worked for Conlin. After considering Attorney Duff's skill and experience, the rates charged by attorneys of his age and experience in Iowa, and his reputation, the Court determines Attorney Duff is entitled to a fee of $125 per hour.

c. Associates

 Associate Tiffany Klosener requests an hourly rate of $130 per hour, for a total of $7,098 ($130 per hour × 54.6 hours). Klosener graduated from law school in 1994 and became employed as an attorney with Conlin in 1996. Associate Melinda Ellwanger requests an hourly rate of $120 per hour, for a total of $6,252 ($120per hour × 52.1 hours). Ellwanger became employed with Conlin as a law clerk in 1993 and was admitted to practice in 1995. Associate Gretchen Jensen requests an hourly rate of $95 per hour, for a total of $25,859 ($95 per hour × 272.2 hours). Jensen became employed as a law clerk in 1996, and was admitted to practice in 1998. IBP's affidavits show that for

lawyers of one-to-four years of experience, the typical hourly rate charged is between $85 and $110 per hour. In light of their skill and experience, these attorneys are entitled to the following fees: Klosener, $90; Ellwanger, $85; and Jensen, $80.

Based upon the *Hensley* factors and evidence presented, the rates for calculating the lodestar are as follows: Conlin $225; Duff, $125; Ellwanger, $85; Klosener, $90; and Jensen, $80.

d. Law Clerks and Legal Assistants

Attorney fees can include work performed by legal assistants and law clerks. *Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *Hawkins,* 697 F.2d at 817.

 Madison's counsel typically uses a team of legal assistants and law clerks in preparing cases for trial. The law clerks include third- and second-year law students. Third-year law students are considered senior law clerks, and second-year law students are junior law clerks. Madison claims fees for legal assistants as follows:

a) Linda Wickett: 272.7 hours at $75 per hour;
b) Wendy Hart: 514.6 hours at $75 per hour;
c) Shelly Johnson: 179.6 hours at $75 per hour.

Madison additionally claims fees for law clerks:

a) Brooke Timmons: 106.1 hours at $75 per hour;
b) Jean Mauss: 172.1 hours at $60 per hour;
c) Stephanie Sheridan: 146.4 hours at $60 per hour;
d) Combined: 598.7 hours at $45 per hour for:
 1) Sarah Lopez
 2) Ann Meyer
 3) Bernice Corely

Based upon the evidence presented by both Madison and IBP, the Court determines legal assistants Linda Wickett,

Wendy Hart, and Shelly Johnson are entitled to a rate of $60 per hour. Senior law clerks Jean Mauss and Stephanie Sheridan and law clerk Brooke Timmons are entitled to a fee of $45 per hour. Junior law clerks Sarah Lopez, Ann Meyer and Bernice Corely are entitled to a fee of $35 per hour.

### 2. Reasonable Hours Spent

In evaluating the reasonable number of hours spent on litigation, unnecessary or redundant hours should be excluded. *See Hawkins,* 697 F.2d at 810. If the plaintiff fails to adequately document attorney fees and costs, a reduced fee may be warranted. *H.J., Inc. v. Flygt Corp.,* 925 F.2d 257, 260 (8th Cir.1991). Local Rule 54.2 requires that fee claims shall be supported by adequate itemization, including the amount of time claimed for any specific tasks, as well as the hourly rate. IBP complains that Madison's application is utterly bereft of "adequate itemization," or documentation of the amounts claimed for "specific tasks." *See Miller v. Woodharbor Molding & Millworks, Inc.,* 174 F.3d 948, 949 (8th Cir.1999). *Thorne v. Welk Investment, Inc.,* 197 F.3d 1205, 1213 (8th Cir.1999). As a result, IBP claims, Madison's fees should be reduced.

Both Madison's and IBP's billing in this case have been provided for review. I have carefully reviewed Madison's entire bill. I compared some of the entries in Madison's and IBP's bills, and find that Madison has adequately documented the services for which a fee is sought.

#### a. Conlin

Conlin has provided an itemized list of her work to support her claim for $413,100 in attorney fees, based upon 1,373 hours. Thirty days before trial, she incurred approximately 10 percent of the hours claimed, and approximately 20 percent of

the fees. IBP claims that by the discovery cut-off date, December 15, 1998, Madison's counsel should have been aware of any discovery deficiencies. IBP claims the bulk of hours generated by all of Madison's legal team were incurred in document review of exhibits, witnesses, and pretrial preparation. IBP is apparently arguing that if Madison had not waited until near the time of the trial to organize the document review, fewer hours would have had to be expended. Both parties engaged in significant document production and review, which was necessary to the presentation of the case. The timing was driven by IBP's answers to discovery, not Madison's counsel's slothfulness.

Most of Conlin's hours appear reasonable; however, portions appear excessive and duplicative. I find the total duplication to be 20 percent, based upon a review of Madison's counsel's bills. After this reduction, the total number of hours for computing the lodestar for Conlin is 1,099.

#### b. Duff

Most of Duff's hours appear reasonable; however, portions appear excessive or duplicative. I find the total duplication to be 20 percent, as reflected in the fee bill. After this reduction, the total number of hours for computing the lodestar for Duff is 788.

#### c. Associates

Most of Klosener's, Ellwanger's, and Jensen's hours appear reasonable; however, portions appear excessive or duplicative. New attorneys are not as efficient as experienced counsel. I find total duplication to be 25 percent, as reflected in the fee bill. After this reduction, the total number of hours for computing the lodestar is 41 for Klosener; 39 for Ellwanger; and 204 for Jensen.

#### d. Law Clerks and Legal Assistants

It is difficult to determine the reasonableness of hours claimed by legal assistants and law clerks. The law clerks were students or recent graduates inexperienced in employment litigation. The hours spent by legal assistants and law clerks appear to be duplicative.

The legal assistants billed the following hours:

| | | |
|---|---|---|
| a) | Linda Wickett: | 272.7 hours |
| b) | Wendy Hart: | 514.6 hours |
| c) | Shelly Johnson: | 179.6 hours |
| | Total: | 966.9 hours |

The law clerks billed the following hours:

| | | |
|---|---|---|
| a) | Brooke Timmons: | 106.1 hours |
| b) | Jean Mauss and Stephanie Sheridan: | 318.5 hours |
| c) | Sarah Lopez, Ann Meyer and Bernice Corely: | 598.7 hours |
| | Total: | 1,023.3 hours |

This total of work time (1,990 hours) is nearly the equivalent of one full-time staff person working for a year, in addition to the total of 2741.3 hours claimed for the licensed lawyers.

IBP claims legal assistants and law clerks spent time completing non-compensable clerical tasks, including the following: updating filing, updating document lists and notebooks, copying documents, providing courtroom support, taking documents to court, and replacing copies of documents. IBP asserts these tasks are not billable to a client.

IBP claims that duplication occurred throughout the case, including preparing the fee application, and that hours claimed should be reduced, because research and legal work done by inexperienced attorneys involves a learning curve, which normally would not be borne by a client. Based on duplication and billed clerical tasks, I find that Madison's billed hours for legal assistants and law clerks should

be reduced by 75 percent. After this reduction, the total number of hours for computing the lodestar is 242 for legal assistants and 256 for law clerks.

### B. Claim For Fee Enhancement

Madison requests an enhanced award above the lodestar amount in this contingent-fee case. IBP argues an enhanced lodestar is unavailable in contingent-fee cases. *See Forshee,* 178 F.3d at 532; *Newhouse v. McCormick,* 110 F.3d 635, 644 (8th Cir.1997) (citing *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)); *Morris v. American Nat'l Can Corp.,* 988 F.2d 50, 52–53 (8th Cir.1993). No enhancement is applied in the fee award.

### C. Claim for Expenses and Costs

#### 1. Legal Standard

Madison seeks a total $85,365.91 in costs under both 42 U.S.C. § 1988 and 28 U.S.C. § 1920. IBP argues that Madison has waived the right to recover taxable costs under 28 U.S.C. § 1920, because she did not timely file form A.O. 133, as required under Local Rule 54.1(a)(1). IBP further asserts that Madison is barred from recovering under 42 U.S.C. § 1988 any costs for which she has waived the right to taxation under 28 U.S.C. § 1920.

██ Local Rule 54.1 requires the party entitled to recover taxable costs to file form A.O. 133 and serve it on the adverse party within 14 days of the Clerk of Court's mailing of the form after entry of judgment. Here, the Court entered its judgment on March 19, 1999, and 14 days later, on April 2, 1999, Madison filed her Application for Fees. Madison did not file a separate bill of costs under Local Rule 54.1, but combined her motion for fees and costs. A separate cost petition would have been redundant. *Compare Tuf Racing*

*Prods.*, No. 94 C 50392, 1999 WL 669226, at *4 (not waive claim for taxable costs, when it filed, within appropriate time frame, combined motion for fees and costs rather than separate bill of costs, because separate claim would have been redundant), *with Fargo Biltmore Motor Hotel Corp. v. Best Western Intl., Inc.*, 742 F.2d 459, 464 (8th Cir.1984) (affirming district court's disallowance of award of costs, when party filed bills of costs four months after a deadline set in local rules). The Court finds Madison has not waived her claim for taxable costs.

### 2. Costs Claimed

The fee and cost award could have been more efficiently managed if the claim had been submitted in a better format, with a summary in one unified application, after the replies and supplements were filed. The court reviewed all the pleadings on the issue of costs, including all of IBP's resistances.

#### a. Investigative Work

Madison's counsel claims she is entitled to $3,943 for legal and business investigative work. Madison has provided sufficient documentation regarding these expenses. The reasonable award for investigative work is $3,943.

#### b. Copying/Printing

 Madison's counsel claims $25,914.75 for photocopying at her law firm, and $3,312.24 for commercial copying, plus copies from agencies in the amount of $167, for a total of $29,393.99 in copying expenses.

IBP claims Madison is not entitled to any expenses because she has waived her right to costs. IBP further argues that it would be inappropriate to require IBP to pay Madison's charge of 25 cents per page for in-house copies, rather than the commercial copy rate of eight cents per page as shown on Madison's bills. IBP also argues that Madison may recover expenses only for copies that were introduced at trial. In her claim, Madison fails to indicate what was used for trial.

As discussed above, Madison has not waived her right to recover these costs. Her counsel, however, provides little or no explanation as to what was copied, and the number of copies of each set of documents. All that appears in Madison's billing records is her name and the number of copies per month. It appears Madison charged a flat rate of 25 cents per page for 103,659 pages. This case was document-intensive. For example, from December 1998 to February 1999 alone, IBP's trial counsel charged the company for 33,114 copies at 15 cents per page, with another $380 in copy expense from IBP's other law firm. (Pl.'s Ex. 1000AF). Madison had the obligation to provide multiple sets of exhibits for the court, opposing counsel and witnesses. I observed the numerous documents Madison provided for trial. I find 15 cents per page is a reasonable amount for in-house copying expenses; Madison is awarded $15,548.85.

Madison claims a total of $3,312.24 for commercial copying, apparently relating primarily to personnel files ordered produced in January 1999, as well as to trial preparation. Madison is awarded $3,312.24 for commercial copy expense.

Madison also claims a total of $167.00 for copying expenses at the Iowa Civil Rights Commission, and the U.S. District Court. I find $167.00 is a reasonable amount for these copying expenses. Additionally, Madison spent $134.79 for audiotape copies of ICRC interviews. Madison is awarded a total of $19,162.88 for photocopying and commercial copy expenses.

### c. Filing and Service Fees

Madison's request for filing and service-of-process fees of $295.60 is granted.

### d. Deposition

Madison claims $9,533.60 in deposition expenses. IBP argues the depositions were not reasonably necessary for trial because Madison failed to show whether any of the depositions were put into evidence at trial, and whether any of the deposed individuals were beyond subpoena power of the court, or were otherwise unavailable to testify at trial. Deposition testimony was used at trial for impeachment and to refresh the recollection of several witnesses at trial. Madison points out that nearly every deponent was called as a witness at trial, and that the deponents not called at trial were listed by one of the parties as a witness in the case.

■■■ The expense of taking or obtaining copies of depositions for trial cannot be taxed as costs unless: (1) the depositions were reasonably necessary for trial, and (2) the depositions were not solely for the purpose of discovery or investigation. *See Koppinger v. Cullen–Schiltz & Assoc.*, 513 F.2d 901, 911 (8th Cir.1975). Because not all of the depositions were used at trial, Madison is awarded $4,766.80 for the deposition expenses.

### e. Trial Transcript

In addition to the deposition expenses, Madison requests the costs of daily copy transcript of $5,450.50, and other trial transcripts of $4,190. The transcript expense totals $9,640.50. IBP argues Madison has failed to show that the expenses were reasonably necessary for trial.

■■■ Before the costs of daily transcripts can be awarded, the prevailing party must show that they were not obtained primarily for the convenience of the parties, but were necessary for use in the case. *See McDowell v. Safeway Stores, Inc.*, 758 F.2d 1293, 1294 (8th Cir.1985). Due to the length of the trial, and the fact that the major witnesses testified over several days, I find that $3,500 is reasonable for daily copy expense. Further, nearly the entire trial transcript was necessary for post-trial motions, in addition to its use on appeal. But, in addition to the paper copy of the transcript, Madison's counsel received a copy on computer disk at a cost of $2,124.50. Only the cost of the paper copy, $2,065, is authorized. For daily copy and transcript reporter services, the total amount of $5,565.50 is authorized.

### f. Expert Witnesses

■■■ Expert witness fees are recoverable in an employment discrimination case. *See* 42 U.S.C. §§ 1988(c), 2000e–5(k). Madison claims fees and expenses for economist J. Peter Mattila, Ph.D., who charged $105 per hour, for a total of $4,942.93. Madison claims fees for 71.25 hours for Eugene Borgida, Ph.D., who charged $275 per hour for 71.25 hours, or $19,593.75 plus $799.24 in expenses, for a total of $20,392.99. The combined claimed expert witness fees and expenses for both experts totals $25,335.92.

IBP claims that, although there is legal authority to award reimbursement for expert fees, those fees must be reasonable and necessary. IBP argues that the bill for services of Borgida is clearly unreasonable, because his testimony was not in depth, nor was it necessary. Borgida did provide a framework of analysis, based upon social science research, which the jury could use in its evaluation of the testimony. However, an hourly rate of $275 for a college professor, who is consulting in his spare time, seems clearly excessive. The amount of $10,000 plus

expenses, for a total of $10,799.24 is awarded toward the cost of Borgida.

IBP further claims that although Mattila's bill is more reasonable in rate, and his testimony more germane to the proceedings, his total bill is also unreasonable. The Court finds $4,942.93 is a reasonable amount for Matilla's economic expertise. The total award for expert fees and expenses is $15,742.17.

### g. Fax and Telephone

Madison claims a total of $874 in fax, and $257.82 for long distance telephone expenses, for a total of $1,087.67. Madison charges for faxing a flat rate of $5 for the first page, and $1 per page thereafter. IBP does not challenge this amount.

Based upon a review of the bills, the Court finds the amount of $257.82 for telephone charges and $175 for fax charges are reasonable, and the total amount of $432.82 is awarded for this expense.

### h. Meals and Travel

Madison claims a total of $1,646.48 in lodging, meals, and travel expenses. IBP argues the meal reimbursement expenses are unreasonable. Madison claims that all reasonable out-of-pocket expenses are recoverable because they are part of the cost normally charged to a fee-paying client. The amount of $1,646.48 is reasonable, and this amount is awarded.

### i. Witness/Mileage

Madison claims $1,180.96 in mileage expenses. IBP does not contest this amount. Based upon a review of the documentation, I find $1,180.96 is a reasonable claim, and award that amount.

### j. Postage Delivery

Madison claims a total of $521.67 in postage and delivery expenses. Generally, IBP claims Madison has waived her right to these expenses. However, IBP does not specifically contest this amount. The amount of $521.67 is reasonable, and Madison's request for this amount is granted.

### k. Online Research

Madison requests a total of $1941.88 in Westlaw® research expenses. IBP claims Madison is not entitled to research fees, because her counsel does not provide documentation of what was researched.

 In this circuit, "computer-based legal research must be factored into the attorneys' hourly rate, hence the cost of the computer time may not be added to the fee award." *Standley v. Chilhowee R–IV Sch. Dist.*, 5 F.3d 319, 325 (8th Cir. 1993).

In light of the hourly rates and hours authorized, this expense has been factored into the attorney fees, and nothing is awarded for Madison's claimed expenses for computer-aided legal research.

### l. Supplies

Madison requests $568.45 for books and supplies. IBP contests this request, citing inadequate documentation. Based upon the bills provided and observations of the supplies used at trial, the Court awards $568.45.

### D. Summary of Fees and Expenses Award

Madison's Motion in regard to attorney fees (Clerk's No. 215), with supplements, is granted in the amount of $390,865. This amount reflects the following calculations:

Fees:

| | | |
|---|---|---|
| Roxanne Conlin: | 1099 hours × $225 per hour | $247,275.00 |
| Thomas Duff: | 788 hours × $125 per hour | $ 98,500.00 |

| | | |
|---|---|---|
| Tiffany Klosener: | 41 hours × $ 90 per hour | $ 3,690.00 |
| Melinda Ellwanger: | 39 hours × $ 80 per hour | $ 3,120.00 |
| Gretchen Jensen: | 204 hours × $ 75 per hour | $ 15,300.00 |

Legal Assistants

| | | |
|---|---|---|
| Linda Wickett | 68 hours × $ 60 per hour | $ 4,080.00 |
| Wendy Hart | 129 hours × $ 50 per hour | $ 6,450.00 |
| Shelly Johnson | 45 hours × $ 50 per hour | $ 2,250.00 |

Legal Clerks

| | | |
|---|---|---|
| Brook Timmons | 27 hours × $ 50 per hour | $ 1,350.00 |
| Jean Mauss | | |
| Stephanie Sheridan | 80 hours × $ 45 per hour | $ 3,600.00 |
| Sarah Lopez | | |
| Ann Meyer | | |
| Bernice Corely | 150 hours × $ 35 per hour | $ 5,250.00 |

| | |
|---|---|
| Total | $390,865.00 |

Madison's motion in regard to costs is granted in the amount of $53,826.33. This amount reflects the following calculations:

Expenses:

| | |
|---|---|
| Investigation Expenses | $ 1,943.00 |
| Copying/Printing Expenses | $ 19,162.88 |
| Filing Fee | $ 295.60 |
| Deposition Expenses | $ 4,766.80 |
| Trial Transcript | $ 5,565.50 |
| Expert Witness Expenses | $ 15,742.17 |
| Fax & Telephone Expenses | $ 432.82 |
| Lodging/Meals Expenses | $ 1,646.48 |
| Mileage Expenses | $ 1,180.96 |
| Postage/Mail Expenses | $ 521.67 |
| Services/Research Expenses | 0 |
| Miscellaneous Expenses | $ 568.45 |

| | |
|---|---|
| *Total Costs :* | $ 53,826.33 |

| | |
|---|---|
| TOTAL FEES AND COSTS: | $444,691.33 |

IV. Conclusion and Order

Plaintiff has established her entitlement to compensatory damages, punitive damages and attorney fees on her employment discrimination and harassment claims. She is not entitled to front pay or other equitable relief. Rulings on the post-trial motions are summarized as follows:

A. Plaintiff's Motion to Amend Judgment (Clerk's No. 209) is partially granted. Based upon a reallocation of the compensatory damages awarded sexual harassment and discrimination claims, the judgment is altered, pursuant to Fed.R.Civ.P. 59(e). The judgment shall be amended to include $110,000 in compensatory damages under Iowa Code Ch. 216, for past emotional distress on the claims of sexual harassment and sexual discrimination. Thus, Plaintiff's total award on the verdict is $1,748,417. Interest is awarded as outlined below. The balance of Plaintiff's motion is denied.

B. Defendant's Motion for a New Trial (Clerk's No. 212) is denied.

C. Defendant's Renewed Motion for Judgment as a Matter of Law (Clerk's No. 213) is denied.

D. Defendant's Motion to Alter or Amend the Judgment (Clerk's No. 214) is denied.

E. Plaintiff's Claim for Equitable Relief (Clerk's No. 174) is denied.

F. Plaintiff's Application for Attorney Fees and Costs (Clerk's No. 215) is granted. Judgment is entered in the amount of $444,691.33 for attorney fees and costs, plus post-judgment interest as allowed by law.

G. Prejudgment interest is awarded on the sex-discrimination backpay and emotional-distress awards pursuant to Iowa Code § 535.3 from the date of the commencement of this action, September 18, 1996, at the statutory rate set by Iowa Code § 668.13(3). Prejudgment interest on the backpay award on the racial-harassment claims, but not the emotional-distress portion of these claims from the date of the commencement of this action, is granted at the rate specified in 28 U.S.C. § 1961(a), which is 5.67 percent. Madison's claim for prejudgment interest on punitive damages is denied.

H. Post-judgment interest is awarded on the entire judgment pursuant to 28 U.S.C. § 1961(a), at the rate of 5.67 percent from the date of the judgment entry until paid.

IT IS SO ORDERED.